UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------

DONALD GRAHAM,

                              Plaintiff,

           -against-                          15-Cv-10160(SHS)

RICHARD PRINCE, GAGOSIAN                 OPINION & ORDER
GALLERY, INC., and LAWRENCE
GAGOSIAN

                           Defendants.

-------------------------------------------------------------

SIDNEY H. STEIN, U.S. District Judge.

## Table of Contents

I.    **Background**................................................................**3**

    A.  The Parties ....................................................................3

    B.  Graham's *Rastafarian Smoking a Joint* .................................4

    C.  Prince's *Untitled* and *New Portraits* Exhibition ....................5

    D.  Plaintiff's Cease and Desist Letter and Defendants' Subsequent
        Use of the Image .........................................................7

    E.  This Action ..................................................................10

II.   **Motion to Dismiss Standard** .................................................**10**

III.  **Fair Use**.........................................................................**11**

    A.  Legal Standards ...........................................................11

    B.  Application of the Fair Use Factors.....................................15

        1. Purpose and Character of the Use.................................16

            a.  Transformative use……………………………………16

            b.  Commercial Use……………………………………20

        2. Nature of the Work.................................................21

        3. Amount and Substantiality .......................................21

        4. Effect on the Potential Market for the Copyrighted Work ........22

     5. Application of the Fair Use Factors to the Billboard and the
        Twitter Compilation ........................................................................24

**IV.** **Defendants' Request for Conversion to Motion for Summary**
    **Judgment ..................................................................................26**

**V.**   **Limitation of Damages................................................................26**

   A.   Actual Damages and Infringers' Profits...........................................26

      1. Actual Damages.........................................................................27

      2. Infringers' Profits ......................................................................28

   B.   Statutory Damages, Attorneys' Fees, and Costs .............................29

      1. Statutory damages and attorneys' fees.........................................30

      2. Costs........................................................................................31

   C.   Punitive Damages....................................................................32

**VI.**  **Conclusion..................................................................................32**

Donald Graham brings this action against Richard Prince, Gagosian Gallery, Inc., and Lawrence Gagosian for copyright infringement arising out of Prince's failure to seek Graham's permission to use one of his photographs in creating the "appropriation art" for which Prince is well known. Prince used Graham's photograph, *Rastafarian Smoking a Joint*, to create an artwork known as *Untitled (Portrait)* ("*Untitled*"), which was featured by defendants as part of an exhibition called *New Portraits*, as well as in the catalog for that exhibition, a billboard displayed in New York, and in a post by Prince on the social media platform Twitter.

Defendants have asserted the affirmative defense of fair use and moved to dismiss the Corrected Amended Complaint (the "Complaint"), with prejudice. In the alternative, defendants ask the Court to convert their motion into a motion for summary judgment pursuant to Fed. R. Civ. P. 12(d). Defendants also urge the Court to limit, as a matter of law, Graham's damages claims to any profits obtained from the sale of *Untitled*; to restrict the bounds of possible statutory damages, attorneys' fees, and costs that plaintiff may recover; and to bar plaintiff from seeking punitive damages.

Because the affirmative defense of fair use requires the Court to engage in a fact-sensitive inquiry that cannot be completed – in this case – on a motion to dismiss the complaint, defendants' motion is denied. In addition, because discovery will be necessary to conduct the fair use inquiry, the Court declines

to convert this motion into a motion for summary judgment.  With respect to defendants' request to limit Graham's potential damages, the Court grants defendants' request to bar Graham from seeking punitive damages but otherwise denies that request.

I.   **BACKGROUND**

The following facts are as alleged in the Complaint and are taken as true solely for purposes of this motion:

A.   **The Parties**

Plaintiff Donald Graham, the creator of the original photograph *Rastafarian Smoking a Joint* (*see* Fig. 1 annexed to this Opinion), is a professional photographer who specializes in portraiture.  (Compl. ¶ 14.)  Graham began his career in 1983 and his fine artwork has been exhibited at prominent museums and art galleries throughout the world.  (*Id.* ¶¶ 14, 18.)  Graham has not only received commissions to create photographs for commercial purposes but has also licensed his commercial work to numerous publications.  (*Id.* ¶ 14.)  However, "[i]n order to protect its art market value," Graham generally does not license his fine art photography.  (*Id.* ¶ 23.)

Defendant Richard Prince is a well-known "appropriation artist" who created the allegedly infringing print known as *Untitled (Portrait)* ("*Untitled*") (*see* Fig. 2 annexed to this Opinion) by "cop[ying]," "reproduc[ing]," and "modif[ying]" Graham's *Rastafarian Smoking a Joint* photograph.  (*Id.* ¶¶ 4, 31.)  Prince has built his career on "reproducing, modifying or preparing derivative works from the works of others, typically without permission, and selling [them] as his own."  (*Id.* ¶ 15.)  Prince's appropriation of others' works has subjected him to copyright litigation in the past; he has previously appeared as the defendant-appellant in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013).  (*See id.* ¶¶ 26, 47.)

Defendant Gagosian Gallery owns and operates art galleries in various cities, including one at 976 Madison Avenue, New York, NY.  According to the Complaint, Gagosian Gallery has been Prince's primary gallery and agent.  (*Id.* ¶¶ 5, 16.)  Defendant Lawrence Gagosian is the controlling shareholder of Gagosian Gallery.  (*Id.* ¶ 17.)  That gallery displayed and promoted Prince's

*Untitled* in September and October of 2014 as part of an exhibition of works by Prince entitled *New Portraits* (*id.* ¶ 4), and Gagosian himself allegedly purchased *Untitled* "at or prior to the conclusion" of that exhibition (*id.* ¶¶ 5, 40).

### B.   Graham's *Rastafarian Smoking a Joint*

The original photograph at issue in this case is *Rastafarian Smoking a Joint*. It is a black-and-white portrait that, as its title suggests, depicts a Rastafarian man with long dreadlocks, standing shirtless against a white background, smoking a marijuana cigarette. (Compl., Ex. A; *see* Fig. 1 annexed to this Opinion.) Graham captured the image during a two-week trip to rural Jamaica in 1996, during which he sought to depict "the Rastafarian people in their surrounding environment." (*Id.* ¶ 19.) Graham alleges that he was able to take these photographs only after gaining the trust of his Rastafarian subjects by "convinc[ing]" them "that his purposes were artistic." (*Id.*)

Graham first published *Rastafarian Smoking a Joint* in August 1998 and the work was recognized for its "artistic merit" when it was included, under license, in *Communication Arts* magazine's "Photography Annual 39" edition. (*Id.* ¶ 21.) Since then, Graham has sold prints of the photograph to "fine art collectors" in limited editions and sizes. The photograph is available in an edition of eight prints – which are 4 ft. by 5 ft. – and an edition of twenty-five prints – which are 20 in. by 24 in. (*Id.* ¶ 22.) Graham's photograph is digitally available on his websites but Graham has never "licensed" or "made [*Rastafarian Smoking a Joint*] available for any [other] commercial purpose." (*Id.* ¶ 23).

Graham did not register *Rastafarian Smoking a Joint* with the U.S. Copyright Office until October 20, 2014 – after becoming aware that Prince had appropriated it to create his own artwork.[1] (*Id.* ¶¶ 20, 39, Ex. C.)

---

[1] Graham has since applied for supplemental registration in order to correct the date of first publication listed on the registration; that date should be 1998, not 1999. (Compl. ¶ 20 n.1, Ex. C.)

### C.   Prince's *Untitled* and *New Portraits* Exhibition

Graham alleges that Prince willfully infringed his copyright in *Rastafarian Smoking a Joint* by incorporating the photograph into *Untitled*, a 2014 work that was part of Prince's *New Portraits* exhibition, which was originally displayed at the Gagosian Gallery's Madison Avenue location in New York in September and October of 2014.  (Compl. ¶ 4.)

