**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

DONALD GRAHAM,

                     Plaintiff,

vs.

RICHARD PRINCE, GAGOSIAN GALLERY,
INC. and LAWRENCE GAGOSIAN

                   Defendants.

Case No. 1:15-CV-10160-SHS

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT RICHARD PRINCE'S MOTION FOR SUMMARY JUDGMENT

GREENBERG TRAURIG, LLP
Richard A. Edlin
MetLife Building
200 Park Avenue
New York, New York 10166

Ian C. Ballon
Nina D. Boyajian
Valerie W. Ho

1840 Century Park East, Suite 1900
Los Angeles, California 90067

*Attorneys for Defendant Richard Prince*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ..................................................................................................... 4

    A.    Background ...................................................................................................... 4

    B.    Creation of the *Portrait of Rastajay92* ..................................................... 4

    C.    Donald Graham ............................................................................................ 5

        1.    *Rastafarian Smoking a Joint* ..................................................... 6

        2.    Graham's Presence in and Use of Social Media ........................... 7

ARGUMENT ....................................................................................................................... 8

I.     LEGAL STANDARDS ................................................................................................. 8

II.    PRINCE'S *PORTRAIT OF RASTAJAY92* IS A FAIR USE OF THE PHOTOGRAPH ........ 8

    A.    Prince's *Portrait of Rastajay92* Is Highly Transformative ....................... 8

        1.    *Portrait of Rastajay92* Has a Different Purpose from the Photograph ........... 9

        2.    *Portrait of Rastajay92* Has a Different Character from Graham's Photograph .............................................................. 10

        3.    *Portrait of Rastajay92* is Transformative Despite Borrowing the Image of the Photograph and Not Obscuring It .................... 12

        4.    The Public Benefit of Art Far Outweighs any Commercial Gain from the *Portrait of Rastajay92* ......................................... 13

        5.    The Nature of the Copyrighted Work and the Amount and Substantiality of the Portion Used Are Less Significant in the Context of the Instant Case ............................................. 13

    B.    *Portrait of Rastajay92* Does Not Adversely Impact the Market for the Photograph ............................................................................................ 17

    C.    Graham's Intentional Online Dissemination of the Photograph Also Weighs in Favor of Fair Use ........................................................................... 19

II.    THE ANCILLARY WORKS ARE ALSO NON-INFRINGING USES OF THE PHOTOGRAPH ................................................................................................... 19

III.    PRINCE HAD AN IMPLIED LICENSE TO USE THE IMAGE OF THE
        PHOTOGRAPH ........................................................................................................... 24

CONCLUSION ............................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
    448 F.3d 605, 612 (2d Cir. 2006) .................................................................... *passim*

*Blanch v. Koons*,
    467 F.3d 244 (2d. Cir. 2006) .......................................................................... *passim*

*Bouchat v. Baltimore Ravens Ltd. P'ship*,
    619 F.3d 301 (4th Cir. 2010) ................................................................................14

*Bouchat v. Baltimore Ravens Ltd. P'ship*,
    737 F.3d 932 (4th Cir. 2013) ..........................................................................23, 24

*Campbell v. Acuff-Rose Music, Inc.*,
    510 U.S. 569 (1994) ....................................................................................... *passim*

*Cariou v. Prince*,
    714 F.3d 694 (2d. Cir. 2013) ......................................................................... *passim*

*Davis v. Gap, Inc.*,
    246 F.3d 152 (2d Cir. 2001) ...........................................................................21, 23

*Gordon v. Nextel Commc'ns & Mullen Advert., Inc.*,
    345 F.3d 922 (6th Cir. 2003) ................................................................................20

*Harper & Row Publishers, Inc. v. Nation Enters.*,
    471 U.S. 539 (1985) ..............................................................................................17

*Kelley v. Chi. Park Dist.*,
    635 F.3d 290 (7th Cir. 2011) ................................................................................17

*New Era Publ'ns Int'l, ApS v. Henry Holt & Co.*,
    695 F. Supp. 1493 (S.D.N.Y. 1988) .....................................................................14

*Parker v. Yahoo!, Inc.*,
    2008 WL 4410095 (E.D. Pa. Sept. 25, 2008) .......................................................24

*Perfect 10, Inc. v. Amazon.com, Inc.*,
    508 F.3d 1146 (9th Cir. 2007) ..............................................................................21

*Psihoyos v. Pearson Educ., Inc.*,
    855 F. Supp. 2d 103 (S.D.N.Y. 2012) ..................................................................24

*Ringgold v. Black Entm't Television, Inc.*,
    126 F.3d 71 (2d Cir. 1997)....................................................................................20, 21

*Sandoval v. New Line Cinema Corp.*,
    147 F.3d 215 (2d Cir. 1998)..........................................................................................22

*Southeast Bank, N.A. v. Lawrence*,
    66 N.Y.2d 910 (1985) ....................................................................................................17

*A.V. ex rel. Vanderhye v. iParadigms, LLC*,
    562 F.3d 360 (4th Cir. 2009) ...................................................................................17, 18

*Wright v. Warner Books, Inc.*,
    953 F.2d 731 (2d Cir. 1991).........................................................................................20

**Statutes**

17 U.S.C. § 106A .............................................................................................................17

17 U.S.C. § 106 ...............................................................................................................17

17 U.S.C. § 107...............................................................................................8, 13, 15, 19

17 U.S.C. § 501 ...............................................................................................................17

Defendant Richard Prince hereby submits this memorandum of law in support of his motion for summary judgment ("Motion").

**PRELIMINARY STATEMENT**

Richard Prince's *New Portraits* promote the very goal copyright was created to further – the constitutionally mandated "progress" of the arts. U.S. Const. art. I, § 8, cl. 8. Indeed, the social commentary Prince makes through the *New Portraits* is a core fair use principle (17 U.S.C. § 107), expressed through a novel technological and sociological medium and context. Donald Graham's demand for the "seizure and forfeiture" of art (ECF No. 30 at 33), if granted, would have a chilling effect on the progress in the arts, to the detriment of the public.

In his *New Portraits*, Richard Prince continued the well-established artistic method of finding inspiration in that which already exists and recontextualizing it in a manner that alters its very meaning and purpose. In this case, Prince used an image of a Rastafarian smoking a joint, which already existed pervasively on the internet, largely through Donald Graham's own actions. There is no dispute that Graham disseminated his photograph of a Rastafarian smoking a joint (the "Photograph") on social media to gain recognition for his photography, without any restriction on its further dissemination, and agreed that "everyone" could use it. And there is no dispute that Prince, after finding the image on one of the scores of websites on which it was published, used the image in one of his *New Portraits*. The only dispute is whether Prince's use was permissible. Based on the evidence now before the Court, that question must be answered affirmatively.

Not only does Prince's work have a transformative message, meaning and purpose, but it also has in no way usurped Graham's market – to the contrary, Graham sold his Photograph for the greatest amount after Prince's use. This is not a case of forgery, piracy, counterfeit or plagiarism; nor is it copyright infringement. Indeed, the purchaser of the Prince painting knew the included image

was not taken by Prince and has unequivocally stated that he would never have purchased the Photograph; rather, he wanted the content, context, commentary, and technique of the Prince work. Indeed, it would make no sense for someone to pay for a Richard Prince if they wanted the Graham Photograph, which they could easily purchase for a fraction of the price of a New Portrait.

