[FILED UNDER SEAL]

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DONALD GRAHAM,

                    Plaintiff,


          v.


RICHARD PRINCE, GAGOSIAN
GALLERY, INC., and LAWRENCE
GAGOSIAN,

                    Defendants.

---

Case No. 1:15-cv-10160-SHS

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS GAGOSIAN GALLERY, INC. AND LAURENCE GAGOSIAN'S MOTION FOR PARTIAL SUMMARY JUDGMENT

CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Plaintiff Donald Graham*

November 9, 2018

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... ii

PRELIMINARY STATEMENT ..................................................................................... 1

STANDARD OF REVIEW .............................................................................................. 3

COUNTERSTATEMENT OF FACTS ........................................................................... 4

    A.    Donald Graham and His Photograph *Rastafarian Smoking a Joint* ....................... 4

    B.    Richard Prince, *New Portraits* and *Untitled* ...................................................... 4

    C.    The Gagosian Defendants and the *New Portraits* Exhibition ................................ 5

    D.    *Untitled* Featured in Promotions and Media Coverage of the *New Portraits* Series .............................................................................................................. 6

    E.    *Untitled* Selected for Purchase by Laurence Gagosian ........................................ 7

    F.    Sales of Works in the *New Portraits* Series and Revenues for the Gagosian Defendants ........................................................................................................ 8

    G.    Sales of Works in the *New Portraits* Series in the Secondary Market ................... 8

ARGUMENT ................................................................................................................... 8

I.    A REASONABLE JURY COULD FIND THAT PLAINTIFF IS ENTITLED TO THE GAGOSIAN DEFENDANTS' REVENUES FROM SALES OF OTHER WORKS IN THE *NEW PORTRAITS* SERIES ...................................................... 8

    A.    Plaintiff Has Shown a Causal Nexus Between *Untitled* and Revenues from Sales of Other Works in the *New Portraits* Series ............................................... 9

        1.    *Untitled* Was Used To Promote Sales of Other Works in the Same Series ..................................................................................................... 10

        2.    The Cases Relied Upon By the Gagosian Defendants are Distinguishable and Show that Plaintiff Has in Fact Met His Burden ................................................................................................ 14

    B.    Because the Gagosian Defendants Have Failed to Meet Their Burden, Plaintiff Is Entitled To Recover the Full Revenues from Sales of Other Works in the *New Portraits* Series .................................................................... 16

II.    A REASONABLE JURY COULD FIND THAT PLAINTIFF IS ENTITLED TO LAURENCE GAGOSIAN'S UNREALIZED REVENUES FROM *UNTITLED* ........... 17

    A.    Dismissal of a Claim for Damages Is Not Warranted Solely on the Basis that Plaintiff Claims an Alternative Remedy ..................................................... 18

    B.    Plaintiff Has Shown a Causal Nexus Between *Untitled* and Mr. Gagosian's Unrealized Profits from *Untitled* ................................................... 19

    C.    Plaintiff Has Presented Proof of Unrealized Revenues ........................................ 21

    D.    Because Mr. Gagosian Has Failed to Meet His Burden, Plaintiff Is Entitled To Recover the Full Unrealized Revenues from *Untitled* ..................................... 22

CONCLUSION ............................................................................................................... 22

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Associated Residential Design v. Molotky,*
    226 F. Supp. 2d 1251 (D. Nev. 2002) .......................................................................18, 19, 20

*BHC Dev., L.C. v. Bally Gaming, Inc.,*
    No. 12-2393-JPO, 2014 WL 781871 (D. Kan. Feb. 25, 2014) ...............................................19

*Blackman v. Hustler Magazine, Inc.,*
    800 F.2d 1160 (D.C. Cir. 1986) ..................................................................................................17

*Business Trends Analysts, Inc. v. Freedonia Group, Inc.,*
    887 F.2d 399 (2d Cir. 1989).........................................................................................................21

*Complex Sys., Inc. v. ABN Ambro Bank N.V.,*
    No. 08 Civ. 7497, 2013 WL 5970065 (S.D.N.Y. Nov. 8, 2013) ........................................9, 15

*Cruden v. Bank of New York,*
    957 F.2d 961 (2d Cir. 1992)...........................................................................................................3

*Eales v. Environmental Lifestyles, Inc.,*
    958 F.2d 876 (9th Cir. 1992) .......................................................................................................19

*Fournier v. Erickson,*
    242 F. Supp. 2d 318 (S.D.N.Y. 2003).............................................................................9, 16, 19

*Granger v. Gill Abstract Corp.,*
    566 F. Supp. 2d 323 (S.D.N.Y. 2008)........................................................................................14

*Heyman v. Commerce & Indus. Ins. Co.,*
    524 F.2d 1317 (2d Cir. 1975).........................................................................................................3

*IBM Corp. v. BGC Partners, Inc.,*
    No. 10 Civ. 128, 2013 WL 1775437 (S.D.N.Y. Apr. 25, 2013)..............................................15

*Joseph P. Carroll Ltd. v. Baker,*
    889 F. Supp. 2d 593 (S.D.N.Y. 2012)........................................................................................21

*Kushner v. DBG Property Inv'rs, Inc.,*
    793 F. Supp. 1161 (S.D.N.Y. 1992)............................................................................................22

*Lawton v. Melville Corp.,*
    No. 96 Civ. 9461, 1997 WL 346129 (2d Cir. June 24, 1997) ...................................8, 9, 14, 19

*Mackie v. Rieser,*
    296 F.3d 909 (9th Cir. 2002) ................................................................................................16, 19

