# **<u>Exhibit 9</u>**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DONALD GRAHAM,<br><br>                              Plaintiff,<br><br>vs.<br><br>RICHARD PRINCE, GAGOSIAN<br>GALLERY, INC., and LAWRENCE<br>GAGOSIAN,<br><br>                              Defendants. | No. 1:15-cv-10160-SHS |
| ERIC MCNATT,<br><br>                              Plaintiff,<br><br>vs.<br><br>RICHARD PRINCE, BLUM & POE,<br>LLC, and BLUM & POE NEW YORK,<br>LLC,<br><br>                              Defendants. | No. 1:16-cv-08896-SHS |

**Rebuttal Report of June M. Besek**

## I.      INTRODUCTION

1.      I am a Lecturer in Law and the Executive Director of the Kernochan Center for Law, Media and the Arts at Columbia Law School.  I hold a J.D. degree from New York University School of Law (cum laude, Order of the Coif) and a B.A. degree in Economics from Yale University (cum laude).

2.      Prior to joining Columbia Law School I was the Director of Intellectual Property for Reuters America, Inc. where my work consisted of negotiating, drafting and reviewing licenses and other agreements, supervising litigation related to intellectual property, and counseling business people on legal issues.  I began my career in copyright law at a small New York law firm, Schwab Goldberg Price and Dannay, where I was an associate from 1985-90 and a partner from 1990-97.  My work entailed counseling; drafting and reviewing licenses, settlement agreements and other contracts; and representing clients in litigation in state and federal court and in proceedings in the U.S. Copyright Office and the U.S. Patent and Trademark Office.  I also had the opportunity to work on matters of national and international policy concerning copyright and related rights, including the scope of copyright protection for computer software and databases in the United States and the European Union; U.S. adherence to the Berne Convention, the principal international copyright treaty;[1] and the scope of fair use under U.S. law and the advisability of a similar fair use exception in other countries.  Throughout my career, my work has been primarily in the field of copyright, with a particular emphasis on matters involving new technologies.

---

[1]  Berne Convention for the Protection of Literary and Artistic Works, S. Treaty Doc. 99-27 (1986).

3.      At Columbia I have taught Copyright Law and generally teach seminars on Authors, Artists and Performers and on Current Issues in Copyright. The Artists, Authors and Performers seminar addresses legal and business issues that affect individual creators, *e.g.*, contracts, rights of publicity, authorship, fair use, moral rights, and protecting works on the internet. The Current Issues in Copyright seminar focuses on controversial issues in copyright. The particular subjects we address vary year by year, but we typically have at least one session related to the Digital Millennium Copyright Act and one on Recent Developments in Fair Use. This past spring we had sessions on the Music Modernization Act,[2] digital first sale, section 512 notice and takedown of alleged infringing works on the Internet, the scope of copyright protection for computer software, and copyright protection for literary or artistic works in or on useful articles.

4.      I am currently the American Bar Association Intellectual Property Section's liaison to the American Law Institute on its project to create a Restatement of Copyright. I testified on copyright fair use before Congress (House of Representatives, Judiciary Committee) in connection with its review of copyright law in January 2014. I served as Legal Advisor to the Section 108 Study Group, convened by the U.S. Copyright Office and the Library of Congress, to recommend changes to Section 108 of the Copyright Act (which concerns copyright exceptions for libraries and archives) in light of new technologies. (The Study Group's full report can be found at http://www.section108.gov/.) I was a co-author of the *amicus* brief the American Bar Association filed in *Golan v. Holder* in the Supreme Court. I have written numerous law review and other articles about copyright law. A list of publications is included at <u>Appendix A</u> of this report and my curriculum vitae is attached as <u>Appendix B</u>.

---

[2] H.R. 5447, 115th Cong. 2d Sess. and S. 2823, 115th Cong. 2d Sess.

5.       I am providing my opinion in this case on a *pro bono* basis.  I hope to elucidate certain fundamental principles of U.S. copyright law as they apply in this case and the context of social media.

