**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ERIC McNATT,

                 Plaintiff,

                         -against-

RICHARD PRINCE, BLUM & POE, LLC, and
BLUM & POE NEW YORK, LLC,

                Defendants.

**Case No. 16-cv-08896 (SHS)**

DONALD GRAHAM,

                 Plaintiff,

                         -against-

RICHARD PRINCE, GAGOSIAN GALLERY,
INC. and LAWRENCE GAGOSIAN

                Defendants.

**Case No. 1:15-cv-10160 (SHS)**

**SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTIONS FOR SUMMARY JUDGMENT**

GREENBERG TRAURIG, LLP
Richard A. Edlin
MetLife Building
200 Park Avenue
New York, NY 10166
Tel: (212) 801-9200
EdlinR@gtlaw.com

Ian C. Ballon
Nina D. Boyajian
1840 Century Park East, Suite 1900
Los Angeles, CA 90067
Tel: (310) 586-7700
Ballon@gtlaw.com
BoyajianN@gtlaw.com

*Attorneys for Defendants Richard Prince, Blum &*
*Poe, LLC, Blum & Poe New York, LLC*

**TABLE OF CONTENTS**

I.    INTRODUCTION ......................................................................................... 1

II.    LEGAL ARGUMENT ................................................................................... 4

    A.    *Google* Instructs that Even "Precise" Copying is a Fair Use Where the Secondary Work has a Different "Purpose and Character" and Cannot Serve as a "Market Substitute" for the Underlying Work ...................... 4

        1.    The Supreme Court Confirmed that Even "Precise" Copying Without any Alteration May be a Highly Transformative Fair Use .......... 4

            (a)    Like Google, Prince Used Existing Unaltered Material for a Different Purpose than that of the Original – to Comment on the Entire Genre of Social Media Communication.................... 6

            (b)    Prince Created New Works with a Different Character, Message, and Meaning.................................................................. 10

        2.    In Considering any Potential "Effect" of the Copying in the Market for the Copyrighted Work, the Court Must Consider Not Only Potential Monetary Losses, But Also "Take Into Account the Public Benefits" the Copying will Likely Produce and the "Risk of Creativity-Related Harms to the Public" .................................................. 12

            (a)    As in *Google*, the Secondary Works in This Case do Not Serve as Market Substitutes for the Originals.............................. 12

            (b)    There is a Substantial "Risk of Creativity-Related Harms to the Public" by Enforcing Plaintiffs' Copyright Against Prince ..................................................................................... 13

    B.    *Warhol* Involved a Different Method of Transformation than at Issue in this Case – Direct Alteration of the Underlying Image – and Resulted in a Product – a Licensed Image of a Celebrity – that Became a Market Substitute for the Original................................................................... 15

        1.    The Method of Claimed Transformation in *Warhol* – Direct Alteration of the Underlying Image – is Not the Method of Transformation Employed in this Case.................................................... 15

            (a)    The Analysis of Transformative Elements in the *Portrait of Rastajay92* and the *Portrait of Kim Gordon* Must be Distinct from the Analysis of Warhol's Work .............................. 16

            (b)    Even Absent Obfuscation of the Pre-Existing Image, a Reasonable Observer Would Perceive the Further Purpose and Character and New Expression, Meaning, and Message Present in the *New Portraits* ...................................................... 19

        2.    The Warhol Work Served as a Market Substitute, in the Identical Market, to the Goldsmith Work – Both Comprising Images to be Licensed for Use for the Same Commercial Purposes............................. 20

            (a)    The *Portrait of Rastajay92* Does Not Usurp the Market for the Underlying Photograph .......................................................... 22

    (b)  The *Portrait of Kim Gordon* Does Not Usurp the Market
        for the Underlying Photograph ..................................................... 23

III.  CONCLUSION ........................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*,
    No. 19-2420-cv, 2021 WL 3742835 (2d Cir. Aug. 24, 2021) .........1, 15, 16, 17, 18, 21, 22, 25

*Authors Guild v. Google*,
    804 F.3d. 202 (2d Cir. 2015)..............................................................2, 4, 5, 10, 13, 15, 22, 24

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
    448 F.3d 605 (2d Cir. 2006).........................................................................................4, 10, 11

*Blanch v. Koons*,
    467 F.3d 244 (2d Cir. 2006).......................................................2, 4, 5, 9, 14, 18, 22

*Bleistein v. Donaldson Lithographing Co.*,
    188 U.S. 239 (1903)...........................................................................................20

*Campbell v. Acuff-Rose Music, Inc.*,
    510 U.S. 569 (1994).........................................................1, 5, 8, 10, 11, 20, 25

*Cariou v. Prince*,
    714 F.3d 694 (2d Cir. 2013)...........................................2, 8, 10, 11, 19, 22, 24

*Castle Rock Entm't v. Carol Publ. Group Inc.*,
    150 F.3d 132 (2d Cir. 1998) .........................................................................9

*Eldred v. Ashcroft*,
    537 U.S. 186 (2003)...........................................................................................19

*Google LLC v. Oracle Am., Inc.*,
    141 S. Ct. 1183 (2021).............................1, 2, 4, 5, 6, 10, 11, 12, 13, 14, 15, 16, 24

*Graham v. Prince*,
    265 F. Supp. 3d 366 (S.D.N.Y. 2017)..................................................................8

*Harper & Row*,
    471 U.S. 539 (1985)...........................................................................................2, 13

*Leibovitz v. Paramount Pictures Corp.*,
    137 F.3d 109 (2d Cir. 1998)..................................................................................8

*Marano v. Metro. Museum of Art*,
    844 F. App'x 436 (2d Cir. 2021) ..........................................................................8

*Mattel Inc. v. Walking Mountain Prods.*,
    353 F.3d 792 (9th Cir. 2003) ............................................................................20

*MCA, Inc. v. Wilson*,
    677 F.2d 180 (2d. Cir. 1981).............................................................................12

*Stewart v. Abend*,
    495 U.S. 207 (1990)..........................................................................................15

*Swatch Grp. v. Bloomberg L.P.*,
    756 F.3d 73 (2d Cir. 2014)..................................................................................2, 18

**Federal Statutes**

20 U.S.C. § 951.........................................................................................................14

**Rules**

Fed. R. Civ. P. 12(b)(6)..............................................................................................8

Fed. R. Civ. P. 56.1....................................................................................................3

## I.      INTRODUCTION

The recent opinions of the Supreme Court in *Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183 (2021) and the Second Circuit in *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, No. 19-2420-cv, 2021 WL 3742835 (2d Cir. Aug. 24, 2021) provide further support for Defendants' theory of this case.

Where, as here, two works have no market overlap, and the secondary works use the first in the service of creating First Amendment-protected social commentary that sheds light on a major shift in contemporary life, then the secondary works must be deemed fair use. Richard Prince's *New Portraits* Instagram paintings can only be reasonably perceived as satirical social commentary on the entire genre of communication on social media – specifically Instagram – and the evolving means of inter-personal communication, that have no adverse impact on either the direct or any derivative market for the underlying images. As such, they are entitled to fair use and First Amendment protections.