Prince's *Untitled* is a 4 ft. ¾ in. by 5 ft. ¾ in. inkjet print of a screenshot taken by Prince that captures a "post" made by a user named "rastajay92" on the social media platform Instagram.[2]  (*Id*. ¶ 29, Ex. B; *see* Fig. 2 annexed to this Opinion.)  A screenshot is, in this instance, a digital copy of an Instagam post. Rastajay92's post consists of a slightly cropped copy of *Rastafarian Smoking a Joint* (*id*. ¶¶ 31(a), (b)), which he reproduced without Graham's permission (*id*. ¶¶ 4, 34).  In fact, rastajay92 had "reposted" a copy of the photograph that had previously been posted by yet another Instagram user, "indigoochild*."  (Id*. ¶¶ 31(b), 32.)  When rastajay92 reposted the image, he also commented: "Real Bongo Nyah man a real Congo Nyah [emoji[3] of a raised fist]."  (*Id*. ¶ 31(b).) This is a transliteration of the chorus to a reggae song by recording artist Stephen Marley, Bob Marley's son.[4]  (*Id*. ¶¶ 32-33.)  Rastajay92's comment also attributes his post to indigoochild by stating: "repost @indigoochild."  (*Id*. ¶ 32.)

After Prince encountered rastajay92's post on Instagram, he used the username "richardprince4," to add a comment of his own: "Canal Zinian da lam jam [emoji of a raised fist]."  (*Id*. ¶ 31(b).)  Prince then took a screenshot of

---

[2] Instagram, which is owned by Facebook, Inc., describes itself as "a fun and quirky way to share your life with friends through a series of pictures."  (Compl. ¶ 30.)  The platform allows users to "post" images online to share with their "followers" or the public. Instagram also permits users to "like" or comment on one another's image posts.

[3] Emojis are small, stylized images used to express ideas and emotions or to depict objects in electronic communications.  Users can comment on Instagram using emojis.

[4] Bob Marley is a "renowned Rastafarian reggae artist," according to the Complaint. (Compl. ¶ 33.)

rastajay92's Instagram post, which now included his own comment,[5] as well as the other elements of the Instagram graphic interface: rastajay92's username and comment, the number of "likes" rastajay92's post had received – 128 in this instance – and the number of weeks that elapsed between rastajay92's post and Prince's screenshot – three weeks here.  (*Id.* ¶ 34.)  Prince then printed – or arranged for someone else to print – the screenshot onto canvas in order to create the final artwork at issue in this litigation:  *Untitled.*  (*Id.* ¶ 34, Ex. B; *see* Fig. 2.)




Graham's *Rastafarian Smoking a Joint* (Fig. 1)          Prince's *Untitled* (Fig. 2)

---

[5] When multiple users comment on a post, those comments appear directly under the image in the order they are made.  However, Prince allegedly discovered a way to "hack into" Instagram so that he could "swipe away" other users' comments in order to make his own comment appear in closer proximity to the original post.  (Compl. ¶ 37.)  This ensured that both the post and his comment would appear in a single screenshot.

As noted above, *Untitled* was part of a broader exhibition of Prince's work – the *New Portraits* exhibition – which was displayed in Gagosian's Madison Avenue gallery in September and October of 2014. *Untitled* itself was sold to defendant Lawrence Gagosian "at or prior to the conclusion" of the *New Portraits* exhibition. (*Id.* ¶ 40.) The thirty-six other works in *New Portraits* also feature prints of Instagram screenshots by Prince and were created in much the same way as *Untitled*.[6] (*Id.* ¶¶ 29, 36.) In his own description of this exhibition, Prince characterized the comments he wrote in those Instagram posts as "gobblygook" and "inferior language" that "sounds like it means something." (*Id.* ¶ 36.)

According to Graham, while the *New Portraits* exhibition was ongoing, "[o]ne or more of the Defendants" used *Untitled* to promote the exhibition through websites (*id.* ¶ 43) and through the exhibition's catalog, which "prominently featured" the work (the "Catalog") (*id.* ¶¶ 6, 42).

### D.  Plaintiff's Cease and Desist Letter and Defendants' Subsequent Use of the Image

Graham learned about *Untitled* in "early October 2014" when a friend "recognized" Graham's *Rastafarian Smoking a Joint* image while attending the *New Portraits* exhibition. (Compl. ¶ 39.) Several months later, on February 12, 2015, Graham sent Prince and Gagosian Gallery a cease and desist letter. (*Id.* ¶ 44.)

Graham alleges that, in spite of receiving the cease and desist letter, Prince continued to make unauthorized use of *Rastafarian Smoking a Joint*. In particular, Prince allegedly engaged an agent to "produce and display" a billboard featuring a photograph of *Untitled* (the "Billboard") on a "rooftop observable from a busy Manhattan highway." (*Id.* ¶¶ 45, 101, Ex. D; *see* Fig. 3 annexed to this Opinion.) The Billboard was on display for "several months, until at least July 2015" (Compl. ¶ 45), but it is not clear from the Complaint

---

[6] At least one *New Portraits* work was created by printing a screenshot of Prince's own Instagram post, "without relying on copying the Instagram post of any other Instagram user." (Compl. ¶ 38.)

whether it was erected before the *New Portraits* exhibition closed in October 2014.



The Billboard (Fig. 3)

After Graham filed this lawsuit on December 30, 2015 (*id.* ¶ 52), Prince has occasionally posted on Twitter ("tweeted") about fair use and this lawsuit in particular[7] (*see id.* ¶¶ 53-59).  On or about January 6, 2016, Prince tweeted a photograph of an "unidentified person with dreadlocked hair" (apparently,

---

[7] For instance, Prince tweeted photographs of works from his *New Portraits* exhibition, along with the message:  "You can't sue me if its [sic] not for sale.  You can call me asshole lazy shit.  But you can't sue me."  (Compl. ¶ 59.)  Another of Prince's tweets included a copy of *Untitled*, accompanied by the comment:  "U want fame?  Take mine. Only thing that counts is good art.  All the everything else is bullshit."  (*Id.* ¶ 53.)

*not* the subject of Graham's *Rastafarian Smoking a Joint*), accompanied by the message:  "My lawyers say I can't post Richard Avedon[8] portrait of Rastaj's post of man with dreads smoking weed.  I'm mixed up."  (*Id.* ¶ 55.)  Later that same day, Prince posted a compilation of two somewhat blurry images to Twitter (the "Twitter Compilation"), one of which allegedly features a copy of Graham's *Rastafarian Smoking a Joint*.  (Compl. ¶ 56, Ex. G; *see* Fig. 4 annexed to this Opinion.)



The Twitter Compilation (Fig. 4)

---

[8] Richard Avedon is a well-known portrait photographer whose works have been featured at the Gagosian Gallery.  (Compl. ¶ 55.)

Prince's Twitter Compilation contains a cropped, lower-resolution version of Graham's photograph, which cuts out the Rastafarian subject's torso and includes only the subject's face, hands, and marijuana cigarette. The image is not framed in an Instagram post (*id.* ¶ 57), and is instead accompanied by a blurry color photograph from an unknown source and the following statement: "Booze Pot Sex.  I guess I was wrong.  (Memo to Turner: I DID NOT take make create this montage)" (*id.* ¶ 56; *see* Fig. 4).

Graham alleges that Prince, Gagosian Gallery, and Gagosian never asked for or obtained permission to reproduce, modify, distribute, or display *Rastafarian Smoking a Joint* in *Untitled*, the Catalog, the Billboard, the Twitter Compilation, or in any other work.  (*Id.* ¶¶ 4-8, 46.)

### E.   This Action

Graham's Complaint asserts three separate claims of willful copyright infringement against Prince for (1) the *Untitled* work displayed in the *New Portraits* exhibition and its Catalog, (2) the Billboard, and (3) the Twitter Compilation.[9]  Graham also asserts separate claims of willful copyright infringement against Gagosian Gallery and Lawrence Gagosian on the basis of *Untitled* and the Catalog.  He seeks declaratory relief; injunctive relief, including orders of seizure, forfeiture, and destruction of the various works at issue; statutory or actual damages; and attorneys' fees and costs.