Specifically, Prince's use of the image of the Photograph was a fair use because Prince's work is highly transformative, having a different purpose and meaning than the Photograph, as underscored by his intent and the perceptions of a reasonable observer, reflected in the consumers and exhibitors of Prince's work, and experts in the field. In using an image that Prince found on Instagram, but repositioning it in a larger-than-life form in the physical media of canvas made to appear like a giant iPhone, adding his comments to it, reproducing it in a painting using elements of the Instagram frame, and displaying it with other Instagram-themed portraits, Prince has imbued what was once an austere depiction of a Rastafarian smoking marijuana into part of Prince's ode to social media. That Prince did not cut, mark, paint over, scratch or otherwise obscure the image of the Photograph (as he did in the *Cariou* case) is critical, *not detrimental*, to his fair use of the Photograph. The same is true of his intentional taking of much of the Photograph. Had he done anything to alter the post as it appeared before he captured it, his intent – in authentically replicating in the physical world the virtual world of social media – would go unseen. By blowing up an image that is typically seen only on a small screen into a giant painting and selecting a specific medium and coloration, Prince transformed the Photograph from a documentary photographic portrait to commentary on the nature of social media. In analyzing the entirety of the two works at issue (which is required, instead of analyzing only the photographic elements) the transformation is indisputable.

The evidence further militates a finding of fair use based on the key fourth factor of the fair use test – whether Prince's work had an adverse effect on the market for the Photograph. As Graham

knows, he does not have the necessary model release to exploit the image of the Rastafarian (as he has for 20-odd years). It is also undisputed that the *Portrait of Rastajay92* is a single-edition work that was only briefly on the market, sold once, and is not expected to return to the market. Graham's works and Prince's works exist in entirely distinct markets (as reflected by the undisputed fact that the purchaser of the *Portrait of Rastajay92* has stated that he would never have purchased the Photograph). Finally, Graham has not lost any sales of the Photograph—to the contrary, he sold the Photograph for the most he has ever sold it and became better-known after the alleged infringement.

*Second*, Prince had an implied license to use the image of the Photograph. Notably, Graham, on multiple occasions over approximately 10 years, chose to post the Photograph online to promote his work without any restriction on its further dissemination. When he posted the Photograph on Facebook, Graham chose to do so with a public "everyone" setting, granting everyone (even those who were not Facebook users) the right to use the Photograph, and granting Facebook—and anyone else Facebook chose, at its discretion—a non-exclusive, transferable license to use his Photograph. He understood that his work could perpetually remain on the internet even after he had deleted his social media account. He did not use any industry-standard mechanisms, like watermarks or copyright notices, to communicate that the work should not be further disseminated. Prince reasonably interpreted Graham's conduct as permission to use the Photograph in a new way. When coupled with the transformative nature of Prince's work and the utter lack of adverse market impact on the Photograph, a finding of infringement in this case cannot stand.

This Motion does not purport to address the outer limits of what an artist can do with a photograph in general; it addresses whether a single photograph used in a single painting where the use is transformative, the photographer intended wide dissemination, and the use had no impact for the genuine product, is fair use. Without question, there will be some copying that goes too far and is

not fair. That will always be true. Prince's work in this case, however, falls within the boundaries of fair use.

## STATEMENT OF FACTS

### A.   Background

The relevant background facts discussing social media, Richard Prince's body of work, and the *New Portraits* series, are set forth in the concurrently-filed Motion for Summary Judgment in the related case, *McNatt v. Prince, et al.*, No. 1:16-cv-08896-SHS ("McNatt Motion" or "McNatt Mot."), and are incorporated here by reference.

### B.   Creation of the *Portrait of Rastajay92*

Prince's *Portrait of Rastajay92* was one of the *New Portraits* series, the genesis and creation of which are described in the McNatt Motion. (UF ¶ 18).[1] "Rastajay92" was the user name of an Instagram user who had posted, or re-posted, many images of Rastafarians to Instagram, including the image at issue in this case.[2] (UF ¶ 19). After reviewing scores of images of Rastafarians on Rastajay92's feed, Prince selected the image of the Rastafarian that he used because he thought it was "a pretty good representation," or even a self-portrait, of Rastajay92. (UF ¶ 22). The image that Prince saw on Rastajay92's feed did not have a copyright notice, watermark, attribution, or other physical indication that it was taken by a professional photographer or that it should not be further disseminated, as was consistent with social media norms and the Instagram license in effect at the time. (UF ¶ 24; *see also* Boyajian Decl. Ex. 17 ¶¶ 19, 72; Boyajian Decl. Ex. 16 at 87:10-25). Indeed, if an artist were to append a copyright notice or watermark to her work, that would be a "telegraph" to Prince and he would "respect that." (Boyajian Decl. Ex. 14 at 226:9-13). It "wouldn't interest"

---

[1]   Citations to "UF" refer to Defendant's 56.1 Statement of Undisputed Material Facts In Support of His Motion for Summary Judgment. Citations to "Ex.   " refer to exhibits attached to the Declaration of Nina D. Boyajian in Support of Defendant Richard Prince's Motion for Summary Judgment.
[2]   Indeed, the image at issue in this case was a re-post. In other words, Rastajay92 saw that image on someone else's Instagram feed, a user named Indigoochild, and re-posted it to his feed. (UF ¶ 20). It is unclear whether he re-posted it from someone else's feed, or if he was the first to post the image to Instagram. (UF ¶ 21).

him. (*Id.* at 231:16-19). Rastajay92's feed also reminded Prince of the Rastafarian-themed work he had started in 2003, *Canal Zone*, and he thought it would be "a very cool way to keep that body of work relevant, up to date." (UF ¶ 25).

When Rastajay92 re-posted the image of the Photograph, he added the caption, "Real Bongo Nyah man a real Congo Nyah" followed by an emoji of a raised fist. Prince was drawn to Rastajay92's caption beneath the image of the Rastafarian and reviewed dozens of comments on Rastajay92's post. (UF ¶ 27). The language of Rastajay92's comment made Prince feel as though they had something in common. (*Id.*). Prince wanted to respond to it, and decided to parody the post (the image together with the comment) through his own comment: "Canal Zinian da lam jam," followed by the same raised-fist emoji. (UF ¶ 28). Prince describes his own comment as "self-referential," referencing his growing up in the Canal Zone, as well as the *Canal Zone* paintings that similarly included images of Rastafarians. (UF ¶ 19). Once Prince had re-photographed the *Portrait of Rastajay92*, he selected it to be enlarged, had the resulting screenshot printed with a colorized tint on a special white wrap-around canvas, and stretched as a single-edition work, consistent with the other *New Portraits*. (UF ¶ 10). The only "place" the *Portrait of Rastajay92* that Prince created appeared was on his phone and in the single painting.

Between September 19 and October 24, 2014, the *Portrait of Rastajay92* was exhibited, along with 36 other *New Portraits*, in the Gagosian Gallery in New York ("Gagosian Exhibition"),[3] as an ode to the social media phenomenon. (UF ¶ 35). ████████████████████

████████████████████████████████

## C.   Donald Graham

Donald Graham is an independently wealthy heir of the Fisher Communications fortune,

---

[3]      As set forth in the partial motion for summary judgment concurrently filed by the Gagosian Defendants, which Prince joins, Gagosian Gallery, Inc. exhibited 37 of Prince's *New Portraits* works at the Gagosian Gallery, in a gallery space located at the back of Gagosian Gallery's bookshop on Madison Avenue. (Boyajian Decl. Ex. 24 at 132:17-133-6).

currently living in Beverly Hills. (Boyajian Decl. Ex. 20 at 5; Boyajian Decl. Ex. 21 at 10:21-11:7).[4]

Graham's photographs have never been a significant source of income, collectively earning him less

than $95,000 over the past six years. (Boyajian Decl. Ex. 22 ¶¶ 1-7). In the past 23 years, Graham

has offered for sale only ▮ photographs, and has sold fewer than ▮ prints. (UF ¶ 53). Unlike Prince,

Graham has never had any shows at museums[5] featuring only his work (UF ¶ 54), and his work, and

specifically the Photograph, has not been—and would not be—displayed at the same galleries in

which Prince's *New Portraits* works were displayed. (UF ¶ 55).