*Mager v. Brand New Sch.*,
     No. 03 Civ. 8552, 2004 WL 2413978 (S.D.N.Y. Oct. 28, 2004) ............................................15

*Nelson-Salabes, Inc. v. Morningside Dev., LLC*,
     284 F.3d 505 (4th Cir. 2002) ............................................................................................17

*Oleg Cassini, Inc. v. Electrolux Home Prod., Inc.*,
     No. 11 Civ. 1237, 2014 WL 1468118 (S.D.N.Y. Apr. 15, 2014)............................................21

*On Davis v. The Gap, Inc.*,
     246 F.3d 152 (2d Cir. 2001)..........................................................................................9, 14 15, 16

*Silverstein v. Xl Specialty Ins. Co.*,
     No. 15 Civ. 6818, 2016 WL 3963129 (S.D.N.Y. July 21, 2016), *appeal
     withdrawn* (Nov. 21, 2016) ............................................................................................22

*Stenograph L.L.C. v. Bossard Assocs., Inc.*,
     144 F.3d 96 (D.C. Cir. 1998) ............................................................................................17

*Taylor v. Meirick*,
     712 F.2d 1112 (7th Cir. 1983) ............................................................................................14

*Tu v. TAD Sys. Tech. Inc.*,
     No. 08 Civ. 3822, 2009 WL 2905780 (E.D.N.Y. Sept. 10, 2009)............................................18

*Van Brouck & Assocs., Inc. v. Darmik, Inc.*,
     329 F. Supp. 2d 924 (E.D. Mich. 2004)......................................................................17, 18

*William Hablinski Architecture v. Amir Constr. Inc.*,
     No. 03 Civ. 6365, 2004 WL 4909902 (C.D. Cal. Dec. 27, 2004) ............................................18

## Statutes & Rules

17 U.S.C. § 504(b) ...................................................................................................... passim

Federal Rules of Civil Procedure Rule 56(c)...................................................................................3

Plaintiff Donald Graham ("Graham" or "Plaintiff") respectfully submits this memorandum of law in opposition to the motion for partial summary judgment filed by Defendants Gagosian Gallery, Inc. ("Gagosian Gallery") and Laurence Gagosian ("Mr. Gagosian") (collectively, the "Gagosian Defendants").

## PRELIMINARY STATEMENT

Appropriation artist Richard Prince copied Mr. Graham's fine art photograph and sold it for tens of thousands of dollars, without asking for permission, giving Mr. Graham any credit, or offering to pay for the property he took.  Gagosian Gallery and its owner, Laurence Gagosian, chose to allow Mr. Prince to display his infringing work, *Untitled*, alongside other works in his *New Portraits* series in an Exhibition at Gagosian Gallery for over a month, and exclusively sold those works for Mr. Prince for commissions of over a million dollars.  Although the Gagosian Defendants were well aware of Mr. Prince's attitude toward copyright law—and had even been sued along with Mr. Prince by another photographer for copyright infringement in this court—they too did not seek Mr. Graham's permission to use his photograph or ask Mr. Prince to seek his permission.

Instead, the Gagosian Defendants openly used *Untitled* to generate demand for and promote the sales of the other works in the *New Portraits* series.  They featured *Untitled* in solicitations sent to potential buyers, in a preview of the Exhibition open to select potential buyers, in an Exhibition Catalog and on Gagosian Gallery's heavily-trafficked website—all this on top of publicity featuring *Untitled* from other sources, including a billboard erected over a busy New York City highway which generated additional traffic for Gagosian Gallery's website, an article by a Pulitzer Prize-winning art critic, a segment on a major television network and various art blogs.  This favored work was even selected for purchase by Mr. Gagosian himself,

who hung it up in one of his homes.  The promotional benefits that the *New Portraits* series enjoyed from its anchor work, *Untitled*, have continued, with other works re-selling in the secondary market for as much as $250,000, over six times their original listed price.

The Gagosian Defendants themselves made over a million dollars in commissions from promoting *Untitled* and Mr. Gagosian's support of that promotion has contributed to the skyrocketing value of that work which he now owns.  Yet the Gagosian Defendants argue that Mr. Graham is not entitled to any portion of their profits from sales of the other works in the *New Portraits* series or any portion of Mr. Gagosian's unrealized profits from *Untitled*.  Each of their arguments fails on the facts and the law.

With respect to their profits from sales of the other works in the *New Portraits* series, the Gagosian Defendants are wrong that Plaintiff has not met his initial burden of showing any causal nexus between those revenues and *Untitled*.  There is ample evidence that all of the Defendants view *Untitled* as being part of a single series of *New Portraits* works and that *Untitled* was used to promote the related sales of the other works in that series before those sales were consummated.  Indeed, revenues from sales of works in a single series promoted by use of the infringing work in that series have a much stronger nexus to the infringement than do the untethered claims for defendants' total revenues, or for defendants' revenues earned from endeavors barely or not involving the infringing works, in the highly distinguishable cases upon which the Gagosian Defendants rely.

With respect to Mr. Gagosian's unrealized profits from *Untitled*, the Gagosian Defendants are wrong again that Plaintiff has not shown any causal nexus between those unrealized revenues and any infringement.  Contrary to the Gagosian Defendants' representation, Mr. Gagosian is not an innocent purchaser of *Untitled* with no connection to the infringement.