## II.       BACKGROUND & SUMMARY OF CONCLUSIONS

6.       Counsel for Plaintiffs Donald Graham and Eric McNatt have asked me to render an expert opinion on issues related to Prince's use of *Rastafarian Smoking a Joint* and *Kim Gordon I* ("Plaintiffs' Works") in his own works (the "Prince Works").  Specifically, I have been asked to review (1) the assertion made in the Expert Report of Alice E. Marwick, PhD that (a) the terms of use of Instagram authorize Richard Prince to use any photographs posted on those services for his own purposes;[3] (b) Prof. Marwick's statement that owners of rights in photos should not post their photos to the Internet if they are concerned about unauthorized uses, and users of photographs available on the internet are justified in using photos without watermarks or copyright notices;[4] and (c) Prof. Marwick's comments about the "significance" and "new communicative meaning" of Prince's Instagram work and the implication that it is somehow transformative in the sense of the fair use doctrine[5]; and (2) the opinion of Sandra Minott Phillips, Q.C. that Donald Graham's use of his *Rastafarian Smoking a Joint* is a violation of Jamaican right of publicity ("ROP") laws.[6]

7.       Based on my review of these materials, and the application of my experience and expertise to the questions at issue, I conclude the following:  (1) the Terms of Service of Instagram do not confer any express or implied license for any user to use copyrighted material posted to the social media platform for their own purposes; (2) authors are not required to affix a

---

[3] Marwick ¶ 17
[4] Marwick ¶¶ 14, 15, 72
[5] *See* Marwick ¶¶ 84; 86-87
[6] Minott-Phillips ¶ 18

notice or watermark to works that are posted to the internet in order to preserve their rights under U.S. copyright law; (3) Prof. Marwick's assertion that the Prince Works add new meaning and message to Plaintiffs' Works is incorrect; and (4) whether a photographer's work violates the publicity rights of a subject in a foreign jurisdiction does not impact the photographer's ability to claim copyright protection in the United States. In reaching the above conclusions, I draw upon my education, training and experience, including specialized knowledge of copyright law. My opinions are based upon review of the materials cited in this report, including in particular the works in question. Appendix C lists the materials I have been provided, some of which I considered or relied upon in the course of forming my opinion. If relevant new information comes to light, I reserve the right to update, refine or revise my opinions.

## III.   EXPERT ANALYSIS

**The Terms of Use Constitute an Agreement between the Website Owner and Users Who Post Content to the Website, and Do Not Constitute a Broad License to Use That Content to Third Parties Such As Richard Prince.**

8.   Professor Marwick's report suggests that defendants' use of the photos at issue is authorized by the Terms of Use for Instagram,[7] pursuant to which McNatt and Graham's photos were posted.[8] On the contrary, the grant of rights in the Terms of Use runs to Instagram, and not to all of its users. For example, Instagram's Terms of Use provide:

> Instagram does not claim ownership of any content that you post on or through the Service. Instead, you hereby grant to Instagram a non-exclusive, fully paid and royalty free, transferable, sub-licensable, worldwide license to use the Content that you post on or through the Service, subject to the Service's Privacy Policy. . . .[9]

---

[7] While Professor Marwick also discusses the terms of service of Facebook, I am not aware of any allegations in this case that concern the use of that platform.
[8] Marwick ¶ 17
[9] Instagram's Terms of Use effective January 19, 2013, available at https://help.instagram.com/478745558852511

These provisions do not grant rights from the party who posts content to other users. Users could have such rights only if they were granted by Instagram (or by the posting party, assuming she has those rights), and no such grant is provided in the Terms of Use. Indeed, the very purpose of terms of use such as the above is to protect social media platforms like Instagram itself from claims of copyright infringement.

9.     There is no evidence in this case that Instagram granted defendants the broad rights they claim or that defendants were third-party beneficiaries of its Terms of Use. Moreover, the Terms of Use for Instagram contain the same broad statement that the posting user retains ownership of the copyright in the posted content that the court in *AFP v. Morel* found to contradict AFP's claim to broad rights in Morel's content.[10]

10.     In summary, the Instagram Terms of Use do not authorize defendants' use of Plaintiffs' Works without plaintiffs' content.

---

[10] *Agence France Presse v. Morel*, 934 F. Supp.2d 547 (S.D.N.Y. 2013). In *AFP*, Morel posted on Twitter (through TwitPic) photographs he had taken of an earthquake in Haiti. Shortly thereafter, Lisandro Suero reposted the photos to his own account, claiming he had exclusive photos of the earthquake. An Agence France Press (AFP) employee searching online for photos of the earthquake found and uploaded the photos from Suero's site and sent them to AFP, who then sent them to Getty Images pursuant to an existing agreement with Getty; the photos were credited to Suero. AFP subsequently brought a declaratory judgment action against Morel, claiming that it was a third-party beneficiary of the Twitter Terms of Service, which provided AFP with a license to use Morel's photos. Morel asserted counterclaims for copyright infringement against AFP and others. The court concluded that Twitter's Terms of Service did not provide a license for AFP's activities with respect to Morel's photos.