The "reasonably [] perceived" analysis (*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 582 (1994)) must go beyond superficial optics and, at a minimum, include an appreciation of the purpose, character and meaning of the relevant pieces. The question is not whether works look the same; it is whether they are the same in "purpose…meaning…or message." *Campbell*, 510 U.S. at 579. Thus, the reasonably perceived analysis cannot be accomplished by some automated recognition process. The First Amendment – and the Supreme Court – requires more. Imbued with this capacity to reasonably perceive a different purpose, character or meaning in the secondary work, the observer must – and most certainly *may* (*Campbell*, 510 U.S. at 582) – conclude that Richard Prince created social commentary by taking a purely aesthetic black and white portrait photograph and juxtaposing it in a manner that comments on what was quickly becoming the dominant way in which people communicate.

1

In *Google*, the Supreme Court recognized that "precise[]" copying of copyrighted material is not only permissible, it is sometimes essential to achieve a transformative purpose. *Google*, 141 S. Ct. at 1203. Had Prince obscured or used the defacing techniques employed in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) or *Warhol*, he would have rendered his social commentary unrecognizable and meaningless, and undermined his transformative purpose. The viewer had to be able to recognize the photograph within the post as well as its proportion, placement, framing, comments, symbols and emojis, mimicking actual Instagram posts, for his satirical commentary on social media to work. Thus, using a "degree of defacement" test in this case, as was applied in *Warhol* (and *Cariou*), is to considerably misunderstand the multiple ways in which transformation can be accomplished, and would thwart the First Amendment. In fact, the *New Portraits'* broader societal focus and social commentary are more transformative than the works in *Warhol* or *Cariou*, in that the secondary works in those cases were commenting solely on the subjects of the underlying photographic images, while the *New Portraits* comment on an entire genre. *See Blanch v. Koons*, 467 F.3d 244, 254-55 (2d Cir. 2006).

The Supreme Court and the Second Circuit have both recognized the fourth factor as the most important fair use factor (*Harper & Row*, 471 U.S. 539, 566 (1985); *Authors Guild v. Google*, 804 F.3d. 202, 214 (2d Cir. 2015); *Swatch Grp. v. Bloomberg L.P.*, 756 F.3d 73, 90 (2d Cir. 2014)) and both *Google* and *Warhol* emphasize the lack of market overlap as a prime indicator of fair use. The Supreme Court in *Google* added further weight to the importance of this factor by adopting a balancing test that takes into account the public benefits the copying will likely produce and the potential "risk of creativity-related harms to the public." *Google*, 141 S. Ct. at 1208.

Moreover, unlike the undisputed overlapping commercial licensing market in *Warhol*, here the undisputed evidence developed in discovery does not reveal any semblance of market overlap.

No person seeking the pure aesthetic of the original documentary portrait photographs would find Richard Prince's Instagram paintings, with their iPhone framing, and attached language, comments, symbols and emojis, as a remotely suitable alternative; and conversely no one interested and attracted to the social commentary of Richard Prince's *New Portraits* would accept the original portrait photographs as a substitute. It is also readily apparent that the *New Portraits*, even if produced by an unknown artist, would still have a different purpose from the underlying photographs and would be transformative social commentary, with no additional potential for market overlap.

In addition to the evidence of distinct markets cited in Defendants' briefs in support of summary judgment (*see, e.g.,* McNatt Dkt. 126, Defendants' Rule 56.1 Statement of Undisputed Material Facts in Support of MSJ ("McNatt UF"), ¶¶ 34, 45-46; Graham Dkt. 132, Defendant's Rule 56.1 Statement of Undisputed Material Facts in Support of MSJ ("Graham UF"), ¶¶ 39, 81) we now have the benefit of additional time elapsed since the production of these works in 2014, and it is empirically and indisputably clear that the respective markets for these works (including any derivative market for the original image) are worlds apart. The social commentary contained in the *New Portraits* far exceed the scope of any derivative market that the original photographers might conceivably exploit in their distinct portrait photography markets. In this case, those markets are limited not only because they are distinct, but also because neither Plaintiff has the rights of publicity necessary to exploit the copyrights any further, and for Graham, he provided a broad license to "everyone" for free use when he posted his photograph on Facebook. *See infra* § B.2.

The relevance and importance of Richard Prince's commentary on this new communication paradigm, with online photos and illiterate, emoji and symbol-laden comments, has proved prescient and profound, especially when viewed through the lens of 2014 when Instagram was still relatively novel, and these works were first created. In 2021, Instagram and other online sharing platforms are

dominant forums of communication, circulating billions of pictures and comments every day. It is thus difficult to imagine that using online documentary photos to create, mimic and satirize Instagram posts in order to make social commentary on an entire genre of internet communication, one that ultimately subsumed all other forms of communication, would not be fair use and protected free speech. As such, broad-based commentary, while not reaching the level of protection for political or religious speech, should be encouraged and deserves a heightened level of free speech protection to avoid chilling free speech and artistic protection. If the *New Portraits* commentary on the turning tide of social communication in the 21st Century is not protected by the First Amendment, it is difficult to imagine how future commentators could similarly speak on such issues without risking legal consequences.

If fair use is to have meaning and protect free speech, it must protect social commentary, especially when, as here, it does no economic harm to the underlying work.

## II.    LEGAL ARGUMENT

**A.    *Google* Instructs that Even "Precise" Copying is a Fair Use Where the Secondary Work has a Different "Purpose and Character" and Cannot Serve as a "Market Substitute" for the Underlying Work**

1.    The Supreme Court Confirmed that Even "Precise" Copying Without any Alteration May be a Highly Transformative Fair Use

The Supreme Court in *Google* confirmed what has been the prevailing law in this Circuit for over 15 years – that exact copying can constitute fair use. *See, e.g.*, *Authors Guild*, 804 F.3d 202; *Blanch*, 467 F.3d 244; *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605 (2d Cir. 2006). Specifically, after explaining that "Google copied portions of the Sun Java API precisely, and it did so in part *for the same reason* that Sun created those portions," *Google*, 141 S. Ct. at 1203 (emphasis added), the Supreme Court held that Google's exact copying served a distinct purpose: the development of "a highly creative and innovative" alternative to the original work, *id*. The Court

specifically articulated that the same fact pattern in the artistic setting – exact copying with a different purpose – could "fall within the scope of fair use even though it precisely replicates a copyrighted advertising logo to make a comment about consumerism." *Id*. at 1204.

While acknowledging the significant amount of code that was copied verbatim, the Court held that such a "substantial" taking will "generally weigh in favor of fair use where . . . the amount of copying was tethered to a valid, and transformative purpose." *Google*, 141 S. Ct. at 1205 (citing *Campbell*, 510 U.S. at 586-87). The Court in *Google* expressly rejected the notion that Google's copying was excessive because Google "could have achieved its Java-compatibility objective by copying only the 170 lines of code that are 'necessary to write in the Java language,'" as doing so would "view[] Google's legitimate objectives too narrowly." *Id.*; *see also Authors Guild*, 804 F.3d at 221 (display of copyrighted language verbatim without incorporating it into any new work was fair because "courts have rejected any categorical rule that a copying of the entirety cannot be a fair use."). In other words, just because one can do less, does not mean that one is required to do less under fair use, consistent with the First Amendment.