## II.   MOTION TO DISMISS STANDARD

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted addresses the sufficiency of the pleading, rather than the merits of a claim.  To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint should be

---

[9] Because Graham's photograph had not yet been registered with the Copyright Office at the time the *New Portraits* exhibition commenced, he only alleges infringement of a registered copyright with respect to the second and third claims.  (*See* Compl. ¶¶ 66, 70.)

dismissed where the claims have not been "nudged . . . across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

In evaluating a motion to dismiss a complaint pursuant to Fed. R. Civ. P. 12(b)(6), a court accepts the truth of the facts alleged in the complaint and draws all reasonable inferences in the plaintiff's favor. *TCA Television v. McCollum*, 839 F.3d 168, 177 (2d Cir. 2016). The court "do[es] not look beyond facts stated on the face of the complaint, . . . documents appended to the complaint or incorporated in the complaint by reference, and . . . matters of which judicial notice may be taken." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (citation omitted); *see also Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993).

## III. FAIR USE

### A.   Legal Standards

As embodied in the United States Constitution, the purpose of copyright is "[t]o promote the Progress of Science and useful Arts." U.S. Const. art. I, § 8, cl. 8. To effectuate this purpose, copyright law grants creators a limited monopoly over the dissemination of their original works. *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 95 (2d Cir. 2014). The doctrine of "fair use" is an important limitation on the original creator's monopoly rights. This doctrine, as codified in the Copyright Act of 1976, provides that "the fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching . . . , scholarship, or research, is not an infringement of copyright." 17 U.S.C. § 107. Thus, fair use is a complete bar to liability for copyright infringement.

The determination of fair use is a "mixed question of fact and law," which necessitates "an open-ended and context-sensitive inquiry," *Cariou v. Prince*, 714 F.3d 694, 704-05 (2d Cir. 2013) (citations omitted). Courts conduct this inquiry by considering four non-exclusive factors:

> (1) "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes";

> (2) "the nature of the copyrighted work";

(3) "the amount and substantiality of the portion used in relation to the copyrighted work as a whole"; and

(4) "the effect of the use upon the potential market for or value of the copyrighted work."

17 U.S.C. § 107.

These factors must be "weighed together, in light of the purposes of copyright." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578 (1994). Nonetheless, the first factor, and in particular a sub-factor called "transformativeness," is at "[t]he heart of the fair use inquiry." *Blanch v. Koons*, 467 F.3d 244, 251 (2d Cir. 2006) (citation omitted). If the allegedly offending use of the original work is "transformative" – that is, if it "alter[s] the first [work] with new expression, meaning, or message," *Campbell*, 510 U.S. at 579 – it is likely to be "the very type of activity that the fair use doctrine intends to protect for the enrichment of society," *Cariou*, 714 F.3d at 706 (quoting *Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 142 (2d Cir. 1998)). *But see TCA Television Corp. v. McCollum*, 839 F.3d 168, 183 n.13 (2d Cir. 2016).

A court cannot engage in the fair use inquiry until it has been presented with facts relevant to evaluating the fair use factors. *See Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 560 (1985) (an appellate court may determine that the fair use defense applies as a matter of law when there are "facts sufficient to evaluate each of the statutory factors"). Due to the fact-sensitive nature of the inquiry, courts generally do not address the fair use defense until the summary judgment phase. *TCA*, 839 F.3d at 178. Although the Second Circuit has "acknowledged the possibility of fair use being so clearly established by a complaint as to support dismissal of a copyright infringement claim," *TCA*, 839 F.3d at 178, there is a "dearth of cases granting" a motion to dismiss on the basis of fair use. *BWP Media USA, Inc. v. Gossip Cop Media, LLC*, 87 F. Supp. 3d 499, 505 (S.D.N.Y. 2015); *see also Browne v. McCain*, 612 F. Supp. 2d 1125, 1130 (C.D. Cal. 2009) ("[I]n light of a court's narrow inquiry [at the motion to dismiss stage] and limited access to all potentially relevant and material facts needed to undertake the [fair use] analysis, courts rarely analyze fair use on a [Rule] 12(b)(6) motion."). In fact, the Second Circuit has stated that "the fact-driven nature of the fair use determination suggests

12

that a district court should be cautious in granting *Rule 56 motions* in this area."
*Wright v. Warner Books, Inc.*, 953 F.2d 731, 735 (2d Cir. 1991) (emphasis added).

The Second Circuit's decision in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) – essentially a prequel to this action, but arising in the context of a summary judgment motion – illustrates the application of the statutory fair use factors to cases involving appropriation art.   In *Cariou*, the photographer Patrick Cariou sued our selfsame defendants – Prince, Gagosian, and Gagosian's gallery – for infringing on Cariou's copyrighted photographs of Jamaican Rastafarians.  *Cariou*, 714 F.3d at 698.  At issue were thirty paintings and collages that Prince made for an exhibition called *Canal Zone*.  Prince made those works by copying and enlarging but also altering photographs of Rastafarians that Cariou had published in a 2000 book called *Yes Rasta*.  *Id.* at 698-700.  The district court granted summary judgment in Cariou's favor and Prince appealed.  A panel of the Second Circuit reversed in part, vacated in part, and remanded, holding that twenty-five of the thirty works were protected by fair use.  *Id.* at 712.  The remaining five works, each of which involved "relatively minimal alterations," were remanded to the district court because that court was "best situated to determine, in the first instance," whether these alterations constituted fair use.   *Id.* at 711.   The parties subsequently settled their dispute with respect to those five works.  *See* Stipulation of Voluntary Dismissal with Prejudice, *Cariou v. Prince*, No. 08-cv-11327 (S.D.N.Y. Apr. 19, 2014), ECF No. 129.

In its analysis, the Second Circuit placed the most significance on the transformativeness sub-factor of the first fair use factor – "the purpose and character of the use," 17 U.S.C. § 107(1).  The majority adopted an objective viewer test to determine whether the new works were transformative, noting that "[w]hat is critical is how the work in question appears to the *reasonable observer*, not simply what an artist might say about a particular piece or body of work."   *Id.* at 707 (emphasis added).   After conducting a "side-by-side" comparison of Cariou's "serene and deliberately composed" photographs and Prince's "crude and jarring" artworks, *id.* at 706-07, the majority concluded that a reasonable observer would find that twenty-five of Prince's works "employ[ed] new aesthetics" and created "a new expression."  *Id.* at 707-08. The majority stressed the substantial aesthetic differences between the works, pointing out that Prince "fundamentally" altered the original photographs'

"composition, presentation, scale, color palette, and media." *Id.* at 706. These changes were sufficient to render twenty-five of the thirty *Canal Zone* works at issue transformative as a matter of law. *Id.* at 707.

Although the majority recognized that the works were undoubtedly "commercial" in purpose, it "[did] not place much significance on that part of the first statutory factor due to the transformative nature of the work." *Id.* at 708.

In analyzing the second statutory factor – "the nature of the copyrighted work," 17 U.S.C. § 107(2) – the Second Circuit panel considered "whether the [original] work is expressive or creative," and "whether the work is published or unpublished, with the scope for fair use involving unpublished works being considerably narrower." *Id.* at 709-10 (citations omitted). The majority found that although the fact that Cariou's photographs were "creative and published" did weigh against a fair use determination, this factor was "of limited usefulness" where Prince's secondary work was "being used for a transformative purpose." *Id.* at 710 (citations omitted).

The majority found that third factor – "the amount and substantiality of the portion used in relation to the copyrighted work as a whole," 17 U.S.C. § 107(3) – was also dependent upon the degree to which the original use was transformative. The majority explained that this factor requires a consideration of "whether the quantity and value of the materials used[ ] are reasonable in relation to the *purpose* of the copying." *Cariou*, 714 F.3d at 710 (quoting *Blanch v. Koons*, 467 F.3d 244, 257 (2d Cir. 2006)) (emphasis added). Because the majority found twenty-five of Prince's works to be so thoroughly transformative, it concluded that this factor weighed "heavily" in Prince's favor for those works even though Prince had gone so far as to make use of the "entire source photograph[s]" in certain of those twenty-five works. *Id.* at 710.