> 1.   *Rastafarian Smoking a Joint*

Graham claims that he took the Photograph in 1996 in Jamaica. (UF ¶ 56). It is generally not

Graham's practice to obtain releases from individuals he photographs for the purpose of selling their

images (UF ¶ 59), and consistent with this practice, Graham did not get a written release from the

subject of the Photograph to use his image commercially. (UF ¶ 60).[6] Graham does not contend, nor

seek to prove, that he has compensated the Rastafarian after selling his image for 20 years. (UF ¶ 61).

Immediately after he learned about Prince's *Portrait of Rastajay92*, Graham sought to exploit

publicity from it. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ He then hired

a social media consultant, successfully increasing his social media presence. (UF ¶ 85, 87-88).

Graham's media attention further increased significantly when he filed this lawsuit. (UF ¶ 89).

Graham's sales of the Photograph have not suffered since the *Portrait of Rastajay92* was

exhibited; indeed, Graham cannot identify any sales he has lost because of Prince's *Portrait of*

*Rastajay92*. (UF ¶ 80). Since 1997, Graham has sold ▮ copies of the Photograph, with sales prices

---

[4]      As reflected in SEC filings, upon the sale of Fisher Communications to Sinclair Broadcasting in 2013, the value of Graham's beneficial ownership in the company was approximately $4.2 million. (Boyajian Decl. Ex. 25).
[5]      Graham has falsely claimed that one of his photographs was in the permanent collection of the Metropolitan Museum (Boyajian Decl. Ex. 21 at 120:21-121:2, 122:5-8, 123:13-17, 224:11-225:17).
[6]      Graham admits that he smoked marijuana with the Rastafarians he was photographing (Boyajian Decl. Ex. 21 232:31-233:1), calling into question the enforceability of any non-written release that Graham might claim to have obtained. (*See id.* at 115:2-119:20).

ranging from ███ to ████ ── ██ of which occurred *after* he discovered Prince's exhibition of *Portrait of Rastajay92*. (UF ¶¶ 81-82). ████████████████████████████

████████████████████████████████

2.   <u>Graham's Presence in and Use of Social Media</u>

Ironically, Graham has been an active and willing participant in the social media culture on which Prince comments. Before October 2014, Graham displayed digital copies of the Photograph on the Internet and social media. (UF ¶ 65). For example, sometime before 2005, Graham posted a digital image of the Photograph on his public website, which he uses to promote his work. (UF ¶ 66). There was no watermark embedded in the image, and Graham could not recall if there was a copyright notice embedded in the image. (UF ¶ 67).

In August 2010, Graham again posted a digital copy of the Photograph online, this time on his publicly-accessible Facebook page, which he also uses to promote his photography. (UF ¶ 68). He chose to post it *without any privacy setting or restrictions, such that everyone could view it and share* (i.e., copy) it. (UF ¶¶ 68, 94). The Facebook post has no watermark, copyright notice, or other visual indication that it should not be further disseminated. (UF ¶ 38). To this day, there are no restrictions on copying the Photograph from Graham's Facebook page. (Boyajian Decl. ¶ 4).

Under the operative Terms of Service on Facebook, when a user, like Graham, "publish[es] content or information using the 'everyone' setting, it means that [the user is] allowing ***everyone, including people off of Facebook***, to access and use that information[.]" (UF ¶ 72) (emphasis added). By agreeing to Facebook's terms, Graham further granted Facebook a "non-exclusive, transferable, sub-licensable, royalty-free, worldwide license to use" Graham's intellectual property in the Photograph, and the license was terminable when he deleted his content or account, "unless your

content has been shared with others, and they have not deleted it." (UF ¶ 73).[7]

In line with social media practices, images of the Photograph have been reproduced without his express permission and without attribution or a "photo credit"[8] on innumerable occasions, including, at a minimum, on Instagram by users Rastajay92 and Indigoochild (UF ¶¶ 76-77). But Graham did not request that either user (or any the other social media users that reposted the Photograph) delete their images of the Photograph or credit him as the author. (UF ¶ 77). Indeed, Graham has acknowledged posting photographs on social media that he did not take, without permission. (UF ¶ 79). Graham even posted exhibition photographs taken by Gagosian Gallery's professional photographer, which included images of other *New Portraits* works containing portions of photographs that are not his. (*Id.*).

## ARGUMENT

### I.   LEGAL STANDARDS

The Court is well-familiar with the standards for granting a motion for summary judgment, as well as the factors for assessing fair use under 17 U.S.C. § 107. We will not repeat them here, but they are summarized in the McNatt Motion as appropriate. (*See* McNatt Mot. at I.A).

### II.   PRINCE'S *PORTRAIT OF RASTAJAY92* IS A FAIR USE OF THE PHOTOGRAPH

#### A.   **Prince's *Portrait of Rastajay92* Is Highly Transformative**

In considering the first statutory factor—the "purpose and character" of the secondary use, 17 U.S.C. § 107(1)—the primary inquiry is whether the secondary use is "transformative," that is, "whether the new work merely supersedes the objects of the original creation, . . . or instead adds something new, with a further purpose or different character, altering the first with new expression,

---

[7]     After Graham was questioned on the issue of implied license, Graham changed his Facebook settings to make his profile private—something he could have done in 2010. (Boyajian Decl. ¶ 18). After the Gagosian Defendants objected, Graham's profile was restored to its original, public setting. (*Id.*)

[8]     That is, Rastajay92 did not indicate that the picture was taken by or associated with Graham. (Boyajian Decl. Ex. 17 ¶ 82).

meaning, or message[.]" *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994) (internal quotation and alteration marks omitted). Here, Prince's *Portrait of Rastajay92* has both a different purpose *and* a different character from the Photograph, and is thus transformative as a matter of law.

### 1.   *Portrait of Rastajay92* Has a Different Purpose from the Photograph

Prince's purpose in creating *Portrait of Rastajay92*, as with the other *New Portraits*, is significantly different from Graham's purpose in taking the Photograph. Prince's stated intent in creating the *New Portraits* series is described in detail in the McNatt Motion (*see* McNatt Mot. at 16-18); in general, it was to "comment[] on the social media, the whole idea of putting up images on a new platform that was available to anyone, to an entire population[.]" (UF ¶ 17). His intent in creating the *Portrait of Rastajay92* was no different. (Prince Decl. ¶17; *see also* UF ¶¶ 28-29).

This purpose is a world away from Graham's purpose in making the Photograph, which was to "capture[] the spirit and gravitas of the Rastafarian people." (ECF No. 30 ¶ 19).[9] The Photograph "focuses intensively on the subject, and attempt[s] to honor or 'reveal' something about that individual," thus both literally and figuratively "documenting" its subject. (Boyajian Decl. Ex. 36 ¶ 45; Boyajian Decl. Ex. 37 ¶ 3.) Graham was successful in achieving his purpose; the viewer is intensely focused on the Rastafarian because there is nothing else in the image. (*See* Boyajian Decl. Ex. 21 at 233:19-234:11). By contrast, Prince's reframing of the Rastafarian's image in the Instagram frame with the addition of his commentary "focuses more on the perceptions of the viewer as the creator of meaning about the individual."[10] (Boyajian Decl. Ex. 36 ¶ 45). Prince's temporary "adopt[ion]" of the "personality" and linguistic nuances of the comments on the Rastajay92's post, as he made his own comments (Prince Decl. ¶ 19), stands in stark contrast to Graham's "mute"

---

[9]      Defendants' proffered expert testimony corroborates both Graham and Prince's respective stated intents. (Boyajian Decl. Ex. 38 ¶ 15; Boyajian Decl. Ex. 36 ¶ 45; *see also* Boyajian Decl. Ex. 43 ¶ 3). Thus, in this case, unlike in *Cariou*, the Court has the benefit of Prince's and Graham's respective (and drastically divergent) intents *and* expert testimony supporting the same.