2

Rather, he *personally* authorized the exhibition, promotion and sale of *Untitled* alongside other works in the *New Portraits* series, without seeking or asking Mr. Prince to seek Mr. Graham's permission to use his photograph, despite being well aware of the history of copyright infringement allegations against Mr. Prince.  The Gagosian Defendants' back-up ████████ ██████████████████████████████████████████████████████████ ███████████████████████████████████████████ is flawed—necessarily contradicts their suggestion that there is no evidence at all allowing any assessment of value and runs counter to courts' routine endorsement of this market approach for assessing damages.  The Gagosian Defendants' other attacks on unrealized profits are also contrary to law or nonsensical.

Ironically, the Gagosian Defendants have not even endeavored to meet *their* burden of proving their deductible expenses and portions of those revenues that are attributable to factors other than Mr. Graham's photograph.  The law is clear that where Plaintiff has met his burden but Defendants have failed to carry their burden, Plaintiff is entitled to recover the full amount of those revenues.

Accordingly, Defendant's motion for partial summary judgment should be denied.

## **STANDARD OF REVIEW**

Under Rule 56(c) of the Federal Rules of Civil Procedure, a movant is entitled to summary judgment only if he can demonstrate that there is no genuine issue as to any material fact.  In considering a motion for summary judgment, the court "must resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought." *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir. 1975).  "Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted." *Cruden v. Bank of New York*, 957 F.2d 961, 975 (2d Cir. 1992).

## COUNTERSTATEMENT OF FACTS

### A.   Donald Graham and His Photograph *Rastafarian Smoking a Joint*

Donald Graham is a professional photographer who specializes in portraiture. (COF ¶ 1.)  Graham's fine artwork has been exhibited at various high-profile galleries and museums, including but not limited to the Metropolitan Museum of Art and the International Center of Photography in New York and A. Galerie in Paris.  (*Id.* ¶ 2.)  Graham, at his own expense, spent approximately two weeks in May of 1996, trekking through the villages and mountains of Jamaica, carrying with him his photography equipment and mobile studio, to capture photographs of the Rastafarian people.  (*Id.* ¶ 7.)  Graham's efforts culminated in a series of photographic works, including *Rastafarian Smoking a Joint*.  (*Id.*)  *Rastafarian Smoking a Joint* was first published in August 1998 and, in recognition of its artistic merit, was published under license in *Communication Arts* magazine's "Photography Annual 39" as part of Graham's five-photograph, award-winning series in the "Unpublished" category for that year.  (*Id.* ¶ 8.)  Graham sells prints of *Rastafarian Smoking a Joint* in limited editions and in limited sizes, one of which is in the collection of renowned art collector Henry Buhl.  (*Id.* ¶ 9.)  Graham's fine art Internet website, donaldgrahamfineart.com, contains two digital reproductions of *Rastafarian Smoking a Joint*, each in close proximity to the "© Donald Graham" notice; and another digital reproduction of *Rastafarian Smoking a Joint* exists on the Internet website donaldgraham.com, also in close proximity to the "© Donald Graham" notice.  (*Id.* ¶ 10.)

### B.   Richard Prince, *New Portraits* and *Untitled*

Richard Prince is an "appropriation artist" who is well-known for incorporating others' works, typically without permission, and selling the appropriative works as his original works.  (*Id.* ¶ 3.)  In 2014, Prince made a series of works entitled *New Portraits*.  (*Id.* ¶ 11.)  One of the works in that series is *Untitled (Portrait of Rastajay92)* ("*Untitled*"), which featured an

image of *Rastafarian Smoking a Joint*. (*Id.* ¶ 12.) Prince has conceded that he made use of *Rastafarian Smoking a Joint* in *Untitled*, and admits that he did not "do anything to determine who took the photo" in the Instagram post containing Graham's photograph. (*Id.* ¶ 14.) Prince never asked Graham for permission to copy, reproduce, modify, distribute, display or make any other use of *Rastafarian Smoking a Joint* or prepare any derivative work therefrom. (*Id.* ¶ 15.) Prince also made no attempt to contact Graham to ask whether he could license the photograph or negotiate payment for his use of the photograph, nor did Prince credit Graham for his use of his photograph. (*Id.*)

### C.   The Gagosian Defendants and the *New Portraits* Exhibition

Gagosian Gallery owns and operates a number of art galleries in New York City and various other cities, including the gallery located at 976 Madison Avenue, New York, NY 10075 (the "Madison Avenue Gallery"). (*Id.* ¶ 4.) Laurence Gagosian is the controlling shareholder █████████ of Gagosian Gallery. (*Id.* ¶ 5.)

From September 19, 2014 through October 24, 2014, Prince displayed *Untitled*, along with other works in the *New Portraits* series, at the Madison Avenue Gallery in an exhibition entitled "*New Portraits*" (the "Exhibition"). (*Id.* ¶ 19.) At the time of the Exhibition, the Gagosian Defendants had the ability to choose which artists to work with and to prevent an exhibition from occurring at the Madison Avenue Gallery. (*Id.* ¶ 20.) Mr. Gagosian and at least one employee of Gagosian Gallery allowed Prince to display the works displayed in the Exhibition. (*Id.* ¶ 21.) Mr. Gagosian did not research, and is not aware of anyone at Gagosian Gallery who researched, whether Graham's photograph *Rastafarian Smoking a Joint* was copyrighted before *Untitled* was shown in the Exhibition. (*Id.* ¶ 22.) Neither Mr. Gagosian nor Gagosian Gallery ever solicited or obtained permission from Graham to reproduce, modify, distribute or display Graham's *Rastafarian Smoking a Joint*, or asked Prince to seek permission