**There is No Obligation Under U.S. Law to Use a Copyright Notice or Watermark When Posting One's Work to the Internet, and Failure To Do So Does Not Diminish Copyright Protection for the Work.**

11.     Professor Marwick also implies that a copyright owner sacrifices protection for a work if the work is readily available on the Internet or posted without a copyright notice or other indication of ownership.[11]  This is not correct.

12.     First, as a practical matter, many works are posted to the Internet, or copied to another site, without the knowledge or agreement of the copyright owner.  Even when a work is posted with a copyright notice or other rights information, software that implements uploading a photo or copying it to a platform may remove some or all of the rights information metadata automatically.[12]  In other cases, unauthorized users remove that information purposefully.  In either event, the removal of identifying information occurs through no fault of the copyright owner.  In other words, the lack of a copyright notice or rights information does not necessarily indicate that a copyright owner did not initially affix such information to her work and cannot alone justify further copying.

13.     Second, such notice is not required for copyright protection.  Until 1988, use of a copyright notice was mandatory.  But in 1988 when the Berne Convention Implementation Act was passed to permit the United States to join the Berne Convention, the requirement to use a copyright notice was repealed.[13]  A central tenet of the Berne Convention is that "the enjoyment and exercise of [copyright] shall not be subject to any formality."  Berne Convention art. 5(2).  In other words, copyright protection must be automatic, and effective protection may not depend on compliance with government-mandated formal requirements.

---

[11] Marwick ¶ 15

[12] Jane C. Ginsburg, *The Most Moral of Rights*, 8 GEO. MASON J. INT'L COM. L. 1, 65-66 (2016).

[13] Berne Convention Implementation Act of 1988, Pub. L. No. 100-568, 102 Stat. 2853, 2857.

14.     Copyright protection now attaches to a work within the subject matter of copyright as soon as it is created and fixed in tangible form, regardless of whether a notice is used.  Professor Marwick's opinion that a work must have a watermark or notice in order for a work to be protected if it is posted to social media is contrary to the current requirements of copyright law.[14]  Professor Marwick seems to argue that since it is often not readily apparent who owns rights to photographs, then posting those photos to sites like Facebook and Instagram should be allowed, and users of these platforms should be able to use those photos for their own purposes.[15]  On the contrary, the inability to determine who owns a work counsels caution. Moreover, there are many technological advancements, such as Google image matching, that allow internet users to track down the author of works posted to the internet regardless of whether they have a watermark or copyright notice attached.

15.     Moreover, this is not a case where an unsophisticated user might have drawn erroneous conclusions about a work unaccompanied by a copyright notice or other rights information.  Richard Prince is a sophisticated artist who has encountered infringement claims in the past; he was surely aware that plaintiffs' photos were almost certainly protected by copyright. The Gagosian is a sophisticated gallery that sells high-end art that surely is aware that displaying such works could potentially expose it to copyright claims, given its past involvement with displaying allegedly infringing works by Prince.  Indeed, it appears that Mr. Prince employs a cadre of assistants, as does the Gagosian gallery, and that before the initial exhibition of the "*New Portraits*" works, he asked those assistants to determine who the people are who made the Instagram posts that he used (Prince Dep. Exs. 178,179).  In these circumstances, it seems

---

[14] Marwick ¶ 22
[15] Marwick ¶ 22

unlikely that Prince or Gagosian could not have had their employees investigate who the original authors of the photographs are, if they were so inclined.

16.     Professor Marwick suggests that authors concerned about protecting their works from unauthorized copying should simply refrain from posting the works to the Internet.  But even if photographers and other authors choose not to post their works to the Internet, those works can be uploaded without their permission.  Moreover, business is increasing done over the Internet; it is unfair to suggest that authors remove themselves from the digital marketplace to protect their works.  The Digital Millennium Copyright Act was designed to prevent this Hobson's Choice.[16]

17.     Professor Marwick cites Lawrence Lessig's book *Remix* (Penguin 2008) in support of her argument that copying others' work is permissible.[17]  *Remix* represents Prof. Lessig's vision of a world in which remixing, at least for noncommercial purposes, could be freely done without regard to copyright.  Prof. Lessig recognizes that world does not currently exist.  His assertion that "remixes" deserve a special status under copyright law is a debate among legal academics and not all agree.  *See, e.g.*, Robert Merges, *Locke Remixed*.[18]