Just as Google's exact copying of Oracle's code to build a new product was a transformative fair use, Prince's *New Portraits* are also transformative, in that they "add[] something new, with a further purpose *or* different character, altering the first with new expression, meaning, *or* message[.]" *Campbell*, 510 U.S. at 579 (internal quotation and alteration marks omitted) (emphasis added). The Supreme Court's use of the disjunctive — "or" — indicates that the transformative nature of a work can arise by altering the first with new expression, or by giving the original works a new meaning or message, which can arise from myriad techniques, aesthetics, and intent – not just defacement or obfuscation of the underlying image. *See, e.g., Blanch*, 467 F.3d at 254 (notwithstanding the copying of pre-existing material without alteration, holding that the secondary work can be "characterized for

these purposes as satire – its message appears to target the genre of which [the original work] is typical, rather than the individual photograph itself."). Such is the case with the *New Portraits*, in which Prince's use of pre-existing images resulted in works that can only be reasonably perceived as commenting on the then-newly popularized "norms" of social media communication, thus providing the *New Portraits* with both a different purpose and character than the underlying photographs, and through additional expression (e.g., textual comments, emojis, Instagram framing), gives them a new meaning and message.

In considering the purpose and character of Google's "precise" copying of code, the Court held that it was transformative because Google took code that was designed for personal computers and laptops, added new code, and created the Android platform for mobile smartphones. *Google*, 141 S. Ct. at 1203-04. In other words, Google's new, innovative, and socially valuable use of existing material to create the Android platform for mobile smartphones added something new (additional code), with a further purpose and character – to wit, a platform compatible with smartphones.

Just as Google used Oracle's code to build something new, with a further purpose or different character, here too, Prince's *New Portraits* have both a different purpose *and* a different character from the underlying photographs, thus altering the photographs with new expression, meaning, and message.

> (a) Like Google, Prince Used Existing Unaltered Material for a Different Purpose than that of the Original – to Comment on the Entire Genre of Social Media Communication

Prince's purpose in creating the *Portrait of Rastajay92* and the *Portrait of Kim Gordon*, along with the other *New Portraits* works, is significantly different from Graham's and McNatt's respective purposes in making the photographs. As Prince stated, he intended to "comment[] on the social media, the whole idea of putting up images on a new platform that was available to anyone, to an entire population[.]" Graham UF ¶ 17. Prince focused on how these images were

"recontextualized" by the new language emerging in this digital space, a mix of nonsense, slang, hyperbole and image-based emojis. *Id.* at ¶¶ 91-92. His technique was not to merely reproduce the image present in each *New Portrait*; rather, it was to comment on the manner in which people today communicate, present themselves, and relate to one another through social media. *Id.* at ¶ 33. Prince's work allows viewers and gallery visitors to step into a physical manifestation of that virtual world, which only exists in cyberspace and is typically viewed on handheld devices. This purpose is a world away from Graham's purpose in making his photograph, which was to "capture[] the spirit and gravitas of the Rastafarian people" (Graham UF ¶ 57),[1] and McNatt's purpose in making his photograph, which was to comply with the specific creative directives provided by *Paper* Magazine to document Kim Gordon in connection with an interview in *Paper* (McNatt UF ¶¶ 53-54).

Plaintiffs have previously attempted to undermine the commentary Prince made with his *New Portraits* by selectively citing only to Prince's responses to certain general questions regarding commentary, while ignoring later, more specific responses to other questions during the course of a seven-hour deposition. For instance, Plaintiffs cite to Prince's response to the question of whether he was "offering any criticism of social media"[2] in a particular *New Portraits* work, to which Prince responded "No," but later, in response to the more specific question "So, your work, Portrait of Kim Gordon, is a commentary on social media, is that right?" Prince responded: "I think to some extent it is, and it's also a comment on my friend Kim." (McNatt Dkt. 154, Decl. of Caitlin Fitzpatrick in Support of Plaintiff's Joint Motion to Exclude Expert Testimony, Ex. 38 (Prince Depo. Tr.) at 202:22-203:2.) Prince also stated: "And I think a lot of the comments or some of the comments were simply I was commenting on the idea of social media." (*Id.* at 202:16-21.) Prince later testified about

---

[1]      Defendants' proffered expert testimony corroborates both Plaintiffs' and Prince's respective stated intents. *See* Graham Dkt. 129, Decl. of Nina D. Boyajian in Support of Defendant's MSJ ("Boyajian Decl."), Ex. 38 ¶ 15; Ex. 36 ¶ 45; *see also id.* Ex. 43 ¶ 3. Thus, here, unlike in *Cariou*, the Court has the benefit of Prince's and Plaintiffs' respective (and drastically divergent) intents *and* expert testimony supporting the same.

[2]      It is reasonable that Prince would have understood "criticism" in the lay context, that being some kind of negative commentary. McNatt Dkt. 169 (Prince Supp. Decl. ¶ 5).

the other messages he was conveying through his *New Portraits*. (*Id.* at 203:3-204:17).[3]

The Second Circuit's decision in *Marano v. Metro. Museum of Art*, 844 F. App'x 436 (2d Cir. 2021) (summary order) ("*Marano II*"), issued following the original decision in *Warhol*, is instructive. In *Marano II*, the Second Circuit affirmed the dismissal of a complaint following a motion to dismiss on the grounds that the parties' respective purposes were distinct, and therefore the secondary work was transformative.[4] "Whereas [the photographer plaintiff's] stated purpose in creating the photograph was to show 'what Van Halen looks like in performance,' the Met exhibition highlights the unique design of the Frankenstein guitar and its significance in the development of rock n' roll instruments." *Marano II*, 844 F. App'x at 438 (internal citation omitted), *aff'g, Marano v. Metro. Museum of Art*, 472 F. Supp. 3d 76, 84 (S.D.N.Y. 2020) ("*Marano I*") ("the original meaning" behind the Photo was to "convey the message that Van Halen is a groundbreaking and unorthodox musician." In contrast, the Met spotlights the "Frankenstein" guitar—using the Photo to reference and contextualize the exhibition object…"to achieve the ultimate guitar for tone, playability, dependability, and functionality.") (internal citations omitted).[5]

As in *Marano*, the commentary of Prince's *New Portraits* is directed at the entire genre of social media communication rather than a specific photograph or subject of a photograph. Prince's

---

[3]     "What is critical is how the work in question appears to the reasonable observer, not simply what an artist might say about a particular piece or body of work." *Cariou*, 714 F.3d 694 at 707. The court in *Cariou* continued: "Rather than confining our inquiry to Prince's explanations of his artworks, we instead examine how the artworks *may 'reasonably be perceived'* in order to assess their transformative nature." *Id.* (emphasis added) (quoting *Campbell*, 510 U.S. at 582; citing *Leibovitz v. Paramount Pictures Corp.*, 137 F.3d 109, 113-14 (2d Cir. 1998)). In other words, *may* the new purpose *or* character of the secondary work be perceived as providing a new expression, *or* new meaning, *or* a new message? This language suggests that the Court is to determine whether there is any subset of the "reasonable observer" that might perceive a transformative purpose or character, not whether *all* reasonable observers might do so. Plaintiffs' proffered expert agrees. *See* McNatt Dkt. 119, Boyajian Decl. Ex. 55 (Sussman Depo. Tr.) at 92:23-94:22.