The majority's inquiry with respect to the final factor – "the effect of the use upon the potential market for or value of the copyrighted work," 17 U.S.C. § 107(4) – focused on whether Prince's use of Cariou's photographs "usurp[ed]" either the market for Cariou's original works or markets for derivative works that Cariou "would in general develop or license others to develop." *Cariou*, 714 F.3d at 708-09 (quotation marks and citation omitted). Such usurpation occurs when "the [accused] infringer's target audience and

14

the nature of the infringing content is the same as the original." *Id.* at 709.  In *Cariou*, the fourth factor weighed in Prince's favor because the record established that "Prince's work appeals to an entirely different sort of collector than Cariou's" and because "nothing in the record . . . suggest[s] that Cariou would ever develop or license secondary uses of his work in the vein of Prince's artworks." *Id.*

With respect to the five works that were remanded to the *nisi prius* court, the Second Circuit majority found that there were "closer questions" as to whether they were sufficiently transformative to be fair use as a matter of law, which precluded the panel from making a fair use determination.  *Id.* at 710.  The majority explained that, by painting color guitars, "cartoonish appendages," and lozenges over eyes and mouths of the subjects in Cariou's paintings, Prince made them appear "anonymous" and "not quite human," as opposed to "strong individual[s]" in their "natural habitat[s]," as Cariou had presented them.  *Id.* at 711.  The majority also identified a difference in mood between Prince's works on one hand, which combined "divergent elements to create a sense of discomfort," and Cariou's photographs on the other, which presented human subjects "comfortably at home in nature."  *Id.*  Nevertheless, the majority considered these changes to be relatively "minimal alterations" because the two works were "still similar in key aesthetic ways."  *Id.*  The majority determined that it was unable to say "with certainty" whether the pieces were transformative as a matter of law.  *Id.*  In other words, the Second Circuit was unable to decide whether or not the "reasonable observer" would take away a new message or meaning from these five works simply by looking at them side-by-side.[10]

## B.   Application of the Fair Use Factors

Since it is conceivable – albeit highly unlikely – that a fair use affirmative defense can be addressed on a motion to dismiss, *see TCA Television*

---

[10] Judge J. Clifford Wallace concurred in part and dissented in part because he did not believe the appellate court was well positioned to make "fact- and opinion-intensive decisions on the twenty-five works" and instead wanted to remand for the district court to "take such additional testimony as needed," in order to analyze *all* of Prince's works pursuant to the correct standard.  *Cariou*, 714 F.3d at 714 (Wallace, *J.*, concurring in part and dissenting in part).

*Corp. v. McCollum*, 839 F.3d 168, 178 (2d Cir. 2016), the Court reviews defendants' allegedly infringing uses of Graham's *Rastafarian Smoking a Joint* by considering the four fair use factors in light of the factual allegations of the Complaint and its exhibits.  Because the principal allegedly infringing use at issue in this litigation is Prince's *Untitled* print, the Court focuses its inquiry on this particular work.

As explained below, this is not a case in which the "open-ended and context-sensitive" fair use inquiry, *Cariou v. Prince*, 714 F.3d 694, 705 (2d Cir. 2013), can be properly applied at the motion to dismiss stage.  Defendants' motion is premised on the supposition that *Untitled* is transformative as a matter of law and that crediting its transformative character compels a finding that the other fair use factors also weigh decidedly in defendants' favor.  This logical chain breaks at the first link; the Second Circuit's precedents do not support a finding that *Untitled* is transformative as a matter of law.  Moreover, because the Court can only review the narrow set of facts that appear in the Complaint and its appended exhibits – and because all of the plausible factual allegations contained in those documents must be viewed in the light most favorable to the plaintiff – the Court cannot conclude that *any* of the four fair use factors favors defendants.

### 1.  Purpose and Character of the Use

As the Second Circuit's analysis in *Cariou* demonstrates, the "purpose and character of the use" factor, and in particular, whether or not a use is transformative, has a significant impact on the remainder of the fair use inquiry.  In this case, because Prince's *Untitled* does not make any substantial aesthetic alterations to Graham's *Rastafarian Smoking a Joint*, a simple side-by-side comparison of the two works is insufficient to show that Prince made transformative use of Graham's original as a matter of law.  As a result, the first factor does not support a finding of fair use at this motion to dismiss stage.

#### a.  Transformative use

Defendants contend that Prince has made a transformative use of *Rastafarian Smoking a Joint* because a "reasonable viewer" would recognize that Prince uses Graham's photograph simply as "raw material," *Blanch v. Koons*, 467 F.3d 244, 253 (2d Cir. 2006), to convey a number of potential messages, any

one of which is new and distinct from Graham's effort to "capture[ ] the spirit and gravitas of the Rastafarian people" (Compl. ¶ 19). These possible new messages include: "a commentary on the power of social media to broadly disseminate others' work," an endorsement of social media's ability to "generate[ ] discussion of art," or a "condemnation of the vanity of social media." (Defs.' Mem. Supp. Mot. Dismiss ("Defs.' Mem.") 16.) Graham, however, contends that Prince's placing of Graham's photograph into a social media frame and adding a single line of what Prince himself calls "gobblygook" ("Canal Zinian da lam jam [emoji of a raised fist]") cannot be transformative.[11] According to Graham, because *Untitled*'s "predominant aesthetic feature" is still Graham's black-and-white portrait of his Rastafarian subject, Prince's piece simply "exploit[s] the creative virtues of [Graham's] original work." (Pl.'s Mem. Opp. Mot. Dismiss ("Pl.'s Mem.") 9 (citing *Blanch*, 467 F.3d at 252).)

Viewing Graham's *Rastafarian Smoking a Joint* and Prince's *Untitled* side-by-side, it is evident that Prince's work does *not* belong to a class of secondary works that are so aesthetically different from the originals that they can pass the Second Circuit's "reasonable viewer" test as a matter of law. *Cf. Cariou*, 714 F.3d at 706 (twenty-five of Prince's *Canal Zone* works were transformative because they "manifest[ed] an entirely different aesthetic" from the original appropriated photographs). *Untitled* is certainly no more transformative than the five works in *Cariou* that the Court of Appeals remanded to the district court. The Court of Appeals recognized that the moods and expressions evoked by those five remanded artworks did differ from those of Cariou's original work, but nonetheless concluded that those five works were simply too "similar in key aesthetic ways" to the originals to be transformative as a matter of law. *Id.* at 711.

The reader of this Opinion – perhaps a reasonable observer – is invited to perform his or her own side-by-side comparison of Graham's *Rastafarian*

---

[11] The Complaint does not explain the meaning of "Canal Zinian da lam jam," but at oral argument, defense counsel postulated that Prince may have used this phrase to "invent[ ] a song" referring either to the Stephen Marley lyrics quoted by rastajay92 or a "prior litigation" involving Prince. (Oral Argument on Defs.' Mot. Dismiss, Tr. at 15:12-18, Apr. 19, 2017, ECF No. 52.)

*Smoking a Joint* and Prince's *Untitled*.  That observer must conclude that Prince's *Untitled* does not so "heavily obscure[ ] and alter[ ]" Graham's *Rastafarian Smoking a Joint* that it renders the original photograph "barely recognizable." *Cariou*, 714 F.3d at 710.  The primary image in both works is the photograph itself.  Prince has not materially altered the "composition, presentation, scale, color palette, and media" originally used by Graham.  *Cariou*, 714 F.3d at 706. In fact, the "alterations" Prince made in this case are materially less significant than those that were found to be insufficiently transformative to clearly warrant a finding of fair use in *Cariou*.  Prince created those five remanded works by extensively cropping, collaging, and tinting the originals, and he superimposed new and incongruous elements – including color guitars, lozenges, and "cartoonish appendages" – over Cariou's classical black-and-white photographs.  *Id.* at 711.  Here, *Untitled* simply reproduces the entirety of Graham's photograph – with some *de minimis* cropping – in the frame of an Instagram post, along with a cryptic comment written by Prince.