[10]      In other words, viewers of the Photograph would not wonder about what the photographer was trying to capture in the Photograph – it is clear. By contrast, the viewer of the *Portrait of Rastajay92* would have a more complex inner dialogue about what the painting is intended to be – what it is intended to do.

Photograph. (Boyajian Decl. Ex. 36 ¶ 39). No one would mistake the Photograph as commenting on social media or internet culture, and Graham specifically disclaimed making any kind of social commentary in his work. (Boyajian Decl. Ex. 21 at 234:22-24). Thus, it is indisputable that the *Portrait of Rastajay92* adds a "further purpose" to that of the Photograph. *Campbell*, 510 U.S. at 579.

As discussed in the McNatt Motion, this is exactly the kind of difference in purpose that the Second Circuit relied on as evidence of transformative meaning in *Blanch v. Koons*, 467 F.3d 244 (2d. Cir. 2006). (*See* McNatt Mot. at 18-19). Prince employs Graham's image to comment on social media, just as artist Jeff Koons used Blanch's image for his commentary on "the social and aesthetic consequences of mass media." *Blanch*, 467 F.3d at 253. And, like Koons, Prince needed to borrow a preexisting image that "was typical of a certain style of mass communication" (i.e., on social media), to ensure "that the viewer will understand what [he was] referring to,' and to give his commentary "'authenticity'" and "'veracity.'" *Id*. at 255. As the court held in *Blanch*, it is unnecessary to "judge the merits" of *Portrait of Rastajay92* or Prince's "approach to art." *Id.* at 255. It is undisputed that Prince had a "genuine creative rationale," *id.*, for using the Photograph in *Portrait of Rastajay92*.

2.   *Portrait of Rastajay92* Has a Different Character from Graham's Photograph

Prince's distinct purpose for creating the *New Portraits* series bears out in the character of the *Portrait of Rastajay92*, which is also different from the character of the Photograph. As discussed in the McNatt Motion, the *New Portraits* series "employ[] new aesthetics," *Cariou v. Prince*, 714 F.3d 694, 707-08 (2d. Cir. 2013), through a variety of techniques. (*See* McNatt Mot. at 20). *Portrait of Rastajay92* is no less innovative.

As a preliminary matter, it is crucial that the comparison of the works focus not solely on the photographic element of the works, but rather, the entirety of the works.[11] (*See* McNatt Mot. at 26-

---

[11]      The *New Portraits* ought to be viewed as "total experiences—as an image with text and captions that identify the whole not as 'the image' that came from a photograph, but as a contemporary, common, cultural experience of everyday people communicating with other everyday people about a wide array of topics that capture their attention." (Boyajian

27). The dramatic difference in message and meaning between the Photograph and *Portrait of Rastajay92* is evident in the striking aesthetic contrast between them. Unlike Graham's well-composed, traditional, and tasteful portrait of a Rastafarian in his natural setting, Prince presents an out of focus, blown up, image of the Rastafarian plunged into the modern setting of Instagram, surrounded by a jumble of emojis and language (some of it nonsensical), marking who has reposted the image, how many "likes" it has received, and what others have said about it. This is the quintessence of transformative use.

In particular, a central feature of the *Portrait of Rastajay92* is Prince's own commentary in his signature style, which both echoes the comment of Rastajay92 and makes self-referential allusions to his own artistic biography. (Boyajian Decl. Ex. 39 at 133:4-23, 145:23-146:4; Boyajian Decl. Ex. 36 ¶ 39). Through Prince's prominent placement of his own comment, Prince signals that this painting should be understood as part of his longstanding artistic inquiry into the nature of images in mass media (here, social media). The comments provide a vastly different context to the images, eliciting dramatically different conclusions from the viewer. (Boyajian Decl. Ex. 44 ¶ 12; *see also* Boyajian Decl. Ex. 42 at 184-85, 301-03 (acknowledging that a caption "adds more information to the photograph")). In this way (and given Prince's importance in the art world), the *New Portraits* become much more about his comments than they do the images. (Boyajian Decl. Ex. 36 ¶¶ 27-29, 38-39, 48). The discordant digital environment itself becomes Prince's subject matter as it clashes with Graham's classic portrait.

Prince's comments and aesthetic changes further alter viewer reaction provoked by the Photograph. While the Photograph documents a Rastafarian with "authenticity" (UF ¶ 57), producing a visually pleasing image, the *Portrait of Rastajay92* instead invites the viewer to examine and

---

Decl. Ex. 40 at 3). In that way, the *Portrait of Rastajay92* provides "a seemingly unmediated viewpoint of the artist Richard Prince in ways that are characteristically identifiable as his work, and not Donald Graham's…" (*Id.*).

consider what is actually being depicted in the work of art, considering both the image and comments together. It is this type of intellectual stimulation (rather than emotional response) that is the hallmark of contemporary art.

As discussed in the McNatt Motion (*see* McNatt Mot. at 21-22), the "reasonable observer"—i.e., a person with general interest in and appreciation of, but not specialized knowledge of, the arts—would have no difficulty discerning Prince's messages related to the social media phenomenon in *Portrait of Rastajay92*. (Boyajian Decl. Ex. 43 ¶ 3; Boyajian Decl. Ex. 44 ¶¶ 10-12). That a reasonable observer would appreciate the transformative character of *Portrait of Rastajay92* is further demonstrated by (1) the fact that the entire collection at the Exhibition sold out before it opened (UF ¶ 42); (2) the fact that LACMA—one of the most important museums in the country—featured one of the *New Portraits* in a 2018 Richard Prince retrospective and purchased the painting for its permanent collection (Boyajian Decl. Ex. 38 at Exh. 3; Prince Decl. ¶ 37); and (3) that the actual owner of the *Portrait of Rastajay92* perceives a significant transformation of the Photograph in the *Portrait of Rastajay92*. (Gagosian Decl. ¶ 9).[12] When viewed in context—among the dozens of *New Portraits* all evoking a similar social-media motif, which is how the works were displayed—the purpose and character of *Portrait of Rastajay92* is even more apparent.

Finally, given Prince's uncontroverted testimony about his intended meaning and purpose behind the *New Portraits* series, the "reasonable observer" test at the very least lends support to Prince's stated "genuine creative rationale for borrowing [Graham's] image," *see Blanch*, 467 F.3d at 255, as opposed to merely a *post hoc* justification for doing so.

    3.  *Portrait of Rastajay92* is Transformative Despite Borrowing the Image of the Photograph and Not Obscuring It

In *Graham I*, this Court relied heavily on *Cariou* in denying Prince's motion to dismiss.

---

[12] Citations to "Gagosian Decl." refer to the Declaration of Laurence Gagosian filed concurrently by Defendants Gagosian Gallery, Inc. and Laurence Gagosian in support of their motion for partial summary judgment.