5

to use the photographs in the *New Portraits* works displayed in the Exhibition.  (*Id.* ¶ 23.)  At the time of the Exhibition, Mr. Gagosian was aware that Prince had previously been accused of copyright infringement.  (*Id.* ¶ 24.)  The Gagosian Defendants and Prince were previously defendants in the *Cariou* suit in the Southern District of New York, which was brought by a photographer alleging copyright infringement primarily related to an exhibition of Prince's works entitled "Canal Zone".  (*Id.*)

      **D.**    ***Untitled* Featured in Promotions and Media Coverage of the *New Portraits* Series**

Gagosian Gallery promoted attendance for the Exhibition and sales of the works in the *New Portraits* series.  (*Id.* ¶ 25.)  *Untitled* was featured in those promotions and in media coverage of the series.  (*Id.* ¶¶ 25-45.)  ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████  Additionally, the works in the *New Portraits* series that appeared in the Exhibition, including *Untitled*, were staged in the Gallery's fifth floor annex space for approximately a week prior to the opening, and potential buyers were brought into the annex space to see the works that they could purchase.  (*Id.* ¶ 28.)

*Untitled* was displayed in the Exhibition alongside 36 other works in the *New Portraits* series for 35 days.  (*Id.* ¶ 30.)  As part of the Exhibition, Gagosian Gallery produced and distributed an exhibition catalog that included an image of *Untitled* alongside images of the

other exhibited works (the "Catalog").  (*Id.* ¶ 32.)  ██████████████████ until at least December

30, 2015, Gagosian Gallery also displayed on its website, www.gagosian.com, photographs of

works in the *New Portraits* series from the Exhibition, including at least one photograph that

showed *Untitled* alongside six other works.  (*Id.* ¶ 35.)  Gagosian Gallery's website is heavily

trafficked, generating over 160,000 visits during a recent six-month period.  (*Id.* ¶ 36.)

████████████████, Prince approved the display of a billboard on the West Side

Highway of New York City that featured an image of *Untitled*, along with six other works in the

*New Portraits* series (the "Billboard").  (*Id.* ¶ 37.)  █████████████████████

████████████████████████████████████████████████

*Untitled* also was featured in various media coverage of the *New Portraits* series.

(*Id.* ¶¶ 42-43.)  For example, "Pulitzer Prize-winning art critic Jerry Saltz" published a review of

the Exhibition that featured *Untitled* in an installation photograph of the Exhibition directly

underneath the title of the article and that discussed Prince's "recent run-in with copyright law in

his *Rasta Paintings*"; █████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

### E.    *Untitled* Selected for Purchase by Laurence Gagosian

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████  ████████████████████████████

██████████████████████████████████  Mr. Gagosian selected

*Untitled* to purchase and did purchase *Untitled* ███████████████ He also hung it up in his guest house in Amagansett.  (*Id.* ¶ 51.)

      **F.**      **Sales of Works in the *New Portraits* Series and Revenues for the Gagosian Defendants**

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

Gagosian Gallery was Prince's exclusive agent for the sale of the works in the *New Portraits* series.  ██████████████████████████████████████████████

████████████████████████████████████████████████ Thus, the Gagosian Defendants generated ███████████████ from sales of the works in the *New Portraits* series.

      **G.**      **Sales of Works in the *New Portraits* Series in the Secondary Market**

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

## ARGUMENT

**I.**      **A REASONABLE JURY COULD FIND THAT PLAINTIFF IS ENTITLED TO THE GAGOSIAN DEFENDANTS' REVENUES FROM SALES OF OTHER WORKS IN THE *NEW PORTRAITS* SERIES**

      "In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue."  17 U.S.C. § 504(b).  The copyright owner must show only "*some nexus* between the gross revenues and the infringement".  *Lawton v. Melville*

*Corp.*, No. 96 Civ. 9461, 1997 WL 346129, at *2 (2d Cir. June 24, 1997) (emphasis added).

Moreover, "the Second Circuit recognizes that the evidence of profits offered by a copyright

owner need not, and often cannot, be directly tied solely to the infringement." *Fournier v.*

*Erickson*, 242 F. Supp. 2d 318, 327 (S.D.N.Y. 2003). Thus, courts have found that a copyright

owner can "establish his initial burden" by providing evidence of revenues received from *non-*

*infringing* works and activities where the infringing work was used to promote those revenues.

*See id.* (holding that the plaintiff, whose copyrighted photograph was used in an allegedly

infringing advertisement for Microsoft's Windows 2000 product line, "may offer evidence of

Microsoft's sales or profits from its overall sales of its Windows 2000 product line" and

"evidence as to [the ad agency's] overall profits from supplying Microsoft advertising and

marketing services relating to its Windows 2000 product"). "Once a copyright owner has

demonstrated a sufficient causal nexus between the infringement and the appropriate gross

revenues, the burden shifts to the infringer 'to prove its deductible expenses and elements of

profits from those revenues attributable to factors other than the copyrighted work.'" *Complex*

*Sys., Inc. v. ABN Ambro Bank N.V*., No. 08 Civ. 7497, 2013 WL 5970065, at *3 (S.D.N.Y. Nov.

8, 2013) (quoting *On Davis v. The Gap, Inc*., 246 F.3d 152, 160 (2d Cir. 2001)); *see also* 17

U.S.C. § 504(b).