**Professor Marwick's Assessment of the Purported New Communicative Meaning of the Prince Works Is Incorrect**

18.     Professor Marwick discusses in her report the "new communicative meanings" of the Prince works by putting them in the "context" of the gallery or art world and finds "significant" the larger size of the works compared to viewing the post on Instagram on a mobile

---

[16] *See* S. Rep. 105-190 (105th Cong., 2d Sess.) at 2 ("[T]he law must adapt in order to make digital networks safe places to disseminate and exploit copyrighted materials. . . . Title I of this bill provides this protection and creates the legal platform for launching the global digital online marketplace for copyrighted works.")
[17] Marwick ¶ 59
[18] Robert P. Merges, *Locke Remixed,* 40 U.C. DAVIS L. REV. 101 (2007).

phone.[19]  These comments appear to be directed toward whether the Prince Instagram works are "transformative" in the sense of the fair use doctrine.  The test for the transformativeness is whether the allegedly infringing works alter the original works with new expression, meaning or message when viewed by a reasonable observer.[20]  The question is whether the Prince Works when viewed side-by-side with the original works (the Graham and McNatt photographs) would be perceived by the reasonable observer as altering the original works with new meaning or expression.

19.  I disagree with Professor Marwick's contention that the Prince Works add any "new communicative meaning" or "significance" to the Plaintiffs' Works.  In my academic work, I have studied and commented on the intersection of the internet and copyright law, including the question of whether one work transforms another by altering its meaning or message.  In my opinion, there is no significant alteration to the meaning or expression of the original works simply because they are in the frame of the Instagram interface, and no reasonable observer would discern one.  The Instagram interface is so ubiquitous in social media (for example, it is not uncommon for people to post screenshots of Instagram exchanges or photo posts on other social media sites like Reddit or Facebook) that any expression added by that frame is de mimimis.  Professor Marwick attributes much significance to the nonsensical comments and emojis used by Prince in his comments on the Instagram posts and divines some commentary and criticism of social media from them.[21]  In my opinion, nothing about these comments or emojis represents any commentary about social media.  If the Instagram interface and comments and emojis alone were enough to create new expression and meaning, then

---

[19] *See* Marwick ¶¶ 84; 86-87
[20] MTD Op. 12-14; 16-20
[21] *See* Marwick ¶ 87

copyright protection for any work posted to social media (or any website for that matter) would be significantly compromised. A user would merely have to add a line or two of gibberish to establish transformativeness.

20.    Moreover, unlike the snippet from the film The Great Gatsby mentioned by Professor Marwick that is used as a meme on the Internet to "toast" others,[22] the near entirety of the Graham and McNatt works were used by Prince (with some minor cropping that appears to be a function of Instagram's uploading software). If someone posted the entirety of The Great Gatsby movie to a social media site with a few moments cut from the opening and closing credits—even with comments on the film in the post—it would hardly be considered transformative or new communicative meaning. The fact that Prince used the entirety of the Graham and McNatt works cuts strongly against the idea that Prince's use altered the original expression of the Graham and McNatt works.

### Whether Graham's Photograph Violates Jamaican Law Concerning Publicity Rights is Irrelevant to Whether Graham Has a Viable Copyright Under U.S. Law or Whether Such Copyright Has Been Infringed by Prince.

21.    Whether a work is protected by copyright in the United States is a matter of U.S. law. Under U.S. copyright law, illegality of the content of a work is not a bar to copyright protection. *Mitchell Brothers Film Group v. Cinema Adult Theater*, 604 F.2d 852 (5th Cir. 1979), is the seminal case in this area. In *Mitchell Brothers*, the court ruled that defendants could not assert the obscenity of the copyrighted film at issue as a defense to copyright infringement. The court reasoned that Congress was apparently hostile to content-based restrictions to copyright, since it had enacted them but twice, and in both instances later removed the

---

[22] Marwick ¶¶ 58; 86

restriction. *Id.* at 855 and n. 4.  It also observed that rejecting any obscenity restriction to copyright "avoids substantial practical difficulties and delicate First Amendment issues." *Id.*

22.     Similarly, courts have rejected any claim that fraudulent content of a work is a defense to copyright infringement. *See Belcher v. Tarbox*, 486 F.2d 1087, 1088 (9th Cir. 1973). Accordingly, the possible illegality of the photograph is not material to whether it can be protected under U.S. copyright law.