[4]     It is notable that *Marano I* was decided on a motion to dismiss, where evidence of the Met's intent had not been submitted. Rather, the court determined that it could determine the case on a Rule 12(b)(6) motion because it was a "case[] in which transformativeness can be determined by doing a side-by-side comparison of the original work and the secondary use." *Marano I*, 472 F. Supp. at 83 (citing *Graham v. Prince*, 265 F. Supp. 3d 366, 377 (S.D.N.Y. 2017)).

[5]     *See also Marano I*, 472 F. Supp. 3d at 85 ("[w]hat is relevant is not whether the exhibition comments on the Photo *per se*, such as the photographer's choice of lighting or focus, but whether it uses the Photo to help illustrate [] historical and artistic significance…—a separate and distinct purpose from the Photo's original expressive purpose," rejecting plaintiff's argument that "the Met's use is not transformative because the exhibition does not critique the artistic merits of the Photo itself but 'merely use[s] [it] as an illustrative aid to depict the subjects featured' in the Photo.").

satire and commentary is a distinct kind of transformative use in which the secondary user does not necessarily comment on the underlying work, but rather on the entire genre that it represents, a practice recognized in the Second Circuit as fair use. As the *Blanch* court explained, Koons' painting was fair use of Blanch's photograph because his satirical "message appears to target the genre of which [the Blanch photograph] is typical, rather than the individual photograph itself." *Blanch*, 467 F. 3d at 254-55. "Koons' use of a slick fashion photograph enables him to satirize life as it appears when seen through the prism of slick fashion photography." *Id.* at 265. Koons used the "Blanch image as fodder for his commentary on the social and aesthetic consequences of mass media…' in the creation of new information, new aesthetics, new insights and understandings." *Id.* at 253 (quoting *Castle Rock Entm't*, 150 F. 3rd at 142 (quoting Pierre N. Leval, Toward a Fair Use Standard, 103 Harv L. Rev. 1105, 111 (1990)).

Likewise, Prince selected a series of arresting and typically provocative images that are common on Instagram in order to recreate large format posts for satirical commentary on the entire genre. By massively expanding the posts to 65.75" x 48.75," Prince further heightens the commentaries' effectiveness by forcing longer and clearer focus on a post that would normally be viewed on a screen of a few square inches for seconds, and confronting the viewer and making them contemplate the often coarse, banal and illiterate way people communicate on Instagram.

There can be no question that Prince's purpose in creating *Portrait of Rastajay92* and the *Portrait of Kim Gordon*, with the addition of his inside and self-referential joke comments and presented complete within the Instagram frame, as a post, was different than the photographers' purpose in photographing their respective subjects. Beyond the expression, it is also the meaning and message – which some might argue the heart of contemporary art, compared to more classical forms – that are highly transformational in this case.

9

       (b)     Prince Created New Works with a Different Character, Message, and Meaning

Prince's distinct purpose for creating the *Portrait of Rastajay92* and the *Portrait of Kim Gordon* bears out in the character of the paintings, which are also different from the character of the underlying photographs, not because the images were painted over or obscured as they were in *Cariou* or *Warhol* (as discussed further below), but because the transformative purpose and character of *New Portraits* "may reasonably be perceived," *see Cariou*, 714 F.3d at 707.

As a preliminary matter, just as the Court in *Google* looked at the character of the entirety of the Android platform – not just the portion with the copied code – it is crucial that the comparison of the works here focus not solely on the borrowed element – the common photographic image – but rather, the entirety of the work. *See, e.g.*, *Bill Graham*, 448 F.3d at 613 (considering the elements surrounding the copyrighted works in concluding the exact reproductions were fair use). Notably, the transformativeness inquiry must focus on whether the new work as a whole transformed the use of the borrowed elements – *not whether the reused material itself was transformed. See Campbell*, 510 U.S. at 578-79. While the underlying images may take up a significant *physical portion* of the *New Portraits*, that does not mean they are the most important *element* of the paintings. In fact, the often-provocative text, the colorized emojis, and the other colorized iconography, are more critical to the purpose and character of the *New Portraits* than is the underlying image.

Nor does the fact that Prince used nearly the entirety of the photographs weigh against fair use. Rather, *Google* confirmed that such a use can be a fair use when the resulting work is otherwise transformative. *Google*, 141 S. Ct at 1202-04; *see also Bill Graham*, 448 F.3d at 613 ("copying the entirety of a work is sometimes necessary to make a fair use of the image."); *Authors Guild*, 804 F.3d at 221 ("Complete unchanged copying has repeatedly been found justified as a fair use when the copying was reasonably appropriate to achieve the copier's transformative purpose and was done in

such a manner that it did not offer a competing substitute for the original."). Indeed, had Prince done anything to alter the post – and thereby the image in the post – from how it would have appeared on Instagram, that would have detracted from his intention to effectively capture the medium of social media communication, including the free-flowing nature of the circulation of images. As in *Bill Graham*, Prince used an unobscured copy of the copyrighted image to accomplish his fair use purpose by, among other things, "intermingl[ing]" existing visuals with his original contributions (e.g., text, emoji, large-scale production, etc.). *Bill Graham*, 448 F.3d at 613. Prince's copying was therefore an intentional repurposing. *Google*, 141 S. Ct at 1203 (referring to Google's copying as "'reimplementation,' [which] 'repurposes the same words and syntaxes' of an existing system").

Because the transformative purpose and character of the *New Portraits* "may reasonably be perceived," *see Cariou*, 714 F.3d at 707, by reasonable observers in a side-by-side comparison with the underlying photographs, when invited to submit replicas of their respective works, Prince submitted  full-size, exact reproductions of *Portrait of Rastajay92* and the *Portrait of Kim Gordon* for the Court's review and analysis, while Plaintiffs created and proposed submitting "demonstratives" – rather than replicas – that intentionally misrepresented their respective works so that they appeared to be more similar to Prince's works. *See* McNatt Dkt. 172, Graham Dkt. 190. Such an attempted sleight of hand is an implicit concession that the works, in their actual states, are easily distinguishable and are not market substitutes.

As in *Google*, where the pre-existing material was used in clearly recognizable, unadulterated form, Prince's *Portrait of Rastajay92* and the *Portrait of Kim Gordon* were transformative of the underlying photographs because they "add[] something new, with a further purpose or different character, altering the first with new expression, meaning, or message[.]" *Campbell*, 510 U.S. at 579 (internal quotation and alteration marks omitted).