There is no question that, notwithstanding Prince's additions, Graham's unobstructed and unaltered photograph is the dominant image in *Untitled*. This characteristic distinguishes the work from other appropriation art, such as the painting by Jeff Koons at issue in *Blanch v. Koons*, 467 F.3d 244 (2d Cir. 2006), which was found to be fair use.  In *Blanch*, a case relied upon heavily by defendants, the Second Circuit affirmed the district court's decision granting summary judgment to Koons after discovery proceedings were completed, finding that Koons had made fair use of a fashion magazine photograph of a woman's legs resting on a man's lap in an airplane cabin.  Koons incorporated the legs from that photograph into a massive collage painting featuring three *other* pairs of women's legs, "dangling prominently over images of confections," including trays of pastries and ice-cream, "with a grassy field and Niagara Falls in the background."  *Blanch*, 467 F.3d at 247.  The Second Circuit relied on Koons's testimony – available to it as part of the summary judgment record – that he had "transformed" the photograph by using it as "fodder for his commentary on the social and aesthetic consequences of mass media."  *Id.* at 253.  However, the court in *Blanch* also highlighted how Koons "change[d] . . . [the image's] colors, the background against which it is portrayed, the medium, the size of the objects pictured, [and] the objects' details."  *Id.*  These aesthetic changes contributed to Koons's stated transformative purpose and

ensured that the new work did not merely "exploit the creative virtues of the original work." *Id* at 252.

No similar aesthetic alterations are present in *Untitled*. *Cf. Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 611 (2d Cir. 2006) (affirming grant of summary judgment in favor of publishers that had included miniaturized copies of plaintiff's posters in a book in part because the book "minimized the expressive value" of the original images "by combining them with a prominent timeline, textual material, and original graphical artwork, to create a collage of text and images on each page of the book"); *see also North Jersey Media Group, Inc. v. Pirro*, 74 F. Supp. 3d 605, 615 (S.D.N.Y. 2015) (denying defendant's summary judgment motion where an unaltered original photograph was juxtaposed with another photograph and re-posted on Facebook, along with a comment, because "[t]he [original photograph] [was] the clearly predominant feature of the [secondary image]" and "Second Circuit authority suggests that more is required to 'transform' an image" as a matter of law).

Because Prince's *Untitled* is not transformative as a matter of law, the Court cannot determine on a motion to dismiss that a "reasonable viewer" would conclude that Prince's alterations imbued the original work "with new expression, meaning, or message." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994).   Given Prince's use of essentially the entirety of Graham's photograph, defendants will not be able to establish that *Untitled* is a transformative work without substantial evidentiary support.   This evidence may include art criticism, such as the articles accompanying defendants' briefing, which the Court may not consider in the context of this motion.   *See Island Software & Comput. Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 261 (2d Cir. 2005) (a court may only take judicial notice of facts that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned") (citing Fed. R. Evid. 201(b)).   In addition, although an artist's stated intent is "not dispositive" in determining whether his or her work is transformative, it is also not irrelevant.   *Cariou*, 714 F.3d at 707 (noting that if Prince had "explain[ed] and defend[ed] his use as transformative," it

"might have lent strong support to his defense").[12]  Being limited to an analysis of the pleadings on this motion, the Court cannot determine that the transformativeness sub-factor weighs in Prince's favor.

### b.   Commercial Use

The second part of the purpose and character inquiry considers whether the allegedly infringing work was made for a "commercial" purpose.  The core concern addressed by this sub-factor is "the unfairness that arises when a secondary user makes unauthorized use of copyrighted material to capture significant revenues as a direct consequence of copying the original work." *Blanch v. Koons*, 467 F.3d 244, 253 (2d Cir. 2006) (quoting *Am. Geophysical Union v. Texaco, Inc.*, 60 F.3d 913, 922 (2d Cir. 1994)).  The "greater the private economic rewards reaped by the secondary user (to the exclusion of broader public benefits), the more likely the first [statutory] factor will favor the copyright holder." *Id.*  Nevertheless, because "nearly all" fair uses of copyrighted works are conducted for profit, the Second Circuit has cautioned that "[t]he more transformative the new work, the less will be the significance" of the commercial sub-factor.  *Cariou*, 714 F.3d at 708 (citation omitted).

*Untitled*, along with the Catalog for Prince's *New Portraits* exhibition, are both commercial works.  Although "[t]he public exhibition of art is widely . . . considered to have value that benefits the broader public interest," *Blanch*, 467 F.3d at 254 (quotation marks and citations omitted), this does not eliminate the commerciality of a piece of art exhibited at and sold by a commercial art gallery.  Public benefits are especially limited in this case because *Untitled* was only displayed to the public at the Gagosian Gallery for approximately one month. (Compl. ¶¶ 29, 40.)  In *Cariou*, the Second Circuit concluded that "there is no question" that Prince's *Canal Zone* works, which were similarly exhibited

---

[12] Especially in a case such as this one – where Prince made use of Graham's photograph in a way that is not transformative as a matter of law and where defendants posit that the new work comments on the concept of social media, rather than on anything in Graham's original portrait – evidence about the possible justifications for Prince's wholesale copying will become relevant as this action proceeds. *See TCA Television Corp. v. McCollum*, 839 F.3d 168, 182 (2d Cir. 2016); *Authors Guild v. Google, Inc.*, 804 F.3d 202, 215 (2d Cir. 2015).

for a few weeks at the Gagosian Gallery prior to sale, "are commercial." *Cariou*, 714 F.3d at 703, 708. But, perhaps more significantly for this motion, *Cariou* shows that even a distinctly commercial purpose will be discounted if the work is sufficiently transformative. Here, due to the Court's inability on this motion to dismiss to determine transformativeness conclusively, it is impossible to definitively assess the commerciality sub-factor.

### 2. *Nature of the Work*

The second fair use factor focuses not on the allegedly infringing use, but rather on the original work. It recognizes that works that are "expressive or creative" and "published" are "closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when [these] works are copied." *Cariou v. Prince*, 714 F.3d 694, 709-10 (2d Cir. 2013) (citing *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 586 (1994)). Because defendants do not dispute that *Rastafarian Smoking a Joint* was both creative and published, this factor favors Graham.

### 3. *Amount and Substantiality*

The third factor in the fair use inquiry is "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). The Court must consider "whether the quantity and value of the materials used[ ] are reasonable in relation to the purpose of the copying." *Cariou v. Prince*, 714 F.3d 694, 710 (2d Cir. 2013) (citing *Blanch v. Koons*, 467 F.3d 244, 257 (2d Cir. 2006)).

Verbatim copying of an entire copyrighted work militates against a finding of fair use. *See, e.g.*, *BWP Media USA, Inc. v. Gossip Cop Media, LLC*, 87 F. Supp. 3d 499, 509 (S.D.N.Y. 2015) ("[D]ue to the complete reproduction of the copyrighted images, the third fair use factor weighs in Plaintiff's favor."); *Sandoval v. New Line Cinema Corp.*, 973 F. Supp. 409, 413 (S.D.N.Y. 1997), *aff'd*, 147 F.3d 215 (2d Cir. 1998).

Nevertheless, a transformative secondary use "must be [permitted] to 'conjure up' *at least* enough of the original' to fulfill its transformative purpose," and copying an entire work "is sometimes necessary" to effectuate a transformative purpose. *Cariou*, 714 F.3d at 710 (alterations in original,

citation omitted).  In *Cariou*, this factor weighed in Prince's favor precisely because in those instances where Prince copied photographs in their entirety, his aesthetic alterations were so thorough that they rendered the original images "barely recognizable."  *Id.*.  Similarly, this factor "d[id] not weigh against fair use" in *Bill Graham Archives v. Dorling Kindersley Ltd.*, where a defendant used plaintiff's "images in their entirety," but displayed them in "the *minimal* image size and quality necessary to" effectuate defendant's transformative purpose.  448 F.3d 605, 613 (2d Cir. 2006) (emphasis added).