Constrained to the allegations in the pleadings, and applying the "reasonable observer" test, the Court "conclude[d] that Prince's [work] does not so 'heavily obscure[] and alter[]'" the Photograph to make it "barely recognizable." *Graham I*, 265 F. Supp. 2d at 381. Rather, the court found Prince's "alterations" to the plaintiff's photograph to be "materially less significant than those that were found to be insufficiently transformative to clearly warrant a finding of fair use in *Cariou*." *Id.*

For the reasons discussed in the McNatt Motion, Prince respectfully submits that, on *summary judgment*, the rationale underpinning the Second Circuit's decision to remand a small number of works in *Cariou* does not fit the circumstances of this case, given the undisputed factual record here. (*See* McNatt Mot. at 22-24). Under the law, uses may be transformative even if they borrow underlying works with minimal or no alterations. (*See id.*) Prince's intended meaning and purpose behind the *New Portraits* series is of record and undisputed. And given Prince's purpose—which differed from that in *Cariou*—the transformative techniques employed had to be different. Thus, despite facially "minimal" alterations to the photographic element of the *Portrait of Rastajay92*, Prince's use of the Photograph is sufficiently transformative as a matter of law.

### 4. The Public Benefit of Art Far Outweighs any Commercial Gain from the *Portrait of Rastajay92*

That Prince profited from the one-time sale of the *Portrait of Rastajay92* does not diminish that the purpose and character of the use was fair. As in *McNatt*, Prince's art here is "properly considered to have value that benefits the broader public interest," *Blanch*, 467 F.3d at 254, outweighing whatever commerciality might be present in Prince's use. (*See* McNatt Mot. at 25).

### 5. The Nature of the Copyrighted Work and the Amount and Substantiality of the Portion Used Are Less Significant in the Context of the Instant Case

In analyzing the second statutory factor—"the nature of the copyrighted work," 17 U.S.C. § 107(2) — the Second Circuit considers "whether the [original] work is expressive or creative," and "whether the work is published or unpublished, with the scope for fair use involving unpublished

works being considerably narrower." *Cariou*, 714 F.3d at 709-10 (citations omitted). However, "'the second factor may be of limited usefulness where the creative work of art is being used for a transformative purpose.'" *Blanch*, 467 F.3d at 257 (quoting *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 612 (2d Cir. 2006)).[13] Also, courts "limit[] the weight … placed on this [second] factor" where the plaintiff's works "have been published extensively." *Bill Graham*, 448 F.3d at 612; *see also, e.g.*, *New Era Publ'ns Int'l, ApS v. Henry Holt & Co.*, 695 F. Supp. 1493, 1501 (S.D.N.Y. 1988) (explaining that "at common law … fair use was understood as predicated on the author's implied consent expressed through publication of his work").

Here, the nature of the Photograph is more factual than creative. Graham has stated that his purpose in taking the Photograph was to "capture" "the Rastafarian people in their surrounding environment" and "capture[] the spirit and gravitas of the Rastafarian people." Complaint ¶ 19. In other words, he was seeking "authenticity," not social commentary. (UF ¶ 57). While Prince does not dispute that the Photograph is worthy of copyright protection, Graham's intent was to accurately capture his subjects in their surroundings – to document them. (Boyajian Decl. Ex. 37 at 3; Boyajian Decl. Ex. 42 at 64:6-65:5). By contrast, it is undisputed that Prince's purpose in creating the *Portrait of Rastajay92* was **not** to authentically capture the Rastafarian or the "spirit and gravitas of the Rastafarian people," but rather, to authentically capture and "comment[] on social media" (Boyajian Decl. Ex. 14 at 202:21) by creating new portraits of people – portraits that capture people *as they are on social media*. (Prince Decl. ¶ 12). Moreover, it is undisputed that the Photograph was not only published, but also that it was widely disseminated, including by Graham's own actions, and by his express authorization to allow third-parties to use and license the Photograph to others, without his knowledge. (UF ¶¶ 73-74, 76). The fact that the Photograph was widely published and largely factual

---

[13]     Even a work with facially "expressive content," such as a design or photo, may be used for its "factual content," for instance, to document its existence and use in historical context. *See Bouchat v. Baltimore Ravens Ltd. P'ship*, 619 F.3d 301, 314 (4th Cir. 2010).

(i.e., authentically capturing its subject) in nature weighs in favor of finding fair use.[14] Even if the Photograph were considered more creative than factual, the *Portrait of Rastajay92* would still be fair use because (as explained above and below) Prince used the Photograph "in a transformative manner to [make a] comment…rather than to exploit its creative virtues." *Blanch*, 467 F.3d at 257. What Prince exploits, instead, is social media.

Like the second factor, the third factor—"the amount and substantiality of the portion used in relation to the copyrighted work as a whole," 17 U.S.C. § 107(3)—also depends on the degree to which the use is transformative, as "the extent of permissible copying varies with the purpose and character of the use." *Campbell*, 510 U.S. at 586. Analysis of the third factor thus necessarily intertwines with the first factor. *See Cariou*, 714 F.3d at 710 (because Prince's works were so thoroughly transformative, the third factor weighed "heavily" in Prince's favor even though Prince had made use of the "entire source photograph[s]" in some of the works). In some instances, "copying the entirety of a work is sometimes necessary to make a fair use of the image." *Bill Graham*, 448 F.3d at 613. Thus, the more important inquiry underlying the third factor is whether the use is "reasonable in relation to the purpose of the copying," *Campbell*, 510 U.S. at 586, an inquiry which again touches upon the first factor.

Here, the *Portrait of Rastajay92* incorporates a cropped image of the Photograph: part of the torso and hair of the Rastafarian, both from the top and bottom, has been removed. (UF ¶ 23). Additionally, a significant amount of negative white space that appeared in the Photograph does not appear in the *Portrait of Rastajay92*, and as Graham's proffered expert testified, the removal of negative white space from a photograph can change the meaning and impact of a photograph.

---

[14]      *See Stewart*, 495 U.S. at 237; *Brammer*, 2018 WL 2921089, at *2-3 (holding that while plaintiff's time-lapsed photograph "contained creative elements," because it "was also a factual depiction of a real-world location," it was more likely to be the subject of a fair use than an entirely creative work, and further holding that the scope of fair use was "broadened" because it was undisputed that plaintiff "previously published the photograph on several websites…and at least one of these publications did not include any indication that it was copyrighted.").

(Boyajian Decl. Ex. 42 at 100:16-103:24; *see also* UF ¶ 23). The portions of the image of the Photograph that do remain in the *Portrait of Rastajay92* were necessary to accomplish Prince's transformative purpose—to capture and comment on the nature of social media posts as a communication tool, which type of creative expression serves the purpose of copyright.[15] (Boyajian Decl. Ex. 43 ¶ 4). Like users who take and post selfies,[16] Prince's goal with the *New Portraits* was to contemporaneously and accurately capture the moment. The fact that some of the changes to the image of the Photograph may have been made automatically at the time the image of the Photograph was first uploaded to Instagram is inconsequential to Prince's work as a fair use; to the contrary, had Prince done anything to alter the post from how it would have appeared on Instagram (e.g., the photograph in the shape of a square rather than a rectangle, the Instagram iconography, Instagram "text"), that would have detracted from his intention to effectively capture the medium of communication, including the free-flowing nature of the circulation of images. As in *Bill Graham*, Prince used an unobscured copy of the copyrighted image to accomplish his fair use purpose by, among other things, "intermingl[ing]" existing visuals with his original contributions (e.g., addition of text, emoji, large-scale production, etc.). *Bill Graham*, 448 F.3d at 613. And like Koons, Prince needed to use the image as it was found on Instagram—that is, in a post—to "ensure a certain authenticity or veracity that enhances [his] commentary." *Blanch*, 467 F.3d at 255 (quoting Koons' declaration in support of summary judgment).