### A.   Plaintiff Has Shown a Causal Nexus Between *Untitled* and Revenues from Sales of Other Works in the *New Portraits* Series

Plaintiff has met his burden of showing a sufficient causal nexus between *Untitled*

and the Gagosian Defendants' revenues from the sales of the other works in the *New Portraits*

series. There is ample, non-speculative evidence that Defendants view *Untitled* as being part of

a single series of *New Portaits* works and that *Untitled* was used to promote the sales of the other

works in that series. The Gagosian Defendants' argument that Plaintiff has not shown a causal

9

nexus hinges on their contentions that:  (1) *Untitled* "[w]as [n]ot [u]sed to [p]romote or [a]dvertise the Exhibition" (Gagosian Mot. at 16) because "Plaintiff cannot show that any one purchaser saw [*Untitled*] and then purchased a different *New Portraits* work" (*id.* at 14) and (2) "even if there were such evidence, Plaintiff cannot demonstrate that viewing [*Untitled*] caused any buyer to purchase an entirely different Prince work" (*id.* at 2; *see also id.* at 14).[1]  These contentions, however, rely on mischaracterizations of the record and overstate what Plaintiff needs to show to meet its initial burden.

1.   ***Untitled* Was Used To Promote Sales of Other Works in the Same Series**

Defendants have taken the position that all of the *New Portraits* works are part of a single series of related works that reinforce each other.  Prince himself explained that his "vision for the New Portraits series was that each portrait was a part of a novel, and that when the portraits were exhibited together, they would become a democracy, and would together tell an entire story" and that the works were intended to be viewed as one "collection of portraits". (COF ¶ 16.)  And Defendants' experts have opined that "each of these individual works must be seen as part of a series by 'Prince' comprising hundreds of images, and done over a period of years".  (*Id.* ¶ 17.)[2]

---

[1] The Gagosian Defendants also make the back-up argument that even a showing "of such a causal connection to one or more Other Works purchases" "would be immaterial" since ██████ ████████████████████████████████████████████████████████ (Gagosian Mot. at 14-15.)  Yet they do not—and cannot—point to any authority for this made-up materiality requirement, and have not offered any evidence or performed any analysis to support their purely speculative theory about hypothetical replacement buyers.

[2] Even if certain works in the series were not displayed at the Exhibition ████████ ████████████████████████████████████████████████ (Gagosian Mot. at 14)—that does not change the fact that Defendants view the works at being part of a single series and promoted them together.



)[3]  The

Gagosian Defendants concede in their brief that the underlying solicitations and publicity

happened but downplay the degree to which *Untitled* was featured in those materials and claim

that their promotional value is "speculative", in part by mischaracterizing evidence of when the

works in the *New Portraits* series were "sold".  (Gagosian Mot. at 16-19.)

███████████  Thus, for this individual, viewing *Untitled* did in fact generate interest in purchasing other works in the *New Portraits* series.  Multiple potential buyers also were brought to Gagosian Gallery's annex space to view works in the series that they could purchase, including *Untitled*.  (*Id.* ¶ 28.)  The Gagosian Defendants argue that "[t]here is no evidence that any of these clients . . . viewed [*Untitled*] in the annex space" (Gagosian Mot. at 7), but the more reasonable inference is that at least one of the "more than five" (COF ¶ 28) art buyers brought there to view art did in fact view the art. ███████████████████████

███████████████████████████████

   *Untitled* was also used to promote other works in the *New Portraits* series at the Exhibition itself.  It was displayed in the Exhibition alongside 36 other works in the series—and featured in the Catalog distributed to visitors—for 35 days, and viewed by a large number of visitors during the Exhibition, including potential buyers.  (*Id.* ¶¶ 30-33.) ███████████

██████████████████████████████

██████████████  ████████████████

████████████████████████████

███████████████████████████████

███████████████

   Finally, *Untitled* was used to promote other works in the *New Portraits* series by: (1) being displayed alongside other works ██████████████ on Gagosian Gallery's website, which likely received hundreds of thousands of visits during that time; (2) being showcased for at least a month on the Billboard on a busy New York City highway, ███████████████

████████████████  and (3) being featured in various media coverage of the *New Portraits* series.  (*Id.* ¶¶ 35-44.) ████████████████████████

███████████████████████████████████████████████████ but that does not change

the fact that the purpose of this Billboard was "pure promotion".  (COF ¶ 39; ████████

███████████████████████████████████████████████

████████ ) Moreover, this Billboard did in fact promote the *New Portraits* series, ██████

███████████████████████████████████████████████

██████████████████████████████████████ The Gagosian

Defendants also falsely claim that the only media coverage ████████████████████ was

the Saltz article (Gagosian Mot. at 16)—████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

The Gagosian Defendants repeatedly suggest that these promotional uses do not

support any causal nexus ████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

████████████ But what the record actually shows is that sales of the works in the *New Portraits*

series were not completed until at least two months after the Exhibition opened on September 19,

2014. █████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████ The Gagosian Defendants argue that "[t]he date of payment is

irrelevant" because "Plaintiff is tasked with showing that [*Untitled*] has a causal connection to

the *decisions to purchase* Other Works made ██████████████" but "[t]here is no evidence that those

13

decisions were altered by later events—for example, that any committed buyers later backed out

and were replaced by others".  (Gagosian Mot. at 20 (emphasis in original).)  Defendants cite no

authority that would require Plaintiff to make this particular showing.  Even if such a showing

were required, at a minimum, there would exist a genuine issue of material fact as to when

decisions to purchase were made.