23.     These conclusions apply *a fortiori* to a claim that a work violates the law of a foreign jurisdiction like Jamaica.[23]  If Graham's photograph indeed violates the publicity rights of the subject under Jamaican law, then that might create some cause of action in Jamaica by the subject.  But it does not form the basis for a defense to copyright infringement in the United States nor does it does not affect Graham's copyright in *Rastafarian Smoking a Joint*.

## IV.    CONCLUSION

24.     In summary, it is my opinion that:  (1) under the Terms of Use of Instagram, individuals who post on that service grant rights to Instagram, but not to the world nor to other users of the service; (2) there is no obligation to refrain from posting a photograph to the internet, or to include a copyright notice, watermark or other indicia of ownership, in order to preserve copyright protection for that photograph; (3) the Instagram interface and Prince's comments alone do not significantly alter the meaning or expression of the original works, especially where the near entirety of the original works were used by Prince; and (4) copyright protection does not depend on whether the work violates another type of law, so even if Graham's photograph violates Jamaican right of publicity laws, its U.S. copyright would nevertheless be valid and the violation of Jamaican right of publicity would not be a defense to claims of infringement.

---

[23] *See* Minott-Philips ¶¶14-18

June M. Besek

## Appendix A

### June M. Besek – Publications

*Copyright Issues Relevant to the Creation of a Digital Archive: A Preliminary Assessment* (CLIR & Library of Congress 2003).

*Copyright: What Makes A Use "Fair"?*, EDUCAUSE REV., Nov./Dec. 2003

*Anti-Circumvention Laws and Copyright: A Report from the Kernochan Center for Law, Media and the Arts*, 27 COLUM. J. L. & ARTS 385 (2004)

*Copyright Issues Relevant to Digital Preservation and Dissemination of Pre-1972 Commercial Sound Recordings by Libraries and Archives* (CLIR & Library of Congress 2005)

*Maintaining the Integrity of Digital Archives* (with Philippa Loengard), 31 COLUM. J. L. & ARTS 267 (2008)

*International Study on the Impact of Copyright Law on Digital Preservation* (with Jessica Coates and Brian Fitzgerald (Australia), Wilma Mossink (the Netherlands), Adrienne Muir (UK), et al.) (July 2008)

*Digital Preservation and Copyright*, WIPO MAGAZINE (October 2008)

*Copyright and Related Issues Relevant to Digital Preservation and Dissemination of Unpublished Pre-1972 Sound Recordings by Libraries and Archives* (CLIR & Library of Congress 2009)

*The Development of Digital Libraries in the United States,* in GLOBAL COPYRIGHT: THREE HUNDRED YEARS SINCE THE STATUTE OF ANNE, FROM 1709 TO CYBERSPACE (Lionel Bently *et al.*, eds., Edward Elgar 2010)

*Enabling Digital Preservation by Expanding the Library Exceptions in the US Copyright Act: The Section 108 Study Group,* in WORKING WITHIN THE BOUNDARIES OF INTELLECTUAL PROPERTY, Rochelle Dreyfuss and Diane Zimmerman, eds. (Oxford University Press, 2010)

*Will Recording Artists Be Able to Terminate Their Agreements and Reclaim Rights?*, 22 NYSBA ENTERTAINMENT, ARTS AND SPORTS LAW JOURNAL, Vol. 3 (Fall/Winter 2011)

*Comments on ALRC Discussion Paper 79, Copyright and the Digital Economy* (with Jane C. Ginsburg and Philippa Loengard) (July 31, 2013), available at https://ssrn.com/abstract=2344338

*Constitutional Obstacles? Reconsidering Copyright Protection for Pre-1972 Sound Recording* (with Eva Subotnik), 37 COLUM. J. L. & ARTS 327 (2014)

*Pre-1972 Sound Recordings:  Why Does the Law Treat Them Differently?,* 5 IP THEORY 134 (2015), available at: https://www.repository.law.indiana.edu/ipt/vol5/iss1/9

Capitol Records v. Vimeo: *The Peculiar Case of Pre-1972 Sound Recordings and Federal Copyright Law* (with Owen Keiter), 41 COLUM. J. L. & ARTS (forthcoming 2018)

# Appendix B

## JUNE M. BESEK – Curriculum Vitae

**COLUMBIA LAW SCHOOL**
Kernochan Center for Law, Media and the Arts
   Executive Director, 2004-present; Director of Studies, 1999-present
Lecturer in Law, 2002-present (teaching seminars on Authors, Artists and Performers and Current Issues in Copyright)