2.    In Considering any Potential "Effect" of the Copying in the Market for the Copyrighted Work, the Court Must Consider Not Only Potential Monetary Losses, But Also "Take Into Account the Public Benefits" the Copying will Likely Produce and the "Risk of Creativity-Related Harms to the Public"

*Google v. Oracle* strengthens the case that Prince prevails under critical fourth fair use factor, by adding to the market harm analysis an additional factor: the public benefits the copying will likely produce and the "risk of creativity-related harms to the public." *Id.* at 1208.

Specifically, in considering the fourth factor, "a potential loss of revenue is not the whole story." *Google*, 141 S. Ct. at 1206. A court "must consider not just the amount but also the source of the loss." *Id*. Further, a court "must [also] take into account the public benefits the copying will likely produce. Are those benefits, for example, related to copyright's concern for the creative production of new expression? Are they comparatively important, or unimportant, when compared with dollar amounts likely lost (taking into account as well the nature of the source of the loss)?" *Id*. (citing *MCA, Inc. v. Wilson*, 677 F.2d 180, 183 (2d. Cir. 1981) (calling for a balancing of public benefits and losses to copyright owner under this factor). Perhaps nowhere is this fourth factor balancing test more relevant and important than in encouraging and protecting artistic commentary on social issues.

(a)    As in *Google*, the Secondary Works in This Case do Not Serve as Market Substitutes for the Originals

Despite the fact that both the original and secondary work in *Google* were the same kind of work – namely, software – the Court did not find the secondary work to be a competing substitute for the original. With respect to the amount of economic loss in *Google*, the Court pointed to evidence that (1) Oracle would not have been able to enter into the market for smartphones in the way Android was able to with the platform it built using Oracle's code (*Google*, 141 S. Ct. at 1206); and (2) "devices using Google's Android's platform were different in kind from those that license [Oracle's] technology." *Id.* at 1206-07. "This record evidence demonstrates that, rather than just 'repurposing [Oracle's] code from larger computers to smaller computers,' Google's Android platform was part of

12

a distinct (and more advanced) market than Java software." *Id.* at 1207. The Court also cautioned against the "'danger of circularity posed' by considering unrealized licensing opportunities because "'it is a given in every fair use case that plaintiff suffers a loss of a potential market if that potential is defined as the theoretical market for licensing the very use at bar.'" *Id.* (citing 4 Nimmer on Copyright § 13.05[A][4]).

As discussed at length *infra* § B.2, as in *Google*, the *Portrait of Rastajay92* and the *Portrait of Kim Gordon* cannot serve as market substitutes for the underlying works as they exist in entirely distinct markets. Accordingly, there is no "cognizable market harm." *See Authors Guild, Inc.*, 755 F.3d at 99 ("cognizable market harm" is limited to "market substitution").

   (b) There is a Substantial "Risk of Creativity-Related Harms to the Public" by Enforcing Plaintiffs' Copyright Against Prince

With respect to the newly added "public benefits" consideration, the Court in *Google* reasoned that allowing "enforcement of Oracle's copyright here would risk harm to the public." *Google*, 141 S. Ct. at 1208. Specifically, the Court held that Google's "reimplementation" served the Copyright Act's purpose of "'suppl[ying] the economic incentive to [both] create and disseminate ideas.'" *Id.* (quoting *Harper & Row*, 471 U. S. at 558).

The Court in *Google* was understandably concerned with setting a precedent that effectively restricted the incentives to produce creative and innovative works – the very purpose of the Copyright Act. For that reason, it included in its fourth factor analysis the "risk of creativity-related harms to the public" (*Google*, 141 S. Ct. at 1208) in enforcing a copyright, balancing the public benefits of "creative production of new expression" with "dollar amounts likely lost." *Id.* at 1206.

As discussed in Defendants' expert reports, appropriation art, in which pre-existing images and objects are intentionally borrowed and repurposed, is now "well established as a crucial chapter

and movement in art history." McNatt Dkt. 119, Boyajian Decl. Ex. 6 ¶ 16 ("Phillips Report").[6] However one may personally view the works of appropriation artists, there can be no reasonable dispute that their contributions – and those of many appropriation artists – have enriched the arts, and thereby the public at large. As the Second Circuit has previously noted, "the public exhibition of art is widely and we think properly considered to 'have value that benefits the broader public interest.'" *Blanch*, 467 F.3d at 254; *see also* 20 U.S.C. § 951 ("access to the arts and the humanities" fosters "wisdom and vision" and makes citizens "masters of their technology and not its unthinking servants"). It is undisputed that the *New Portraits* in general, and the single-edition *Portrait of Rastajay92* and the *Portrait of Kim Gordon* in particular, are art that were publicly displayed. McNatt UF ¶ 31, Graham UF ¶ 35. That two of the most prominent art museums in the country (LACMA and MOCAD) have also publicly displayed the *New Portraits* underscores their value as innovative and transformative social commentary.

Just as the Court in *Google* held that "enforcement of Oracle's copyright here would risk harm to the public," (*Google*, 141 S. Ct. at 1208), enforcement of Plaintiffs' copyright against Prince would similarly risk harm to the public by (1) depriving the public from viewing the *New Portraits* – and potentially other types of appropriation art – as museums and galleries, faced with the prospect of financial ruin, would be less inclined to purchase or display such works if they risk being sued for such display (*see* McNatt Dkt. 121, Declaration of Jeff Poe ¶ 13; Graham Dkt. 142, Declaration of Tracy Appleton in Support of Defendant's Motion for Partial Summary Judgment, Ex. 8 ¶ 11 ("Gagosian Decl.")); and (2) individual artists – particularly those without the resources to defend themselves in the courts – would censor themselves in the type of art they create, out of fear that they

---

[6]    Prince follows a long tradition of appropriation artists, beginning with Marcel Duchamp, who used pre-existing objects (a urinal in the case of DuChamp), without alteration – other than adding text ("R. Mutt 1917") – to create a new work with an entirely different meaning and message. *See* McNatt Dkt. 119, Boyajian Decl. Ex. 6 (Phillips Report) ¶ 17.

too will have their art become the subject of legal attack, seizure and destruction.[7] This type of chilling effect is directly contradictory to the objects of copyright protection and the principles of the First Amendment, which undergird the fair use doctrine. *See also infra* § B.1.b. "Thus, while authors are undoubtedly important intended beneficiaries of copyright, the ultimate, *primary intended beneficiary is the public*, whose access to knowledge copyright seeks to advance by providing rewards for authorship." *Authors Guild*, 804 F.3d at 212 (emphasis added); *see also Stewart v. Abend*, 495 U.S. 207, 236 (1990) ("rigid application" of the copyright laws "would stifle the very creativity which [they are] designed to foster.").

The "risk of creativity-related harms to the public" (*Google*, 141 S. Ct. at 1208), should Prince's work be found to be unlawful, would be substantial and very likely irreparable. When "compared with dollar amounts . . . lost" (*id*. at 1206), if any, by Plaintiffs,[8] under the Supreme Court's most recent articulation of the fourth fair use factor, the only consistent result is fair use. Indeed, this case represents the scenario that the Supreme Court's test in *Google* was designed to protect. By creating new art, Prince's works not only furthered "copyright's concern for the creative production of new expression," but did so while causing no market harm to the underlying works.