The Court cannot weigh the third fair use factor in favor of defendants at the motion to dismiss stage.  Unlike the works at issue in *Cariou* and *Bill Graham*, Prince's *Untitled* does not obscure Graham's original photograph but instead reproduces it in its entirety, in a size that enables the original to retain its full aesthetic appeal.  According to defendants, Prince *needed* to use the entirety of *Rastafarian Smoking a Joint* because he was commenting on an Instagram post which itself already contained Graham's complete photograph.  But, as defendants effectively concede, only a determination that Prince's use of the photograph was transformative could enable this factor to weigh in their favor.

### 4.  *Effect on the Potential Market for the Copyrighted Work*

The fourth fair use factor the Court analyzes is the "effect of the use upon the potential market for or value of the copyrighted work."  17 U.S.C. § 107(4).  This factor "requires courts to consider not only the extent of market harm caused by the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market for the original." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994) (internal quotation marks and citation omitted).  The Second Circuit has instructed courts to focus not on whether the secondary use "suppresses or even destroys the market for the original work or its potential derivatives," but on whether the secondary use "*usurps*" the market for the original work, as well as potential derivative markets that the copyright owner "would in general develop or license others to develop."  *Cariou v. Prince*, 714 F.3d 694, 708-09 (2d Cir. 2013) (citing *Campbell*, 510 U.S. at 592).  Usurpation of the market for the original work may

occur when an accused infringer's "target audience and the nature of the infringing content is the same as the original." *Id.* at 709.

The Second Circuit has observed that "[b]ecause copyright is a commercial doctrine whose objective is to stimulate creativity among potential authors . . . , the fourth factor is of great importance in making a fair use assessment." *Authors Guild v. Google, Inc.*, 804 F.3d 202, 223 (2d Cir. 2015). Nevertheless, the Court's analysis of this factor is also influenced by its resolution of the transformativeness inquiry; "[t]he more transformative the secondary use, the less likelihood that the secondary use substitutes for the original." *Cariou*, 714 F.3d at 709 (citing *Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 145 (2d Cir. 1998)).

Although the Court does not now have sufficient factual information to conclude whether or not defendants have actually usurped the market for *Rastafarian Smoking a Joint*, this factor cannot weigh in defendants' favor at the motion to dismiss stage because plaintiff has adequately pled that the "target audience and the nature of [Prince's *Untitled* work and the *New Portraits* Catalog] is the same as [Graham's] original." *Cariou*, 714 F.3d at 709.

First, the Complaint alleges that Graham and Prince both market their artwork to "fine art collectors" and display it in fine art galleries, including galleries that display works by both artists. (Compl. ¶¶ 5, 14, 18, 23, 29, 60, 94.) *Cf. Cariou*, 714 F.3d at 709 ("market effects" factor weighed in Prince's favor because "Prince's audience" of celebrities and fine art collectors was "very different from Cariou's"). Prince may ultimately show that his work actually "appeals to an entirely different sort of collector" than Graham's, *Cariou*, F.3d at 709, but plaintiff's allegations raise a question of fact about the market for each artist's work that cannot be resolved at the motion to dismiss stage. *See BWP Media USA, Inc. v. Gossip Cop Media, LLC*, 87 F. Supp. 3d 499, 510 (S.D.N.Y. 2015); *see also Campbell v. Acuff-Rose Music, Inc.*, 510 U.S 569, 590 (1994).

Second, plaintiff has also pled facts that allow the Court to draw a reasonable inference that Prince's work can serve as a substitute for Graham's original work, notwithstanding Prince's alterations. *See Twin Peaks Prods., Inc. v. Publications Int'l, Ltd.*, 996 F.2d 1366, 1377 (2d Cir. 1993); *see also BWP Media*, 87 F. Supp. 3d at 510. *Untitled* contains an essentially unaltered reproduction of *Rastafarian Smoking a Joint* and both works are two-dimensional artworks

made available in virtually identical sizes.  (Compl. ¶¶ 31, 34, 95.)  Even the copy of *Untitled* that appeared in the Catalog was distributed in "a size in close approximation" to one of the sizes in which *Rastafarian Smoking a Joint* is sold. (*Id.* ¶ 95.)  Defendants' contention that art collectors would never consider buying Prince's appropriation art in lieu of Graham's photograph may well be proven correct once the facts are fully developed, but, at the motion to dismiss stage, the Court is required give deference to plaintiff's allegations.  Once all reasonable inferences are drawn in Graham's favor, Prince's *Untitled* and *New Portraits* Catalog *can* serve as substitutes because they present the entirety of Graham's photograph in the same sizes in which the photograph is sold by Graham, without obstructing or distorting it in any physical sense.

Although it is a more complicated question as to whether Graham can show the usurpation of any potential derivative markets for *Rastafarian Smoking a Joint*, "derivative markets are not the principal focus of the fourth inquiry," *TCA Television Corp. v. McCollum*, 839 F.3d 168, 186 (2d Cir. 2016), and a plaintiff need not show that *both* primary and derivative markets for a copyrighted work have been usurped to survive a motion to dismiss.  At this stage, the "market effects" factor cannot weigh in favor of defendants because there are plausible allegations that the *Untitled* artwork – as well as the Catalog in which it was printed and distributed – share the same audience and nature as Graham's photograph.

Because *Untitled* is not a transformative artwork as a matter of law and because the Court is limited to accepting the facts as set forth in the Complaint, none of the four enumerated factors favors a finding of fair use.  Accordingly, the Complaint does state a claim that entitles Graham to relief for copyright infringement with respect to *Untitled* and the Catalog that accompanied its exhibition.

### 5.   *Application of the Fair Use Factors to the Billboard and the Twitter Compilation*

If the Court does not have access to the facts necessary to conduct a thorough fair use analysis with respect to the *Untitled* print, it is decidedly more encumbered with respect to the other allegedly infringing works identified in the Complaint:  the Billboard and the Twitter Compilation.  The Complaint's allegations about these two works are sufficient to state a claim,

but leave too many factual questions unanswered about their purposes and contexts to permit defendants to successfully make out an affirmative defense of fair use at the motion to dismiss stage.

The Billboard, which appears to include a photograph of *Untitled* hanging in a gallery among other *New Portraits* works, is not transformative as a matter of law for the same reasons that apply to *Untitled*. Indeed, the dominant image for a reasonable observer looking at *Untitled* in the Billboard is Graham's photograph, slightly cropped; Prince's contributions – the Instagram frame and added language – fade into insignificance. (*See* Fig. 3.) Moreover, it is not clear from the Complaint whether the Billboard was erected to promote the *New Portraits* exhibition or if it was only erected at some later time for some other reason. Indeed, the Billboard "does not appear to expressly advertise the sale of works or direct viewers to" the Gagosian Gallery. (Compl. ¶ 102.)

The purpose of the Twitter Compilation is similarly indeterminate. The message accompanying the Twitter Compilation – "Booze Pot Sex. I guess I was wrong. (Memo to Turner: I DID NOT take make create this montage)" (Compl. ¶ 56; *see* Fig. 4) – is most definitely not self-explanatory and is interpreted by plaintiff's Complaint as a "literal" description of the accompanying photographs' portrayal of "booze," "pot," and "sex." (Compl. ¶ 110.) Although defendants contended at oral argument that the purpose of the Twitter Compilation, posted one week after Graham filed this litigation, was "an act of free expression criticizing and making use of [Graham's] image to criticize the lawsuit against him" (Oral Argument on Defs.' Mot. Dismiss, Tr. at 41:1-24, Apr. 19, 2017, ECF No. 52), this interpretation is not apparent from the face of the Complaint.

It would be premature to dismiss plaintiff's claims with respect to either the Billboard or the Twitter Compilation on the basis of a fact- and context-sensitive fair use analysis that the Court is neither equipped nor permitted to conduct at the motion to dismiss stage.