In sum, the use of the Photograph is altogether necessary to accomplish Prince's artistic vision, and at the very least, reasonable in relation to the purpose to which it is put in *Portrait of Rastajay92* and the rest of the *New Portraits* series.

---

[15]   The Supreme Court, over thirty years ago, recognized that exact copying, in light of new technological developments, can serve the purposes of copyright where there was no harm – past or likely – to the content creators. *Sony*, 464 U.S. at 430-31 (holding that "[w]hen technological change has rendered [the Copyright Act's] terms ambiguous, the Copyright Act must be construed in light of [its] basic purpose," "to stimulate artistic creativity for the general public good."). Indeed, the fair use doctrine is designed such that it can adapt to changing times.

[16]   To be clear, Prince is not arguing that the image of the Rastafarian is a selfie. The point, rather, is that Prince's work replicates and furthers the quality and style of communication in social media.

**B.**    ***Portrait of Rastajay92* Does Not Adversely Impact the Market for the Photograph**

As discussed in the McNatt Motion (*see* McNatt Mot. at 28-33), the fourth factor "is undoubtedly the single most important element of fair use." *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 566 (1985). Here, the fourth factor analysis weighs heavily in favor of fair use.

**First**, Graham lacks the necessary rights to sell the photograph of the Rastafarian who is his subject. The Rastafarian's right of publicity is governed by Jamaican law (*see Southeast Bank, N.A. v. Lawrence*, 66 N.Y.2d 910, 912 (1985)). (*See* Boyajian Decl. Ex. 57 ¶ 4 ("The exclusive property right to commercially market it is possessed by any natural person (or his/her successor) having a commercially exploitable persona.")). Given Graham's actual sale of photographs containing only an image of the Rastafarian, the evidence proves that the Rastafarian does indeed possess a "commercially exploitable persona." And, as discussed in Section C.1, *supra*, Graham does not obtain releases from his photographic subjects and did not obtain a written release in this case.[17] Therefore, any alleged harm caused by Prince's use of the Photograph would be to an illegitimate market. Like the market for plagiarized papers in *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 360, 644 (4th Cir. 2009), this is not the "type of 'harm'" "protected against by copyright law." This alone compels a finding in Prince's favor on factor four. (*See also* McNatt Mot. at 30).[18]

**Second**, even if Graham did have the right to exploit the image of the Rastafarian, the fourth factor would weigh in Prince's favor because the *Portrait of Rastajay92* does not "usurp" the market

---

[17]    Given the circumstances surrounding the taking of the Photograph (subject appears to be unsophisticated in legal matters, subject appears to be under the influence of marijuana, Graham himself may have been under the influence of marijuana), any alleged oral release that Graham may claim to have obtained would fail to "satisfy the essential elements of a contract (offer, acceptance, certainty and consideration)" and would therefore be unenforceable under Jamaican law. (Boyajian Decl. Ex. 45 ¶ 17). Graham's inability to "recall the specifics of his conversations with the Rastafarian further underscores that an enforceable release could not be proven." (*Id.*)

[18]    Indeed, the type of "harm" that Graham appears to be claiming is alleged harm to his moral rights (Graham depo at 51, testifying that his copyright was "misused" and that he did not receive "credit"), which are not protected by the Copyright Act. *See Kelley v. Chi. Park Dist.*, 635 F.3d 290, 296 (7th Cir. 2011) (explaining that, in contrast to European law, American copyright law does not protect moral rights; rather, it "protects the economic interests of artists."). Even assuming that the Photograph would be entitled to protection under the Visual Artists Rights Act of 1990 ("VARA"), 17 U.S.C. § 106A, Graham has chosen not to bring a claim under VARA, but instead under 17 U.S.C. §§ 106 and 501, which are focused on economic harm – harm that does not exist in this case.

for the Photograph. *Vanderhye*, 562 F.3d at 643. As in *Cariou*, the record establishes that "Prince's work appeals to an entirely different sort of collector than" Graham's photographs. *Cariou*, 714 F.3d at 709. In the first place, *Rastajay92* was a single-edition work that is owned by an individual who would not have purchased or displayed the Photograph.[19] Therefore, by definition, the painting cannot have an adverse impact on the market for Photograph. Moreover, the "target audience" (*Cariou*, 714 F.3d at 709) for the Photograph and the *Portrait of Rastajay92* are vastly different. The *Portrait of Rastajay92* appeals to a collector of contemporary art,[20] while the Photograph appeals to a collector of classic black and white photography.[21] (Boyajian Decl. Ex. 40 ¶ 34; Boyajian Decl. Ex. 36 ¶ 52). The difference in the nature of Graham's and Prince's markets is also reflected in the price differential between the works at issue—at the time Prince made *Portrait of Rastajay92*, the most Graham had sold the Photograph for was ███ (Boyajian Decl. Ex. 23), while the list price for *Portrait of Rastajay92* was ███ (Boyajian Decl. Ex. 19)—as well as the varied institutions that they exhibit and sell their works.[22]

   ***Third***, there is no evidence that Graham has lost any sales of the Photograph since Prince first exhibited the *Portrait of Rastajay92*. (UF ¶ 80). ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

---

[19]    While many fair use cases involve products that are offered for sale on an ongoing basis and the issue is what impact ongoing sales of the secondary products have on the market for the original (*see, e.g., Campbell*, *Castle Rock*, *Google Books*, *Hathi Trust*), ████████████████████████████████████████████████

████████████████████   *See also* McNatt Mot. at 31 (Graham's experts agreeing that purchasers of Prince's work have a strong interest in owning a Prince work in general, and more specifically, a work from the groundbreaking *New Portraits* series).
[21]    In fact, as Graham testified, the fact that he printed his photographs using traditional silver gelatin, rather than inkjet, like all the *New Portraits*, "is something that customers appreciate" because of its "archival longevity" when compared to inkjet. (UF ¶ 62).
[22]    Prince has had solo exhibitions at the Guggenheim and Whitney and has had his work acquired by and exhibited at the world's preeminent museums and is exhibited and sold by the most prestigious galleries in the world, including Gagosian Gallery (UF ¶ 2; Boyajian Decl. Ex. 38 at Exh. 3). In contrast, Graham has never had a solo exhibition at a major museum and has never had his work acquired (rather than donated) to any museum. (UF ¶ 54). His work is solely sold by himself and a gallery in France. (Boyajian Decl. Ex. 14 at 296:13-297:1).

███████████       Moreover, it is undisputed that Graham became better known after Prince created

the *Portrait of Rastajay92*—largely due to his efforts to capitalize on the fact that Prince had used his

work, including by hiring a social media consultant to increase his social media presence (UF ¶

85)—and even better known after he decided to sue Prince. (UF ¶ 89). This enhanced recognition can

only help a photographer's ability to sell his work. (*See also* McNatt Mot. at 33). Analysis of the

fourth fair use factor weighs strongly in favor of fair use.

### C.     Graham's Intentional Online Dissemination of the Photograph Also Weighs in Favor of Fair Use

As discussed in the McNatt Motion, the four fair use factors set forth in 15 U.S.C. § 107 are

non-exclusive. Here, a relevant additional consideration exists: Graham's intentional publication and

dissemination of the Photograph to promote his work. As discussed in Section C.2, *supra*, Graham

(1) posted his work online and in social media without any restrictions (express or implied) on its

continued dissemination, (2) took no action against those who did disseminate his work without his

express consent, and (3) exploited Prince's fair use of his work in an attempt to garner fame.