>           2.      **The Cases Relied Upon By the Gagosian Defendants are**
>                   **Distinguishable and Show that Plaintiff Has in Fact Met His Burden**

The "infringer's gross revenue" that Plaintiff has shown—revenues from sales of

works in a single series promoted by use of an infringing work in that same series—is

distinguishable from the types of sweeping and/or highly speculative infringer's revenues found

to lack a "causal nexus" to the infringement in the cases cited by the Gagosian Defendants.

Unlike the plaintiffs in *Lawton*, *Taylor*, *Granger*, *On Davis*, and *IBM Corp.*, Plaintiff does not

argue that it is entitled to the Gagosian Defendants' *total* revenues, or revenues from *every sale*

*made and every service provided*.  *See Lawton*, 1997 WL 346129, at *2 (the plaintiff "simply

show[ed] gross revenues from the sale of everything the defendant sells"); *Taylor v. Meirick*, 712

F.2d 1112, 1122 (7th Cir. 1983) ("It was not enough to show [the defendant]'s gross revenues

from the sale of everything he sold, which is all, really, that [plaintiff] did."); *Granger v. Gill*

*Abstract Corp.*, 566 F. Supp. 2d 323, 330-31 (S.D.N.Y. 2008) (finding that "a plaintiff does not

carry his burden simply by submitting overall gross revenues that are, at least in part, unrelated

to the infringement at issue" and this plaintiff sought "a preposterous" $726 million from a small

company with only losses and small gains during the relevant years); *On Davis*, 246 F.3d at 161

(a jewelry designer whose copyrighted eyewear was used in an ad for the Gap label stores sought

the entire parent company's "gross revenue of $1.668 billion" which was "derived in part from

sales under other labels within the Gap, Inc.'s corporate family that were in no way promoted by

the advertisement"); *IBM Corp. v. BGC Partners, Inc.*, No. 10 Civ. 128, 2013 WL 1775437, at

*4-5 (S.D.N.Y. Apr. 25, 2013) (a claim for all of the profits of a company that used copyrighted

software for only certain back-office functions was "overly speculative"). And Plaintiff's claim

is certainly less speculative than claims for (1) all profits derived from an elaborate opening

sequence for a television program that very briefly showed copyrighted eyeball stickers which

"cannot be said [to have been] in any way significant to the overall opening sequence or the

[television] program", *Mager v. Brand New Sch.*, No. 03 Civ. 8552, 2004 WL 2413978, at *4

(S.D.N.Y. Oct. 28, 2004), or (2) profits from business activities that were not processed on the

copyrighted software, *Complex Sys., Inc.*, 2013 WL 5970065, at *11.

       The court's analogy to "an anthology of poetry" in *On Davis*, which the Gagosian

Defendants quoted (Gagosian Mot. at 15), in fact shows that Plaintiff has met his burden. The

court analogized:

> [I]f a publisher published an anthology of poetry which contained a poem covered
> by the plaintiff's copyright, we do not think the plaintiff's statutory burden would
> be discharged by submitting the publisher's gross revenue resulting from its
> publication of hundreds of titles, including trade books, textbooks, cookbooks,
> etc. In our view, the owner's burden would require evidence of the revenues
> realized from the sale of the anthology containing the infringing poem.

*On Davis*, 246 F.3d at 160. Just as this poet would meet his burden by submitting evidence of

revenues "from the sale of the anthology [of poems] containing the infringing poem", here,

Plaintiff has met his burden by submitting evidence of revenues from the sale of the *New*

*Portraits* series of Prince's works containing his infringing work, *Untitled*.[4] Plaintiff does not

seek what the court in *Fournier* saw as the "core concern" of *On Davis*: "broad[] . . . revenue

---

[4] In fact, Prince himself made the similar analogy that the works in the *New Portraits* series
are "part of a novel" that "together . . . would tell an entire story". (COF ¶ 16.) He even noted
that although each work was sold on its own, they were intended to be viewed as one "collection
of portraits". (*Id.*)

from lines of business that were unrelated to the act of infringement", like revenue from sales of other categories of art such as sculptures and paintings that have nothing to do with the series of prints at issue here. *Fournier*, 242 F. Supp. 2d at 327 (internal quotation marks omitted) (quoting *On Davis*, 246 F.3d at 160).

And it is hard to see how Plaintiff's "evidence of causation through promotional use is even more attenuated" than the evidence found to be speculative in *Mackie*, as the Gagosian Defendants claim. (Gagosian Mot. at 17.) In *Mackie*, "[r]emarkably, [plaintiff]'s own expert stated that he could not 'understand' how it would be possible to establish a causal link" from the inclusion of a photograph of the plaintiff's copyrighted *sculpture* on "one page in a multi-page brochure that advertised a *series of concerts* that were unrelated to the artwork itself". *Mackie v. Rieser*, 296 F.3d 909, 916 (9th Cir. 2002).[5] Unlike in *Mackie*, here, ██████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ █████████████████████████████████ And independent of that expert's opinions, a reasonable jury could find a causal connection between *Untitled* and sales of the other works in the *New Portraits* series based on ample other evidence in the record that *Untitled* was used to promote the sales of the other related works. (*See* COF ¶¶ 11, 16-17, 19, 25, 27-32, 34-42.)

> **B.** **Because the Gagosian Defendants Have Failed to Meet Their Burden, Plaintiff Is Entitled To Recover the Full Revenues from Sales of Other Works in the *New Portraits* Series**

---

[5] It was this "absence of concrete evidence" that prompted the court to "surmise[] virtually endless permutations to account for an individual's decision to subscribe to the [concert] series", all related to *musical* aspects of a symphony that have nothing to do with *sculpture*. *Mackie*, 296 F.3d at 916 (emphasis added).