### Previous Experience

REUTERS AMERICA INC., New York
Director of Intellectual Property, 1998-1999

SCHWAB, GOLDBERG PRICE & DANNAY, New York
Partner, 1990-1997; Associate, 1985-1990

KRAMER, LEVIN, NESSEN, KAMIN & FRANKEL, New York
Litigation Associate, 1983-1985

JUDGE CHARLES H. TENNEY, United States District Court, S.D.N.Y.
Law Clerk, 1981-1983

### Education

NEW YORK UNIVERSITY SCHOOL OF LAW
J.D., 1981, Cum Laude, Order of the Coif
Annual Survey of American Law
   Research Editor, 1980-1981; Staff Member, 1979-1980

YALE UNIVERSITY
B.A., 1976, Cum Laude, Economics

### Bar Admissions

State of New York, 1982
United States District Court for the Southern District of New York, 1982
United States Court of Appeals for the Seventh Circuit, 1996
United States Supreme Court, 1995

### Professional Affiliations

ALAI-USA (US Group of Association Littéraire et Artistique Internationale)
Secretary-Treasurer, 2001-present
Member, 1999-present

AMERICAN BAR ASSOCIATION
Intellectual Property Law Section, Member, 1985-present
Member of Council, 2005-2009, 2011-15, 2017-present

Copyright Division Chair, 1998-1999, 2009-11
Copyright Reform Task Force Chair, 2008-2011, Member 2016-present

ASSOCIATION OF THE BAR OF THE CITY OF NEW YORK
Committee on Copyright and Literary Property, 1997-2000, 2009-2012, 2015-present
Committee on Entertainment Law, 2006-2009
Committee on Trademarks and Unfair Competition, 1993-1996, 2012- 2015
Committee on Computer Law, 1986-1989, 1990-1993

COLUMBIA JOURNAL OF LAW AND THE ARTS
Editorial Board Member

COPYRIGHT SOCIETY OF THE U.S.A.
Trustee, 1993-1996, 2008-2011
Member, 1985-present

JOURNAL OF THE COPYRIGHT SOCIETY OF THE U.S.A.
Editorial Board Member

VOLUNTEER LAWYERS FOR THE ARTS, NEW YORK
Board Member

**Other Activities[24]**

Serve as liaison from the American Bar Association Section of Intellectual Property Law to the American Law Institute's ongoing Restatement of Copyright Project

Testified on Fair Use in Copyright before the U.S. House of Representatives, Judiciary Committee, January 28, 2014

Served as Legal Advisor for the Section 108 Study Group, convened by the Library of Congress and the U.S. Copyright to consider exceptions to copyright for libraries and archives in the digital age.  See  www.section108.gov

Co-authored the amicus brief of the American Bar Association in *Golan v. Holder* in the U.S. Supreme Court

Spoke at International Workshop on Digital Preservation and Copyright at the World Intellectual Property Organization (WIPO), Geneva, Switzerland, July 15, 2008

Spoke at Symposium "Authors, Attribution and Integrity" co-sponsored by The United States Copyright Office and the Center for the Protection of Intellectual Property at George Mason University School of Law

---

[24] This list represents only a subset of speaking engagements and similar activities.

Featured in *Illuminating the Profession: Women in Copyright*, LANDSLIDE (a publication of the ABA Section of Intellectual Property Law) March/April 2018 as one of the "outstanding attorneys who practice copyright law.

## Appendix C

**Defendants' Expert Reports**
Alice E. Marwick
Sandra Minott-Phillips
Lisa Phillips
Allan Schwartzman
Brian Wallis
Daniel Wolf

**Graham Filings**
Corrected Amended Complaint and Exhibits
Gagosian's Answer to Complaint
Prince's Amended Answer to Complaint

**McNatt Filings**
Complaint and Exhibits
Defendants' Answer to Complaint

**Motion to Dismiss (Fair Use)**
Defendants' Memorandum of Law in Support of Motion to Dismiss (Fair Use)
Plaintiffs' Memorandum of Law in Opposition to Motion to Dismiss (Fair Use)
Defendants' Reply Memorandum in Support of Motion to Dismiss (Fair Use)
Judge Stein's Opinion (Motion to Dismiss *re* Fair Use)

**Depositions**
Donald Graham Deposition Transcript
Exhibits to Donald Graham Deposition
Eric McNatt Deposition Transcript
Exhibits to Eric McNatt Deposition
Richard Prince Deposition Transcript
Exhibits to Richard Prince Deposition

**Other**
Instagram Terms of Use