**B.**   ___*Warhol* Involved a Different Method of Transformation than at Issue in this Case – Direct Alteration of the Underlying Image – and Resulted in a Product – a Licensed Image of a Celebrity – that Became a Market Substitute for the Original___

    1.   ___The Method of Claimed Transformation in *Warhol* – Direct Alteration of the Underlying Image – is Not the Method of Transformation Employed in this Case___

It is as tempting as it is incorrect, to apply the same physical transformation analysis to Prince's *New Portraits* as was applied to the secondary work in *Warhol*. But transformation through physical alteration, i.e., direct painting, cropping, obscuring of the image itself, is but one way to

---

[7]     *See, e.g., Warhol*, 2021 WL 3742835, at *20 ("Warhol's works are among many pieces that incorporate, appropriate, or borrow from protected material. Risk of a copyright suit or uncertainty about an artwork's status can inhibit the creative expression that is a goal of copyright.") (concurrence).

[8]     *See infra*, § B.2 for discussion of parties' respective disparate markets and Plaintiffs' lack of authorization to resell.

transform an image. That the most recent visual art fair use analysis in this Circuit – as well as the Second Circuit's analysis of Prince's prior works in *Cariou* – concerned the alteration of images through physical modifications to the images themselves, in no way defines – or worse yet – restricts, the myriad ways in which visual art can be transformed. Doing so would run afoul not only of the fair use doctrine, but also the First Amendment in which the doctrine is firmly rooted.

The *Warhol* case "concerns a series of silkscreen prints and pencil illustrations created by the visual artist Andy Warhol based on a photograph of the musical artist Prince [the Goldsmith Photograph]." *Warhol*, 2021 WL 3742835, at *1. In 1984, Goldsmith licensed the Goldsmith Photograph to *Vanity Fair* magazine for use as an artist reference; *Vanity Fair*, in turn, commissioned Warhol to create an image of Prince for its November 1984 issue, using the Goldsmith Photograph as a reference. *Id*. In April 2016, after Prince died, *Vanity Fair* obtained a commercial license from Warhol for an image from the series Warhol created based on Goldsmith's work and published it on the cover of its May 2016 issue without attribution to Goldsmith. *Id*.

The Second Circuit reversed the district court's finding that Warhol's use was transformative, holding that the works "share the same overarching purpose" (*Warhol*, 2021 WL 3742835, at *8) and "Warhol's modifications serve[d] chiefly to magnify some elements of th[e] existing material and minimize others" while "retaining the essential elements of[] its source material." (*id*. at *10).

        (a)    The Analysis of Transformative Elements in the *Portrait of Rastajay92* and the *Portrait of Kim Gordon* Must be Distinct from the Analysis of Warhol's Work

As the Supreme Court confirmed in *Google*, transformative use turns not on how much of an original work remains or can be seen in the secondary work, but rather, on what the new work adds to the existing work. *Google*, 141 S. Ct. at 1202-03. What material is "added" and how it is "added" to the pre-existing material, however, will turn on an analysis of the specific new work at issue, rather than application of a singular standard applied to all similar works, e.g., software, visual art. As

the Second Circuit stated in *Warhol*, "we cannot, nor do we attempt to, catalog all of the ways in which an artist may achieve th[e] end" of "embodying a distinct artistic purpose, one that conveys a new meaning or message separate from its source material." *Warhol*, 2021 WL 3742835, at *8. It would be misguided, then, to apply the same analysis to the *Portrait of Rastajay92* or the *Portrait of Kim Gordon* as was applied to the works in *Warhol* (or *Cariou*), namely, discerning whether the underlying images were obfuscated enough in the new works to render them transformed. Indeed, in describing (pre-litigation) his process in creating the *New Portraits*, Prince recalls asking himself how else he could contribute to this new type of portrait he was creating. He stated:

> I didn't want to paint it.
> I didn't want to mark it.
> I didn't want to add a sticker.
>
> Whatever I did, I wanted it to happen INSIDE and before the save. I wanted my contribution to be part of the 'gram.' I didn't want to do anything physical to the photograph after it was printed.[9]

(McNatt Dkt. 119, Boyajian Decl. Ex. 10 ("Birdtalk") at PRINCE_MCNATT 0000254). This explicit intent to transform through means other than painting or marking over, or obfuscating with an object (e.g., sticker) was an intentionally distinctive technique from the technique he previously employed with the *Cariou* works, and distinct from the technique Warhol employed.[10]

Accordingly, a first factor analysis focused on the recognizability of the source material misses the mark. Obscuring the source material is but one way to provide a secondary work with a different purpose or character, with a new message, meaning, and expression. As the *Warhol* court stated, the alteration of an original work "with 'new expression, meaning, or message,' whether by the use of 'new aesthetics,' by placing the work 'in a different context,' or by any other means is the

---

[9]    Prince was explaining that he wanted his creation to exist in social media itself, and then be captured on a phone and enlarged to "absurd proportions." McNatt Dkt. 119, Boyajian Decl. Ex. 6 (Phillips Report) ¶ 32. This is readily distinguishable from *Warhol*, where Warhol's very intent was to make physical alterations to the image itself for use in direct competition with the photograph in the context of a magazine cover. There is no similar context here.

[10]    In this sense, Prince's method, while unique and innovative, was closer to the transformations made on other unobfuscated images, as in *Blanch* and *Bill Graham Archives*.

*sine qua non* of transformativeness. *Warhol*, 2021 WL 3742835, at *6 (omitting internal quotations). Indeed, if Prince had obscured the screenshots in anyway, it would have *taken away* from his intended purpose here—to forensically and accurately capture interaction on social media, which largely consists of reposting and commenting on others' images—both people he knows and those he does not. McNatt Dkt. 119, Boyajian Decl. Ex. 56 (Phillips Depo. Tr.) at 112:14-113:19. Dramatic cropping of portions of the subjects in the photographs in the *New Portraits* would have significantly inhibited Prince's comment on Instagram users' engagement, because it would no longer resemble a "real" post. Indeed, the creative choices Prince made for the ultimate format the *New Portraits* took (e.g., printing the entirety of the post on a three-dimensional canvas) make it such that the single-edition *New Portraits* themselves are a repost, but in the tangible, rather than virtual, world.