## IV. DEFENDANTS' REQUEST FOR CONVERSION TO MOTION FOR SUMMARY JUDGMENT

The Court declines defendants' request to convert this motion into one for summary judgment pursuant to Fed. R. Civ. P. 12(d).  Rule 12(d) allows district courts to consider "matters outside the pleadings" after giving the parties "a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d); *see generally Sahu v. Union Carbide Corp.*, 548 F.3d 59, 67 (2d Cir. 2008).  The procedure may be appropriate in certain copyright infringement actions where discovery is unnecessary to resolve a motion to dismiss.  *See Newton v. Penguin/Berkley Publ'g USA*, No. 13 Civ. 1283, 2014 WL 61232, at *5-*6 (S.D.N.Y. Jan. 6, 2014); *see also Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 691-92 (7th Cir. 2012).  Here, discovery will be necessary to uncover evidence about the purposes and circumstances under which each of the allegedly infringing works were created, to ascertain whether certain of the works are commercial in nature, and to identify the markets for Graham's and Prince's works.  *Cf. Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 808 F. Supp. 2d 634, 641 (S.D.N.Y. 2011) (denying motion to dismiss on the basis of fair use and "declin[ing] to address such a fact-intensive issue before the parties have had an opportunity for discovery").

## V. LIMITATION OF DAMAGES

Defendants ask the Court not only to find that they made fair use of Graham's photograph, but also to limit Graham's potential damages award by (1) ruling that, as a matter of law, Graham has no claim to compensatory damages beyond defendants' profit on the sale of the *Untitled* print; (2) dismissing Graham's claims to statutory damages, attorneys' fees, and costs; and (3) dismissing Graham's claim to punitive damages.

### A.   Actual Damages and Infringers' Profits

The Copyright Act of 1976 enables copyright owners to recover either statutory damages or the combination of actual damages and the infringers' profits, to the extent there is no overlap.  *See* 17 U.S.C. § 504(a).  Recoverable non-statutory damages are thus comprised of two categories:  (1) "the actual damages suffered by him or her as a result of the infringement," as well as (2) any "profits of the infringer that are attributable to the infringement," but

only to the extent those profits have not already been "taken into account in computing" actual damages.  17 U.S.C. § 504(b).  In their motion to dismiss plaintiff's Complaint, defendants alternatively ask the Court to preemptively limit plaintiff's recovery of actual damages and infringers' profits to the amount of profits earned by defendants from the sale of *Untitled*.  Because the Complaint raises factual questions about both actual damages and infringers' profits – the two components of the non-statutory damages calculation – the Court denies defendants' request to limit Grahams' potential recovery as premature.

### 1. *Actual Damages*

In his Complaint, plaintiff seeks an unspecified amount of actual damages (Compl. at Prayer for Relief) because he claims that he was injured "to a degree and extent as yet to be determined" (*id.* at ¶¶ 64, 68, 73, 79, 85).

"Courts and commentators agree" that actual damages "should be broadly construed to favor victims of infringement."  *Davis v. The Gap, Inc.*, 246 F.3d 152, 164 (2d Cir. 2001) (citations omitted).  Typically, a plaintiff can establish actual damages by "demonstrating that he lost sales or other profits that he would have obtained from the sale or license of the infringed work 'but for' the defendant's infringement."  *Baker v. Urban Outfitters*, 254 F. Supp. 2d 346, 356 (S.D.N.Y. 2003) (citations omitted).  In the Second Circuit, "the [copyright] owner's actual damages may include in appropriate cases the reasonable license fee on which a willing buyer and a willing seller would have agreed for the use taken by the infringer."  *Davis*, 246 F.3d at 167; *see also Rogers v. Koons*, 960 F.2d 301, 313 (2d Cir. 1992).

Defendants argue that actual damages in this case cannot exceed defendants' profits from the sale of *Untitled* because plaintiff has not alleged any actual "lost sales, licensing, or other business opportunities" and because any licensing fee awarded in this case "would necessarily be less than the profits garnered from the sale of [*Untitled*]."  (Defs.' Mem. 24.)  However, defendants have not pointed to any cases that hold that reasonable licensing fees may only be awarded if specific lost licensing opportunities are expressly alleged in the Complaint.  *Cf. Baker*, 254 F. Supp. 2d at 357-58 (reasonable licensing fee was appropriate even though the plaintiff "initially stated that he has only worked on assignment and has not sold or licensed photography in

his career").  Moreover, defendants' position that any reasonable licensing fee will necessarily be lower than defendants' profits from the sale of *Untitled* is itself unsupported by any materials submitted to the Court.  The determination of a reasonable licensing fee for *Rastafarian Smoking a Joint* is a question of fact, which could call for the calculation of the fair market value of licensing the photograph in multiple additional contexts, including the Catalog, the Billboard, and possibly even the Twitter Compilation.  The fact that the reasonable licensing fee *might* ultimately be lower than the as yet undetermined profits from the sale of *Untitled* does not compel the Court to limit plaintiff's potential damages on the basis of the pleadings.  *Cf. Silberman v. Innovation Luggage, Inc.*, No. 01 CIV. 7109, 2003 WL 1787123, at *10 (S.D.N.Y. Apr. 3, 2003) ("[C]alculation of the appropriate [license] fee is for a finder of fact at trial, and not for the Court on summary judgment.").

### 2.   *Infringers' Profits*

To establish an infringer's profits, a plaintiff "is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work."  17 U.S.C. § 504(b).  Thus, the plaintiff can discharge his evidentiary burden by simply proving the defendants' gross revenues; it is then up to the infringer to prove that those revenues are not linked to any infringing use of the plaintiff's original work.

In *Davis v. The Gap, Inc.*, 246 F.3d 152, 160 (2d Cir. 2001), the Second Circuit clarified that the Copyright Act's reference to "gross revenue" means "gross revenue reasonably related to the infringement, not unrelated revenues."  That court held that a designer who alleged that his distinctive eyeglasses were improperly used in a Gap advertisement "failed to discharge his burden" by presenting gross revenues of The Gap, Inc., which included sales from other labels of the company's corporate family that were "in no way promoted by the advertisement."  *Id.* at 161.

Relying on *Davis*, defendants contend that Graham is barred as a matter of law from seeking profits that defendants may have earned through sales of "works that did not *contain* Graham's work."  (Defs.' Mem. 23-24 (emphasis added).)  But this reads too much into *Davis*.  *Davis* did not disrupt the basic burden-shifting framework of 17 U.S.C. § 504(b); it does *not* require the

copyright owner to provide evidence of "profits derived solely and directly from the infringing activity." *Fournier v. Erickson*, 242 F. Supp. 2d 318, 327 (S.D.N.Y. 2003); *see also Broadspring, Inc. v. Congoo, LLC*, No. 13-CV-1866, 2014 WL 7392905, at *9 (S.D.N.Y. Dec. 29, 2014). After *Davis*, indirect profits – derived from the use of the copyrighted work to promote sales of other products – are still "legally cognizable if the copyright owner can provide sufficient proof of a causal nexus" to the infringement. *Complex Sys., Inc. v. ABN Ambro Bank N.V.*, No. 08 Civ. 7497, 2013 WL 5970065, *2 (S.D.N.Y. Nov. 8, 2013).

In this case, Graham has not only alleged that defendants directly profited from the sale of *Untitled* (Compl. ¶¶ 40, 78), but has also claimed that Prince indirectly profited by using Graham's photograph in "promotional and advertising materials" for other *New Portraits* works and exhibitions (*id.* ¶ 62; *see also id.* ¶¶ 102, 112), and that Gagosian Gallery and Gagosian "benefited financially from the publicity and notoriety" they received from the *New Portraits* exhibition, in which *Untitled* was included (*id.* ¶¶ 78, 84). Graham has adequately pled a causal nexus between the alleged infringement and indirect profits by alleging facts – such as the selection of *Untitled* to appear in a catalog for the *New Portraits* exhibition and in a billboard displaying Prince's works – from which it can be reasonably inferred that the infringing photograph generated profits beyond those earned from the direct sale of *Untitled*.