It is not surprising, then, that the Photograph then became widely available on social media,

although without a copyright notice or embedded watermark. When Richard Prince found the image,

he thought it was a self-portrait of the user named Rastajay92 and had no idea that it was someone's

copyrighted work. These are equitable considerations relevant to the "open-ended and context-

sensitive [fair use] inquiry," *Cariou*, 714 F.3d at 705, that should be considered "in light of the

purposes of the copyright laws." *Campbell*, 510 U.S. at 577-78.[23]

## II.     THE ANCILLARY WORKS ARE ALSO NON-INFRINGING USES OF THE PHOTOGRAPH

Aside from the creation and display of *Portrait of Rastajay92*, Graham's complaint alleges

---

[23]     To be clear, Prince does not suggest that Graham's actions in disseminating his Photograph without any restriction are outcome determinative to the fair use analysis (in contrast to the implied license analysis, where Graham's actions are dispositive). Rather, these actions are an important fair use consideration in this context of social media.

that Prince is liable for three other acts: a Tweet, the display of a version of the *Portrait of Rastajay92* on a Billboard, and the inclusion of *Portrait of Rastajay92* in a Pamphlet of the *New Portraits* images showing all of the works displayed at the Gagosian Exhibition. Like the *Portrait of Rastajay92*, the ancillary uses are all quintessential fair uses of the Photograph. Separately, the Tweet and Billboard are *de minimis* uses of the Photograph and therefore not *prima facie* infringing at all.

Tweet. After this lawsuit was filed, Prince posted a Tweet that consisted of a third-party compilation of two blurry images. (UF ¶ 44). The image on the left of the Tweet is of a portion of one of Jeff Koons' paintings that appropriated a Gordon's Gin advertisement, which was the subject of a lawsuit against Koons, and the image on the right is a distorted copy of a portion of the Photograph. (UF ¶ 48). It is undisputed that Prince did not create the montage and does not recall its origin. (UF ¶ 49). The Tweet also contains the words "Booze Pot Sex. I guess I was wrong. (Memo to Turner: I DID NOT take make create this montage)." (UF ¶ 50). Prince testified that: "I was making a comment on the fact that I didn't create the montage." (UF ¶ 49).

Prince is not liable for copyright infringement for posting the Tweet for at least two reasons. First, Prince's use of the Photograph is a *de minimis* use for which the law does not impose consequences. This proposition is so uncontroversial that Graham's own proffered expert admitted as much. (Boyajian Decl. Ex. 48 at 176:16-178:4). Second, even if that not were the case, the Tweet is a quintessential fair use of the Photograph because it is a comment on the lawsuit (also acknowledged by Graham's own proffered expert). (UF ¶ 52).

"The legal maxim '*de minimis non curat lex*' (sometimes rendered, "the law does not concern itself with trifles") insulates from liability those who cause insignificant violations of the rights of others." *Ringgold v. Black Entm't Television, Inc.*, 126 F.3d 71, 74 (2d Cir. 1997).[24] In the

---

[24]    The determination that a use is *de minimis* (and therefore *prima facie* infringing) is a threshold inquiry that precedes the determination of whether it is fair use. *See Gordon v. Nextel Commc'ns & Mullen Advert., Inc.*, 345 F.3d 922, 924 (6th Cir. 2003) (citing *Ringgold*, 126 F.3d at 77); *see also Wright v. Warner Books, Inc.*, 953 F.2d 731, 743 (2d Cir.

Second Circuit, the *de minimis* doctrine is applied in two distinct scenarios: (1) where there exists "a technical violation of a right so trivial that the law will not impose legal consequences," and (2) where "copying has occurred to such a trivial extent as to fall below the quantitative threshold of substantial similarity[.]" *Ringgold*, 126 F.3d at 74. While Prince believes the Tweet constitutes *de minimis* use under the second scenario, we do not address that here because the Tweet *clearly* constitutes *de minimis* use under the first.

In *Davis v. Gap, Inc.*, 246 F.3d 152, 173 (2d Cir. 2001), Judge Leval explained the first type of *de minimis* use as follows:

> Trivial copying is a significant part of modern life. Most honest citizens in the modern world frequently engage, without hesitation, in trivial copying that, but for the *de minimis* doctrine, would technically constitute a violation of law. …

Consistent with the examples of *de minimis* use set forth in *Davis (see id.)*, the Tweet is a trivial, inconsequential use of the Photograph. Prince used Twitter to comment on the impending lawsuit, posting a montage of two, blurry photographs side-by-side (both related to copyright infringement lawsuits involving appropriation artists). The Photograph took up less than half of the area of the montage and much smaller portion of the entire content of the Tweet. Prince did not create the montage, and re-displayed the montage in the Tweet to *specifically* comment that he did not create it.[25] The Tweet could not arguably cause any sort of actual harm to Graham or the value of the Photograph. Accordingly, this type of non-commercial commentary, over social media, is the type of "trifle" which is not actionable copying under the *de minimis* doctrine. *See also Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1165 (9th Cir. 2007).

To the extent quantitative and qualitative considerations of similarity are taken into account, the Photograph has been significantly blurred and, as merely a portion of the montage which itself is

---

1991) (Van Gaafeiland, J., concurring) ("The defense of fair use assumes the existence of infringement. In my opinion, if there is any infringement in the instant case, it is technical at best and so de minimis as not to be actionable.").

[25]     It is also notable that in true Prince fashion, his comment "memo to turner", which may seem nonsensical to most, is in fact a reference to a well-known Mick Jagger song, *Memo from Turner*. (Prince Decl. ¶ 35).

only a portion of the Tweet, is not the central or predominant focus of the Tweet. *See, e.g.*, *Sandoval v. New Line Cinema Corp.*, 147 F.3d 215, 217 (2d Cir. 1998) (holding background use of out-of-focus photographs to be *de minimis* use).

Even if the Tweet were not a *de minimis* use of the Photograph, it would still qualify as fair use under the statutory analysis for many of the reasons set forth above with respect to the *Portrait of Rastajay92*. In addition, the Tweet was made for another, highly transformative purpose: Prince was making a comment on the instant lawsuit. (UF ¶ 52). *See Leveyfilm, Inc.*, 2018 WL 2921089, at *10 (defendant's use of a photo of a DVD cover as part of an article regarding a lawsuit concerning video recorded on DVD was fair use because "due to its attachment to the DVD cover of the video at the center of the lawsuit— [the photo] had become the news story itself.").[26] Accordingly, if the Tweet is not a *de minimis* use of the Photograph, it is certainly a protected fair use.

<u>Billboard</u>. Approximately eight months after the Gagosian Exhibition closed, a friend of Prince's approached him about the possibility of displaying some of his artwork on a billboard. (Boyajian Decl. Ex. 14 at 170:12-20). Prince was interested in the idea, and on or about June 12, 2015, a billboard was displayed on the West Side Highway in New York City that depicted a photograph of an installation image of the Gagosian Exhibition which included an image of seven *New Portraits* works, one of which was the *Portrait of Rastajay92*. (UF ¶ 44). The Billboard was not intended as an advertisement of the Exhibition or any of the *New Portraits* shown on the Billboard, as the Exhibition ended months earlier, and all of the *New Portraits* had already been sold. (UF ¶ 45).