While Plaintiff has established his initial burden and the burden has shifted to the Gagosian Defendants "to prove [their] deductible expenses and the elements of profit attributable to factors other than the copyrighted work", 17 U.S.C. § 504(b), the Gagosian Defendants have not even endeavored to present any evidence of their deductible expenses for the other works in the *New Portraits* series or of any apportionment of revenues from the sales of those works. Because the Gagosian Defendants have failed to meet their burden, Plaintiff is entitled to recover the full amount of revenues from sales of the other works in the *New Portraits* series it has established. *See Stenograph L.L.C. v. Bossard Assocs., Inc.*, 144 F.3d 96, 103 (D.C. Cir. 1998) (stating that "[b]ecause [defendants] clearly failed to carry their burden under § 504(b), we have no reason to disturb the copyright infringement award" based solely on evidence of gross revenues presented by the plaintiff); *Blackman v. Hustler Magazine, Inc.*, 800 F.2d 1160, 1164 (D.C. Cir. 1986) ("Plaintiff carried its burden; defendant did not. Since the statutory scheme calls for subtracting defendant's proof from that of the plaintiff, and since defendant's proof was found to be zero, the figure proven by plaintiff winds up establishing the profits."); *Van Brouck & Assocs., Inc. v. Darmik, Inc.*, 329 F. Supp. 2d 924, 937 (E.D. Mich. 2004) ("As a consequence of this burden-shifting approach, 'under § 504(b), all gross revenue is presumed to be profit attributable to the infringement, unless the infringer is able to demonstrate otherwise.'" (quoting *Nelson-Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505, 511-12 n.9 (4th Cir. 2002))).

## II.   A REASONABLE JURY COULD FIND THAT PLAINTIFF IS ENTITLED TO LAURENCE GAGOSIAN'S UNREALIZED REVENUES FROM *UNTITLED*

The Gagosian Defendants' arguments as to why Plaintiff is not entitled to Mr. Gagosian's unrealized revenues from *Untitled* also fail. Multiple courts have made clear that Section 504(b) permits recovery of *unrealized* infringer's profits, even if the infringing item has not yet been sold or is not being offered for sale, "to prevent the infringer from unfairly

benefitting from a wrongful act". *Associated Residential Design v. Molotky*, 226 F. Supp. 2d 1251, 1256 (D. Nev. 2002) (quoting H.R. Rep. No. 94–1476, at 161 (1976)); *see also Van Brouck*, 329 F. Supp. 2d at 937 ("Plaintiff is entitled to infringer's profits even though the infringing property . . . has not been sold—such a rule is necessary to prevent Defendants from circumventing and thwarting the explicit purpose of § 504(b), which is to preclude copyright infringers from unfairly benefitting from their wrongful acts."); *William Hablinski Architecture v. Amir Constr. Inc.*, No. 03 Civ. 6365, 2004 WL 4909902, at *2 (C.D. Cal. Dec. 27, 2004) (rejecting the defendants' argument that the plaintiff cannot establish "gross revenues" "because no such revenues . . . have been realized or are likely to be realized any time soon" since the infringing item "is not presently on the market" (internal quotation marks omitted)). Plaintiff has met his initial burden to provide proof of Mr. Gagosian's unrealized revenues attributable to his significant role in promoting the infringing work, and the burden has shifted to the Gagosian Defendants.

A.   **Dismissal of a Claim for Damages Is Not Warranted Solely on the Basis that Plaintiff Claims an Alternative Remedy**

The Gagosian Defendants point to no authority that supports their argument that Plaintiff's claim for damages in the form of unrealized profits on *Untitled* should be dismissed because Plaintiff seeks seizure and forfeiture of *Untitled* in the alternative.  (Gagosian Mot. at 20-21.)  The Gagosian Defendants' reliance on *Tu* is misleading as that case reflects only the narrow and inapposite bar on "duplicative *statutory damages*" under both federal copyright and trademark statutes "for the same intellectual property injury", which Plaintiff does not seek here. *Tu v. TAD Sys. Tech. Inc.*, No. 08 Civ. 3822, 2009 WL 2905780, at *4-5 (E.D.N.Y. Sept. 10, 2009).  Even assuming that an award of unrealized profits would be impermissibly duplicative of seizure and forfeiture in this case, it would be premature to dismiss Plaintiff's claim for

18

unrealized profits, solely on the basis that he seeks an alternative duplicative remedy, at this

stage.  *See, e.g.*, *BHC Dev., L.C. v. Bally Gaming, Inc.*, No. 12-2393-JPO, 2014 WL 781871, at

*2 (D. Kan. Feb. 25, 2014) ("allowing [plaintiffs] to *present* alternative theories to the jury poses

no risk of double recovery" (emphasis added)).

  **B.**  <u>Plaintiff Has Shown a Causal Nexus Between *Untitled* and Mr. Gagosian's</u>
    <u>Unrealized Profits from *Untitled*</u>

    The Gagosian Defendants' claim that Plaintiff has not shown a causal nexus, this

time, between Mr. Gagosian's unrealized revenues and an infringing act (Gagosian Mot. at 22-

23), again relies on distortion of law and facts.  As discussed above in Section I, to establish

infringer's profits, a copyright owner must show only "*some nexus* between the gross revenues

and the infringement", *Lawton*, 1997 WL 346129, at *2 (emphasis added), and "need not" prove

profits "directly tied solely to the infringement", *Fournier*, 242 F. Supp. 2d at 327.  Here, there is

sufficient "non-speculative evidence", *Mackie*, 296 F.3d at 916, showing that Mr. Gagosian's

unrealized revenues are attributable to his involvement in the promotion of the infringing work.