Other courts have similarly held that transformative uses may occur where plaintiffs' works are reproduced without alteration. Indeed, the Second Circuit has repeatedly emphasized the profound expressive importance and new meaning and message that a transformative use may have in *not* altering an underlying work. In *Swatch Grp. Mgmt. Servs. v. Bloomberg L.P.*, the court recognized that the defendant needed to copy "a full, unadulterated recording of the underlying work" to convey information "that would have been impaired" if the work had been altered. 756 F.3d at 85 (citation omitted). The court observed that making a "faithful reproduction" and exact copy "served 'the interest of accuracy, not piracy.'" *Id*. In a similar vein, in *Blanch*, as here, the Second Circuit recognized Koons' secondary work had a different "target" message than the original work (*Blanch*, 467 F.3d at 254),  and that Koons had an interest in appropriating an image faithfully as a means of giving his commentary "authenticity:" Koons said, "[b]y using an existing image, I also ensure a certain authenticity or veracity that enhances my commentary—it is the difference between quoting and paraphrasing—and ensure that the viewer will understand what I am referring to." 467

F.3d at 255. Prince's use of the images of Plaintiffs' photographs serves the exact same interest: to comment effectively on how images circulate on social media and how people communicate on social media, Prince needs to actually show the authentic posts, including the images, in the format he is commenting on. McNatt Dkt. 125 (Memo in Support of MSJ), at 27. His interest in the images was in "authenticity" and in "accuracy, not piracy."[11]

> (b)   Even Absent Obfuscation of the Pre-Existing Image, a Reasonable Observer Would Perceive the Further Purpose and Character and New Expression, Meaning, and Message Present in the *New Portraits*

As described above, the touchpoint for determining transformativeness is whether that transformation "may reasonably be perceived" by reasonable observers. *Cariou*, 714 F.3d at 707. Contrary to Plaintiffs' previous suggestions, "[c]ourts in this circuit" do not "employ the term 'reasonable observer' interchangeably with … 'average lay observer.'" (McNatt Dkt. 143 (Opp. to MSJ) at 12). The Second Circuit has never held, or even suggested, that these terms are interchangeable, because to do so would violate not only the Supreme Court's fair use precedent, but also First Amendment law, which undergirds the fair use inquiry.[12]

This First Amendment precedent is essential to consider because fair use acts as a "First Amendment safeguard[]" for copyright law. *Eldred v. Ashcroft*, 537 U.S. 186, 220 (2003). It is no doubt for this reason that the Supreme Court in *Campbell* phrased the relevant question under the first factor as whether a transformative character "*may* reasonably be perceived." This phraseology gives maximum leeway to minority views that a work may be transformative. Citing *Campbell* in an art fair use case, the Ninth Circuit emphasized that the determination of transformativeness must resist

---

[11]   Common themes have pervaded Prince's art throughout his career, most notably, the use of words and text, such as in the *Jokes* paintings, a search for commonality, as in the *Gangs*, and a response to technological changes, as in the *New Portraits*. McNatt UF ¶¶ 26, 29; Graham UF ¶ 30.

[12]   Indeed, such a standard, borrowed from the substantial similarity test for determining infringement, would make no sense in a fair use case, where it is *presumed* that the ordinary observer would observe copying, and the question is whether the copying was fair. To answer that more nuanced question, one must necessarily proceed beyond the "average lay observer" to the "reasonable observer." *See also* McNatt Dkt. 125 (Memo in Support of MSJ), at 21-22.

"majority views" which could "possibly silence artistic creativity." *Mattel Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 801 (9th Cir. 2003). Because transformative works, like the *New Portraits*, have "socially significant value as free speech under the First Amendment," allowing majority views to govern would be "greatly at odds with the purpose of the fair use exception and the Copyright Act." *Id.*; *see also Campbell,* 510 U.S. at 582-83 ("[i]t would be a dangerous undertaking for persons trained only to the law to constitute themselves final judges of the worth of [a work], outside of the narrowest and most obvious limits. At the one extreme some works of genius would be sure to miss appreciation. Their very novelty would make them repulsive until the public had learned the new language in which their author spoke.") (quoting *Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 251 (1903)).

A reasonable observer, deemed to be aware of history and context in art, could easily distinguish between works that look alike to the ordinary observer, but have radically different messages and meanings, which is, after all, what the transformative inquiry seeks to protect. A reasonable observer would perceive the transformation made to the pre-existing images by virtue of their placement in a specific social media frame, with seemingly non-sensical commentary from Prince. A comment on where society is. Where it is headed in terms of how its members observe and communicate with one another. A reasonable observer would see that such a work has a different purpose and character, new expression, a different meaning and message, than a solemn, free-standing portrait of an individual. *See Campbell*, 510 U.S. at 578-79. The image need not be obscured to achieve that purpose.

2.    The Warhol Work Served as a Market Substitute, in the Identical Market, to the Goldsmith Work – Both Comprising Images to be Licensed for Use for the Same Commercial Purposes

*Warhol* implicated the unique context of a commercial licensing market in which a magazine was searching for a portrait of the musician Prince to publish in its issue commemorating the singer's

death. There, the magazine's commercial licensing of a reproduction of Warhol's portrait served as a market substitute for licensing the plaintiff's photographic portrait, and "there [wa]s no material dispute that both Goldsmith and [Warhol] have sought to license (and indeed have successfully licensed) their respective depictions of Prince to popular print magazines to accompany articles about him." *Warhol*, 2021 WL 3742835, at *15. The court emphasized that the peculiar licensing context of the case was pivotal to its analysis. Indeed, the court expressly stated that a case, as here, involving an artist's original work of art, would merit "significantly more 'breathing space'" for fair use. *Id.* at *16 ("what encroaches on Goldsmith's market is [Warhol's] commercial licensing of the Prince Series, not Warhol's original creation."). Accordingly, the court held that Warhol's "works pose[d] cognizable harm to Goldsmith's market to license the Goldsmith Photograph to publications for editorial purposes and to other artists to create derivative works based on the Goldsmith Photograph and similar works." *Id.*

This case presents the precise scenario that the *Warhol* court took pains to distinguish from its holding, noting that it would present a strong case for fair use: an "original creation" of art that occupies a separate primary market, distinct from a "commercial replica." 2021 WL 3742835, at *16. In fact, the *Warhol* court noted that if the case had involved an original Warhol work of art, there would not be market substitution, noting that "the primary market for the Warhol Prince Series (that is, the market for the original works) and the Goldsmith Photograph do not meaningfully overlap." *Id.* at *14.

Judge Jacobs' concurring opinion elaborated on this point at length. He wrote, [i]t is useful to emphasize that the holding does not consider, let alone decide, whether the infringement here encumbers the original Prince Series works that are in the hands of collectors or museums, or, in general, whether original works of art that borrow from protected material are likely to infringe."

*Warhol*, 2021 WL 3742835, at *20. He further stated that the "[r]isk of a copyright suit or uncertainty about an artwork's status can inhibit the creative expression that is a goal of copyright. So it matters that a key consideration in this case is the harm that the commercial licensing of the Prince Series poses to Goldsmiths market to license her photograph." *Id.* With the *New Portraits*, Prince made only original works of art without any market substitution or overlap with Plaintiffs' markets. Unlike in *Warhol*, there are no prints or any licensing issues; only originals owned by collectors and public museums.

        (a)      The *Portrait of Rastajay92* Does Not Usurp the Market for the Underlying Photograph

The only harm cognizable under the fourth factor is the harm of market substitution. *Authors Guild*, 755 F.3d at 99. Thus, the relevant consideration is "'whether the secondary use *usurps* the market of the original work,'" *Cariou*, 714 F.3d at 708 (quoting *Blanch*, 467 F.3d at 258) (emphasis added). The fourth factor weighs strongly in favor of fair use because *Portrait of Rastajay92* cannot serve as a market substitute for the original portrait photograph.