Because there are factual questions as to whether Graham's actual damages exceed defendants' profits from the alleged infringement and because defendants' allegedly infringing profits may include profits beyond those earned through sales of *Untitled* itself, the Court denies defendants' premature request to limit plaintiffs' claim for non-statutory damages.

### B.  Statutory Damages, Attorneys' Fees, and Costs

A plaintiff in a copyright infringement action is not limited to seeking actual damages and infringers' profits. At any time prior to final judgment, the plaintiff can elect instead to recover statutory damages pursuant to 17 U.S.C. § 504(c). In addition, the plaintiff may also seek attorneys' fees and costs pursuant to 17 U.S.C. § 505.

### 1.   *Statutory damages and attorneys' fees*

To incentivize prompt copyright registration, the Copyright Act makes registration a condition precedent for recovering both statutory damages and attorneys' fees.  Subject to a statutory grace period not relevant here, 17 U.S.C. § 412(2) precludes recovery of either statutory damages or attorneys' fees for "any infringement of copyright commenced after first publication of the work and before the effective date of its registration."

The Second Circuit, as well as its sister circuits, have uniformly found that, in the context of an "ongoing series of infringing acts," the infringement "commence[s]" for purposes of 17 U.S.C. § 412(2) upon the "first act of infringement."  *Troll Co. v. Uneeda Doll Co.*, 483 F.3d 150, 158 (2d Cir. 2007); *see also Derek Andrew Inc. v. Poof Apparel Corp.*, 528 F.3d 696, 700-01 (9th Cir. 2008); *Johnson v. Jones*, 149 F.3d 494, 506 (6th Cir. 1998); *Mason v. Montgomery Data, Inc.*, 967 F.2d 135, 143-44 (5th Cir. 1992).  Thus, a plaintiff cannot recover statutory damages or attorneys' fees for discrete infringing acts that occur after the date of registration if they are part of an ongoing series which began prior to registration.  *See, e.g., Solid Oak Sketches, LLC v. 2K Games, Inc.*, No. 16CV724, 2016 WL 4126543, at *2-*3 (S.D.N.Y. Aug. 2, 2016).

Here, Graham alleges that *Untitled* was created and displayed as part of the *New Portraits* exhibition prior to the October 20, 2014 registration date of *Rastafarian Smoking a Joint*.  (Compl. ¶ 20, Ex. C.)  Therefore, as Graham concedes, 17 U.S.C. § 412(2) precludes him from recovering statutory damages or attorneys' fees related to *Untitled*.  However, it would be premature for the Court to determine now whether plaintiff is precluded as a matter of law from recovering such damages and fees for the other allegedly infringing works.  At this early stage, a decision to bar statutory damages and attorneys' fees for the Twitter Compilation and Billboard would necessarily be premised on an impermissible prejudgment that these works can only be infringements if *Untitled* was one, as well.[13]  Accordingly, the Court denies without prejudice

---

[13] Each separate allegedly infringing work must be analyzed on its own merits and in its own context.  If, at the conclusion of the fair use inquiry after discovery proceedings, the Twitter Compilation and Billboard turn out to be infringements but *Untitled* does not, then any "ongoing series of infringing acts" will have begun *after* registration and 17

defendants' request to limit the statutory damages and attorneys' fees available to plaintiff for the Billboard and Twitter Compilation.

    2.   *Costs*

       Contrary to defendants' contention, the Court has the discretion to award costs for *all* of the alleged infringements in this action, regardless of their timing relative to registration.  The plain language of 17 U.S.C. § 412 states that registration is a prerequisite only for the recovery of "statutory damages [and] attorney's fees," and 17 U.S.C. § 505 states explicitly that attorneys' fees may be awarded as "part of the costs" recoverable in copyright infringement actions, "[e]xcept as otherwise provided" by the Copyright Act.  Thus, the statute does not make registration a condition precedent for the recovery of any "costs" aside from attorneys' fees.  *See* 6 William F. Patry, Patry on Copyright § 22:221 (2017); *Sykel Enters., Inc. v. Patra, Ltd.*, No. 03 Civ. 3364, 2004 WL 719181, at *7 (S.D.N.Y. Mar. 31, 2004) (there is "no statutory bar to [plaintiff's] recovery of costs under [section] 505"); *Lucky Break Wishbone Corp. v. Sears, Roebuck and Co.*, No. C06-312Z, 2009 WL 86491, at *1 (W.D. Wash. Jan. 9, 2009) ("17 U.S.C. § 412 bars only an 'award of statutory damages or of attorney's fees,' and not an award of costs, when infringement predates registration."); *Cook v. Jane Lyons Advertising, Inc.*, No. Civ.A. 97-00914, 1998 WL 164776, at *4 n.5 (D.D.C. Mar. 31, 1998) ("Because section 412 only bars the award of the attorneys' fees portion of costs, the plaintiff's request for those costs other than attorneys' fees is not stricken from the complaint.").[14]  Given the lack of any statutory or precedential basis to preemptively prohibit plaintiff from seeking to recover costs in this infringement action, defendants' request is denied.

_____

U.S.C. § 412(2) would not serve as an impediment with respect to the Twitter Compilation and/or the Billboard.

[14] *But see Homkow v. Musika Records, Inc.*, No. 04 Civ. 3587, 2008 WL 508597 at *5 n.1 (S.D.N.Y. Feb. 26, 2008) (collecting cases and holding that 17 U.S.C. § 412 bars the awarding of costs for pre-registration infringements because "the recovery of attorney's fees and costs" is "intertwine[d]" in 17 U.S.C. § 505).

### C.   Punitive Damages

Finally, defendants ask the Court to deny Graham's conditional request for punitive damages in the event that he is barred from recovering statutory damages.  Defendants are correct that, as a matter of law, punitive damages are not available in infringement actions brought pursuant to the Copyright Act of 1976.  *See Oboler v. Goldin*, 714 F.2d 211, 213 (2d Cir. 1983); *BanxCorp v. Costco Wholesale Corp.*, 723 F. Supp. 2d 596, 620 (S.D.N.Y. 2010); *Football Ass'n Premier League Ltd. v. YouTube, Inc.*, 633 F. Supp. 2d 159, 167-68 (S.D.N.Y. 2009); *Granger v. Gill Abstract Corp.*, 566 F. Supp. 2d 323, 330 (S.D.N.Y. 2008); *see also* 6 Patry on Copyright § 22:151 ("Punitive damages are *never* available for copyright infringement actions brought under the 1976 Copyright Act."); *accord* 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 14.02[C][2] (2017).

## VI. CONCLUSION

Defendants cannot establish at this stage that the affirmative defense of fair use insulates them from liability for copyright infringement.  On a motion made pursuant to Fed. R. Civ. P. 12(b)(6), the Court is limited in its review to those facts alleged in the Complaint and apparent from its exhibits – and the Court must view those facts in the light most favorable to Graham.  Absent a factual record developed through discovery, the Court is therefore restricted in its ability to perform the fact-based and context-sensitive fair use inquiry.

To the extent that the Court *is* able to evaluate the statutory fair use factors on the basis of the facts alleged in the Complaint, the Court concludes that each of them weighs against a finding that Prince's *Untitled* makes fair use of *Rastafarian Smoking a Joint*.  Because Prince has reproduced Graham's portrait without significant aesthetic alterations, *Untitled* is not transformative as a matter of law.  Moreover, *Untitled* is a work made with a distinctly commercial purpose; Graham's original *Rastafarian Smoking a Joint* is, without question, expressive and creative in nature; Prince's use of the entirety of Graham's photograph weighs against a finding of fair use; and the Complaint adequately alleges usurpation of the primary market for *Untitled*.  Accordingly, Prince's motion to dismiss the Complaint is denied.

With respect to defendants' application to preemptively limit the scope of the damages to which Graham may be entitled, the Court grants defendants' request to dismiss plaintiff's demand for punitive damages but otherwise denies defendants' requests without prejudice.

Dated:  New York, New York
      July 18, 2017

SO ORDERED:

_____
Sidney H. Stein, U.S.D.J.