The Billboard was a fair use for the same reasons as the *Portrait of Rastajay92* itself was a

---

[26]     Prince's Tweet could be reasonably perceived as revealing Prince's acknowledgement that, while the creation of appropriation art is culturally relevant and justifiable, some would not take well to it, as evidenced by two, relatively close-in-time lawsuits brought against appropriation artists, and thus the likelihood of appropriation artists such as himself was not all fun and games. Indeed, the prospect of a defendant like Richard Prince being barred from making such a comment on copyright grounds has serious First Amendment implications. *See Eldred*, 537 U.S. at 219-20 (the "fair use" doctrine functions as a "built-in First Amendment accommodation[]," which affords "considerable latitude for scholarship and comment"). The use of the portion of the Photograph (and the Gordon's Gin advertisement, for that matter) in the Tweet was necessary for this purpose.

fair use, but for additional reasons as well. Namely, the Billboard did not provide any information regarding any of the *New Portraits* displayed, and was simply a historical representation of a significant art show in which the *Portrait of Rastajay92* was merely one small part. (ECF No. 30-4). *See Bill Graham*, 448 F.3d at 609 (defendant's use of copyrighted Grateful Dead posters in coffee-table book as "historical artifacts to document and represent the actual occurrence of Grateful Dead concert events featured on [a] timeline" was transformative); *Bouchat v. Baltimore Ravens Ltd. P'ship*, 737 F.3d 932, 945-47 (4th Cir. 2013), *as amended* (Jan. 14, 2014) (use of copyrighted logo in three stadium displays—a timeline, a highlight reel, and a significant plays exhibit—was fair, because use was "designed merely to preserve a specific aspect of Ravens history"). Conveying a historical event did not result in any profit to Prince, and, given that all the works were sold before the Exhibition even opened, and the show ended nearly eight months before it was displayed, the Billboard could not conceivably have caused harm to Graham's prospects at selling his Photograph.

The Billboard is also a *de minimis* use. *See Davis*, 246 F.3d at 173. The Billboard, which was on top of a building, included seven *New Portraits*, surrounded by white space. (Prince Decl. ¶ 34; ECF No. 30-4). The image of the Photograph in the *Portrait of Rastajay92* comprises approximately less than 10% of the Billboard. (*Id.*). The effect of the Billboard, as seen from ground level, is the collection of Instagram paintings – the look and feel of Instagram that Prince intended to capture in the *New Portraits* – not any single photographic element. In this context, the inclusion of a portion of the Photograph on the Billboard is trivial.

Pamphlet. At the Gagosian Exhibition, copies of a pamphlet containing images of each of the *New Portraits* works on display, including the *Portrait of Rastajay92*, were made physically available for free until they were all handed-out. (UF ¶ 41). In addition to being fair use because it possesses many of the transformative qualities of the actual painting of the *Portrait of Rastajay92*,

the painting in the context of the Pamphlet was also a fair use because it was part of a historical record of the Gagosian Exhibition. (Boyajian Decl. Ex. 49; Boyajian Decl. Ex. 24 at 263:9-18). *See Bill Graham*, 448 F.3d at 609; *Bouchat*, 737 F.3d at 945-47. ████████████████████

████████████████████████████████████████

████████████████████████████████████

### III.   PRINCE HAD AN IMPLIED LICENSE TO USE THE IMAGE OF THE PHOTOGRAPH

Prince's use of the image of the Photograph he found on Instagram was pursuant to a non-exclusive implied license. Unlike an exclusive license, "a nonexclusive license may be granted orally, or may even be implied from conduct." *Psihoyos v. Pearson Educ., Inc.*, 855 F. Supp. 2d 103, 119 (S.D.N.Y. 2012) (internal citations omitted).[27] In *Field v. Google*, the court held that Google had an implied license to include works authored by the plaintiff in its databases of "cached" webpages. 412 F. Supp. 2d at 1116. The court held that because the plaintiff had "knowledge of how Google would use the copyrighted works he placed on those pages, and [had] knowledge that he could prevent such use [through "industry standard mechanisms"], [and] instead made a conscious decision to permit it," "[h]is conduct [was] reasonably interpreted as the grant of a license to Google for that use." *Id.*; *see also Parker v. Yahoo!, Inc.*, 2008 WL 4410095, at *3-4 (E.D. Pa. Sept. 25, 2008) (dismissing similar complaint based on reasoning in *Field*).

Similarly, social media users who do not want an image to be circulated freely can choose not to post it (because they know that otherwise they are providing "everyone" the right to use the content), to post it privately, or to post it with a copyright notice or watermark, because they know

---

[27]    The "Second Circuit has not yet ruled on the precise circumstances under which an implied non-exclusive license will be found." *Id.* While some circuits have taken a "narrow" approach to implied license, courts "in this Circuit and elsewhere routinely have relaxed the test to fit other situations." *Psihoyos*, 855 F. Supp. 2d at 119. Some courts "focus on the oft-stated principle that 'consent given in the form of mere permission or lack of objection is also equivalent to a nonexclusive license and is not required to be in writing.'" *Id.* (citation omitted); *Field*, 412 F. Supp. 2d at 1115 ("Consent to use the copyrighted work need not be manifested verbally and may be inferred based on silence where the copyright holder knows of the use and encourages it.").

that otherwise they are providing the social media platform a non-exclusive, transferable license to their content. (Boyajian Decl. Ex. 17 ¶¶ 15, 74). While these are certainly simple actions that are known to a professional photographer like Graham (Boyajian Decl. Ex. 48 at 238), Graham took none of these measures. Instead, he chose to post the Photograph (and other of his work) online and in social media "using the 'everyone' setting" in order to promote his photography, "allowing everyone, including people off of Facebook" to use the Photograph.[28] Accordingly, Graham "made a conscious decision" to omit any such notation and "his conduct is reasonably interpreted as the grant of a license to" anyone to use his work. *Field*, 412 F. Supp. 2d at 1116. He also provided an express license to Facebook to not only use his Photograph, but also license it to others, without his approval or even knowledge. (Boyajian Decl. Ex. 32 at 2.1).[29] That Prince ultimately came across the Photograph and used it[30] not only is unsurprising, but it is also in accordance with what Graham agreed to when he posted the Photograph with the "everyone" setting.

## CONCLUSION

Because Prince's use of the Photograph was a fair use and pursuant to an implied license, this Court should grant Prince's motion for summary judgment.

Dated: New York, New York
October 5, 2018

**GREENBERG TRAURIG, LLP**

By: _____
Richard A. Edlin
MetLife Building
200 Park Avenue
New York, New York 10166
Tel: (212) 801-9200

---

[28]   The Facebook terms provide that the license to "everyone" allows users to (1) access and use the posted information, *and* (2) associate that information with the poster. (Boyajian Decl. Ex. 32 ¶ 2.4). People are therefore permitted to do one or the other, or both. (UF ¶ 94).
[29]   The Facebook terms further state that uploaded photos may continue to exist and be circulated online *even after they delete their accounts* if their content has been shared with others. (Boyajian Decl. Ex. 32 at 2.1). Graham therefore understood that as soon as he posted his work on Facebook, which he did for the purpose of disseminating his work to the public, that he would lose control of how and by whom his work was used. In other words, "Facebook could use [his] photograph in [] a weight loss ad…and there would be nothing that [he] can do about it." (Boyajian Decl. Ex. 16 at 127).
[30]   As set forth above, Prince used a portion of the image of the Photograph in a re-post and a single-edition work of the re-post and did not further license it to others (as Facebook was entitled to do).

EdlinR@gtlaw.com

Ian C. Ballon
Nina D. Boyajian
Valerie W. Ho
1840 Century Park East, Suite 1900
Los Angeles, California 90067
Tel: (310) 586-7700
Ballon@gtlaw.com
BoyajianN@gtlaw.com
HoV@gtlaw.com

*Attorneys for Defendant Richard Prince*