Mr. Gagosian is not an innocent purchaser of *Untitled* with no connection to the infringement, as

the Gagosian Defendants have represented to the Court (Gagosian Mot. at 22).  Rather, he is the

controlling shareholder ▮▮▮▮▮▮ of the art gallery that exclusively exhibited, promoted

and sold *Untitled* along with other works in Prince's *New Portraits* series and that ultimately

made ▮▮▮▮▮▮▮ from those sales, and he chose to work with Prince and allow Prince

to display the works at his gallery for over a month.  (COF ¶¶ 5, 19, 30, 46-47.)  And unlike the

homeowners found not liable in *Eales v. Environmental Lifestyles, Inc.*, 958 F.2d 876 (9th Cir.

1992), because they "were unaware that their home was being constructed with the infringing

plans," 958 F.2d at 878, *cited in Molotky*, 226 F. Supp. 2d at 1255—the key fact in *Eales* that the

*Molotky* court found distinguishable—Mr. Gagosian cannot be said to have been "unaware" of

the infringement.  He was aware of prior allegations of copyright infringement against Prince (having previously been sued along with Prince by another photographer for copyright infringement) and still did not ask Plaintiff for permission to use his photograph or ask Prince to seek that permission before exhibiting *Untitled* in his gallery.  (COF ¶¶ 23-24.)  It cannot be that one can authorize and participate in the use of an infringing work to promote and profit off of a set of related works, watch the value of the works go through the roof and still deny the copyright holder the value of the infringing work.

The Gagosian Defendants' alternative "causal nexus" argument—that the use of non-infringing comparable works to *calculate* infringer's revenues shows that there is no sufficient causal nexus between those revenues and the infringement (Gagosian Mot. at 23-24)— is even more tenuous.  Specifically, the Gagosian Defendants argue that ███████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████  ████████████████████████

████████████████████████████  (Gagosian Mot. at 23-24.)[6]  But the infringer's unrealized revenue is the "value" of the infringing work, *Molotky*, 226 F. Supp. 2d at 1256, and Plaintiff's use of secondary market sales of comparable works to *calculate* that value does not change the fact that Mr. Gagosian's unrealized revenue is attributable to his extensive involvement in promoting the infringing work.  In fact, what the secondary market

---

[6]  ████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████

sales of those other works does show is that precise causal nexus. ████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████

### C.   **Plaintiff Has Presented Proof of Unrealized Revenues**

The Gagosian Defendants argue that, even assuming Plaintiff has shown a causal

nexus, Plaintiff still has not met his burden of presenting proof of Mr. Gagosian's unrealized

revenues because ████████████████████████████████████████████████

████████████████████████████████ But they point to no authority requiring

appraisals as proof of unrealized revenues. *Joseph P. Carroll Ltd. v. Baker*, 889 F. Supp. 2d 593

(S.D.N.Y. 2012) merely sets forth *standards* for appraisals, which do not apply here since, ████

████████████████████████████████████████████████████████████

██ █████████████████████████████████

Moreover, unlike in *Business Trends Analysts, Inc. v. Freedonia Group, Inc*., 887

F.2d 399 (2d Cir. 1989), where "there [was] no evidence at all allowing an[y] assessment of

value" with respect to a theory of damages that is not at issue in this case, *id.* at 407, here, the

record of secondary market sales prices of other works in the *New Portraits* series does allow an

assessment of value. ████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████ Courts also routinely

permit the use of this market approach in a variety of fields. *See, e.g.*, *Oleg Cassini, Inc. v.*

*Electrolux Home Prod., Inc.*, No. 11 Civ. 1237, 2014 WL 1468118, at *7 (S.D.N.Y. Apr. 15,

2014) ("[T]he comparative market approach . . . [is] a technique that has been accepted by other courts in art appraisal cases.") (collecting cases); *see also Silverstein v. Xl Specialty Ins. Co.*, No. 15 Civ. 6818, 2016 WL 3963129, at *4 (S.D.N.Y. July 21, 2016) (evaluating the value of photographs based on a comparative market approach), *appeal withdrawn* (Nov. 21, 2016); *Kushner v. DBG Property Inv'rs, Inc.*, 793 F. Supp. 1161, 1178 (S.D.N.Y. 1992) (applying the market approach to evaluate real property value).

D. **Because Mr. Gagosian Has Failed to Meet His Burden, Plaintiff Is Entitled To Recover the Full Unrealized Revenues from *Untitled***

As with the revenues from sales of the other works in the *New Portraits* series, Mr. Gagosian has not even endeavored "to prove his . . . deductible expenses and the elements of profit [from the unrealized revenues from *Untitled*] attributable to factors other than the copyrighted work".  17 U.S.C. § 504(b).  Because Mr. Gagosian has failed to meet his burden, Plaintiff is entitled to recover the full amount of unrealized revenues from *Untitled* it has established.  (*See* Section I.B above.)

## CONCLUSION

For the foregoing reasons, the Gagosian Defendants' motion for partial summary judgment should be denied.

Dated:  November 9, 2018

Respectfully submitted,

CRAVATH, SWAINE & MOORE LLP,


by _____
                                    David R. Marriott
                                    David J. Kappos

Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000
*dmarriott@cravath.com*
*dkappos@cravath.com*

*Attorneys for Plaintiff Donald Graham*