First, *Portrait of Rastajay92* was a single-edition work that is owned by an individual who would not have purchased or displayed the underlying photograph.[13] Therefore, by definition, the secondary work cannot have an adverse impact on the market for photograph. Moreover, the "target audience" (*Cariou*, 714 F.3d at 709) for the photograph and the *Portrait of Rastajay92* are vastly different. The *Portrait of Rastajay92* appeals to a collector of contemporary art, while the photograph appeals to a collector of classic black and white photography. (Graham Dkt. 129, Boyajian Decl. Ex. 40 ¶ 34 and Ex. 36 ¶ 52). The difference in the nature of Graham's and Prince's markets is also reflected in the price differential between the works at issue—at the time Prince made *Portrait of*

---

[13]      While many fair use cases involve products that are offered for sale on an ongoing basis and the issue is what impact ongoing sales of the secondary products have on the market for the original (*see, e.g., Campbell, Castle Rock, Google Books, Hathi Trust*), here, there is no ongoing sale of the *Portrait of Rastajay92* or the *Portrait of Kim Gordon* and no evidence that the paintings will re-enter the market. (Graham Dkt. 129, Boyajian Decl. Ex. 46 at 118:24-119:25; Gagosian Decl. ¶ 13).

*Rastajay92*, the most Graham had sold the photograph for was $5,500 (Graham Dkt. 129, Boyajian Decl. Ex. 23), while the list price for *Portrait of Rastajay92* was $40,000 (Graham UF ¶ 39)—as well as the varied institutions that exhibit and sell their works.

Second, there is no evidence that Graham has lost any sales of the photograph since Prince first exhibited the *Portrait of Rastajay92*. (Graham UF ¶ 80). To the contrary, the undisputed evidence shows that the price Graham commanded for sales of the Photograph following the *Portrait of Rastajay92* increased, rather than decreased. (*Compare* Graham Dkt. 129, Boyajian Decl. Ex. 29 (sale for $8,000 *after* the sale and exhibition of the *Portrait of Rastajay92*), with Ex. 23 (highest previous sale for $5,500)).

Third, Graham lacks the necessary rights to further exploit the image and likeness of the Rastafarian who is his subject, as Graham does not obtain model releases from his photographic subjects and did not obtain a written release in this case. Graham UF ¶¶ 59-60. Therefore, any alleged harm caused by Prince's use of the photograph would be to an illegitimate market. Accordingly, as in *Google*, the author of the original work cannot exploit the work in the same way as the secondary user. Analysis of the fourth fair use factor weighs strongly in favor of fair use.[14]

    (b)    The *Portrait of Kim Gordon* Does Not Usurp the Market for the
           Underlying Photograph

For many of the same reasons the *Portrait of Rastajay92* does not serve as a market substitute for the underlying photograph, the *Portrait of Kim Gordon* cannot "usurp" the market for McNatt's photograph. First, the (authorized) market for the photograph was one commercial publication, *Paper* magazine, which licensed the work for $100. (McNatt UF ¶ 51.) The *Portrait of Kim Gordon*, by contrast, is a single-edition work that was offered for sale – not licensing – for $90,000. (*Id.* at ¶¶ 34,

---

[14]    Any market harm to Graham is further not cognizable in that he willingly posted the photograph to Facebook using the "everyone" setting, meaning, according to the Facebook Terms of Service at the time (long-since changed), that he "allow[ed] everyone, including people off of Facebook, to access and use that information." Graham UF ¶ 72.

36), and is owned by an individual who would not have purchased or displayed the photograph. McNatt Dkt. 119, Boyajian Decl. Ex. 19 (DiPersia Decl.) at ¶ 7. Accordingly, the "target audience" (*Cariou*, 714 F.3d at 709) or consumer for the photograph and the *Portrait of Kim Gordon* are vastly different. As in *Cariou*, "nothing in the record . . . suggest[s] that [McNatt] would ever develop or license secondary uses of his work in the vein of Prince's artworks." *Cariou*, 714 F.3d at 709; *see also Google*, 141 S. Ct. at 1206 (no harm to "actual or potential markets" where Oracle was "poorly positioned in the mobile phone market.").

Second, McNatt has not shown a possibility—no less probability—of any adverse impact. Indeed, there is no evidence that McNatt has ever offered a physical print of the photograph for sale. *Authors Guild*, 804 F.3d at 224 (emphasis added) ("the possibility, or even the probability or certainty, of *some* loss of sales does not suffice to make the copy an effectively competing substitute that would tilt the weighty fourth factor in favor of the rights holder in the original." ).

Third, like Graham, McNatt lacked a model release to further commercially exploit Kim Gordon's image and likeness. McNatt UF ¶¶ 78-79. McNatt knew that he was not authorized to further exploit the photograph and that Ms. Gordon would not have granted him additional rights. *Id.* at ¶ 80. And Ms. Gordon made that clear in her unrefuted declaration. *Id.* at ¶¶ 79, 83. Accordingly, Prince's use of the photograph in his *Portrait of Kim Gordon* could not impact any legitimate market for the photograph, since McNatt's further unauthorized exploitation of Ms. Gordon's likeness would be unlawful.

The primary basis for finding the fourth factor weighed in Goldsmith's favor in *Warhol* – common commercial licensing, not creation of, the secondary work – indisputably does not exist in this case. "What encroaches on Goldsmith's market is [Warhol]'s commercial licensing of the Prince Series, not Warhol's original creation. Thus, art that is not turned into a commercial replica of its

source material, and that otherwise occupies a separate primary market, has significantly more 'breathing space' than the commercial licensing of the Prince Series." *Warhol*, 2021 WL 3742835, at *16; (quoting *Campbell*, 510 U.S. at 579).

It is important to note, that although Richard Prince has an over 40-year body of work critically recognized as important social commentary, it is readily apparent that these works, even if created by an artist other than Prince, would be obvious social commentary and occupy an entirely different market from the original photographs. In other words, even if Richard Prince's *New Portraits* were produced anonymously, no additional potential for market overlap would exist. They have a completely different purpose – commentary on the genre of social media/Instagram communication on the one hand, and faithful documentary portraits on the other. Indeed, it is not the artist's name or price tag that makes the *New Portraits* social commentary; it is their technique, prescient message, format and context used to comment on an entire genre of social media communication. And, if they had been conceived and created by another artist, they would still qualify as fair use, regardless of price.

### III.   CONCLUSION

The recent decisions in *Google* and *Warhol* confirm that this is a case in which the secondary works were transformative fair uses of the pre-existing material, and could not serve as market substitutes or cause cognizable market harm. Summary judgment on that basis should be granted.

Dated: September 15, 2021                    **GREENBERG TRAURIG, LLP**

By: /s/ *Nina D. Boyajian*
Nina D. Boyajian
Ian C. Ballon
1840 Century Park East, Suite 1900
Los Angeles, CA 90067
Tel: (310) 586-7700
Ballon@gtlaw.com
BoyajianN@gtlaw.com

25

Richard A. Edlin
MetLife Building
200 Park Avenue
New York, NY 10166
Tel: (212) 801-9200
EdlinR@gtlaw.com

*Attorneys for Defendants Richard Prince, Blum &
Poe, LLC, Blum & Poe New York, LLC*