UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DONALD GRAHAM

                                    Plaintiff,

              -against-

RICHARD PRINCE, GAGOSIAN
GALLERY, INC., LAWRENCE
GAGOSIAN,

                                    Defendants.

---

ERIC MCNATT

                                    Plaintiff,

              -against-

RICHARD PRINCE, BLUM & POE, LLC,
BLUM & POE NEW YORK, LLC,

                                    Defendants.

---

15-CV-10160 (SHS)


OPINION & ORDER


16-CV-8896 (SHS)

SIDNEY H. STEIN, U.S. District Judge.

Plaintiffs Donald Graham and Eric McNatt each bring a separate action against defendants Richard Prince and several art galleries under the Copyright Act, 17 U.S.C. § 101. Prince, a well-known appropriation artist, incorporated photographs taken by Graham and McNatt into his series *New Portraits* without first seeking their permission to do so. Defendants contend that the use of these images is a protected "fair use" under the Copyright Act.

The court here addresses two pending motions for summary judgment. In *Graham v. Prince, et al.*, 15-cv-10160, Prince moves for summary judgment in his favor against Graham. (*Graham* Notice of Mot., ECF No. 123.) Defendants Laurence Gagosian and Gagosian Gallery join in Prince's motion. (*See Graham* MPSJ at 1 n.1, ECF No. 141.) In *McNatt v. Prince, et al.*, 16-CV-8896, defendants Prince, Blum & Poe, LLC, and Blum & Poe New York, LLC move for summary judgment in their favor against McNatt. (*McNatt* Notice of Mot., ECF No. 116.)

For the reasons that follow, the two motions for summary judgment are denied.

## I.   FACTUAL BACKGROUND

The following facts are undisputed except as otherwise noted.

### A.   Richard Prince and his Artwork

Defendant Richard Prince is a well-known contemporary appropriation artist. (*Graham* SOF ¶ 1; *McNatt* SOF ¶ 1.)  Appropriation art, as one expert describes it, involves a "radical transformation of the original image or text" using strategies such as aesthetic alteration, conversion of authorship, recontextualization, cultural commentary, and pastiche or parody.  (*McNatt* Boyajian Decl. Ex. 8 ¶ 37.)

As the U.S. Court of Appeals for the Second Circuit has observed, "Prince's work, going back to the mid-1970s, has involved taking photographs and other images that others have produced and incorporating them into paintings and collages that he then presents, in different contexts, as his own."  *Cariou v. Prince*, 714 F.3d 694, 699 (2d Cir. 2013).  His work has been featured by many of the world's preeminent art museums, including the Guggenheim and Whitney in New York City and the LACMA in Los Angeles. (*Graham* SOF ¶ 2; *McNatt* SOF ¶ 2; *McNatt* Boyajian Decl. Ex. 8 ¶ 28)

Prince's art is no stranger to controversy.  His 2008 series *Canal Zone* was the subject of a similar lawsuit in this district.  *See Cariou v. Prince*, 784 F. Supp. 2d 337 (S.D.N.Y. 2011), *rev'd in part, vacated in part, and remanded*, 714 F.3d at 697.

### B.   Prince's Creation of *New Portraits*

The instant actions arise in connection with Prince's series entitled *New Portraits*.  In 2014, Prince was inspired by the social networking platform Instagram to create a series of portraits. (*Graham* SOF ¶ 3; *McNatt* SOF ¶ 3.)  Over the course of several months, Prince reviewed the profiles of hundreds of Instagram users to find images that he wanted to feature. (*Graham* SOF ¶ 4; *Graham* Prince Decl. ¶ 11; *McNatt* SOF ¶ 4; *McNatt* Prince Decl. ¶ 11.)

To create an individual portrait, Prince employed one of two techniques.  For many of the portraits, Prince chose to feature another Instagram user's post. (*McNatt* SOF ¶ 5.)  Prince would "comb[] through all of the comments . . . to determine which comments had interesting language that he wanted to comment on and include in his portrait." (*Graham* SOF ¶ 5; *McNatt* SOF ¶ 5.)  After realizing he could keep only three comments in a screenshot, he manipulated which comments appeared in the screenshot by reporting other users' comments as spam. (*Graham* SOF ¶ 8; *McNatt* SOF ¶ 9.)  This allowed Prince to determine which comments appeared underneath the Instagram post.

To create the other portraits, Prince opted to post an image straight from his own Instagram account, @richardprince4. (*McNatt* SOF ¶ 5.) This allowed Prince to add his own caption and comments without manipulating the comments of other users.

Prince views the use of language as "crucial" to his artwork. (*Graham* Boyajian Decl. Ex. 36 ¶ 39.) Adding comments was his "contribution" (*Graham* Boyajian Decl. Ex. 14 at 126:19; *Graham* SOF ¶ 6; *McNatt* SOF ¶ 7), and, according to him, "the most important part of the portrait," (*Graham* Boyajian Decl. Ex. 14 at 126:7–9).

Regardless of which of the two techniques he utilized, Prince next captured the image as a screenshot on his iPhone and cropped the file so that the resulting portrait included only Instagram content framed by white space. (*Graham* SOF ¶ 10; *McNatt* SOF ¶ 11.) In this way, Prince describes his iPhone as serving as his "scissors," "camera," and "paintbrush." (*Graham* SOF ¶ 4; *McNatt* SOF ¶ 4.)

Ultimately, each image was printed onto an Inkjet canvas measuring 65.75" x 48.75" and then wrapped around wooden stretchers to give the feel of a three-dimensional iPhone screen. (*Graham* SOF ¶ 13; *McNatt* SOF ¶ 14.) The photographic element—i.e., the image posted by the Instagram user—measured approximately 41 x 41 inches. (*Graham* SOF ¶ 14; *McNatt* SOF ¶ 15.)

Over the course of the litigation, Prince has articulated varying purposes behind the creation of *New Portraits*; indeed, his intent remains a key point of disagreement between the parties. During his deposition, Prince explained that his purpose was to "comment on [] social media, the whole idea of putting up images on a new platform that was available to anyone, to an entire population." (*Graham* SOF ¶ 17; *McNatt* SOF ¶ 18.) Similarly, in his sworn declaration, Prince confirmed the series was intended "as a serious and an amusing commentary on social media and art" and "to satirize and provide commentary on the manner in which people today—all people—communicate, present themselves, and relate to one another through the new technology of social media." (*Graham* SOF ¶ 17; *McNatt* SOF ¶ 18.) Prince envisioned that "each portrait represented a part of a novel, and that when the portraits were exhibited together, they represented a democracy and told a complete story." (*McNatt* SOF ¶ 30.) However, as discussed in detail below, plaintiffs argue that these proffered statements conflict with other deposition testimony given by Prince. (*Graham* Plaintiff's Response to SOF ¶ 17; *McNatt* Plaintiff's Response to SOF ¶ 18.)

As noted, the two *New Portraits* at issue incorporate photographs originally taken by plaintiffs Donald Graham and Eric McNatt.

### C.  Facts in *Graham v. Prince, et al.*

#### 1.  *Graham's Creation of* Rastafarian Smoking a Joint

Graham is a professional photographer specializing in portraiture. (*Graham* Counterstatement of Material Facts ["CSOF"] ¶ 1, ECF No. 158.) Graham has been commissioned to take photographs for commercial purposes and has licensed his work to numerous publications. (*Id.* ¶ 2.) His work has been displayed by the Metropolitan Museum of Art and has appeared in more than one hundred magazines, including *Vanity Fair, Elle, Vogue, Paper, Time,* and *Sports Illustrated*. (*Id.* ¶¶ 3, 4.)

In 1996, Graham travelled through rural Jamaica and photographed the image entitled *Rastafarian Smoking a Joint* on black and white film. (*Id.* ¶¶ 12, 14.) The photograph features a Rastafarian man with long dreadlocks, standing shirtless against a white background, smoking a marijuana cigarette. (*Graham* Compl., Ex. A; *see* Fig. 1.) Graham states that he intended to capture the "authenticity" and "the spirit and gravitas of the Rastafarian people" in this photograph. (*Graham* SOF ¶ 57.) Graham did not obtain a written release from his subject to use the image commercially. (*Graham* SOF ¶ 60.)

Graham first published *Rastafarian Smoking a Joint* in 1998, and he continues to sell prints of that photograph through his own studio and a Paris gallery. (CSOF ¶¶ 13, 14.) The image is printed using traditional silver gelatin, a medium that "customers appreciate" because of its "archival longevity." (*Graham* SOF ¶ 62.) Graham posted the photograph to his Facebook page and displayed it on his public website accompanied by a "© Donald Graham" notice on the bottom of the page. (*Graham* SOF ¶ 68; CSOF ¶ 16; Def. Response CSOF ¶ 16.) Since first publishing *Rastafarian Smoking a Joint, Graham* has sold nine copies and collected between $500 to $8,000 for each sale. (*Graham* SOF ¶ 81.)

#### 2.  *Prince's Creation of* Portrait of Rastajay92

Prince was perusing Instagram when he came across Instagram user @Rastajay92, who had posted numerous images of Rastafarians from his account. (*Graham* SOF ¶¶ 18–20.) One such image was Graham's *Rastafarian Smoking a Joint*. (*Id.* ¶ 19.) The caption indicated that the image was a repost, meaning that Rastayjay92 saw the image posted from someone else's account and reposted it onto his own feed. (*Id.* ¶ 20.) The image did not have a copyright notice, watermark, attribution, or otherwise indicate that it was taken by Graham. (*Id.* ¶ 24.) When Rastajay92 reposted the image, he added the caption "Real Bongo Nyah man a real Congo Nyah" followed by the raised fist emoji. (*Id.* ¶ 26.)

Prince explained that he was drawn to this caption because it made him feel as though he and Rastajay92 had something in common and he wanted to respond to it. (*Id.* ¶ 27.) During his deposition, Prince testified that he decided to make a "parody" of the post by including his own comment: "Canal Zinian da lam jam." (*Graham* SOF ¶ 28.) Prince described this comment as "self-referential" as it implicates his childhood in the Canal Zone, as well as his previous series *Canal Zone*, the subject of the *Cariou* lawsuit. (*Id.* ¶ 29.)

After adding his comment, Prince took a screenshot and had the resulting image inkjetted onto a canvas. (*Id.* ¶ 18.) The final product, *Portrait of Rastajay92*, incorporates a cropped portion of Graham's *Rastafarian Smoking a Joint*: part of the subject's torso, hair, and white background have been removed. (*Id.* ¶ 23; *see* Fig. 2.) The subject's face and arms remain fully visible. (*Graham* Plaintiff's Response to SOF ¶ 23.)



Graham's *Rastafarian Smoking a Joint* (Fig. 1)     Prince's *Portrait of Rastajay92* (Fig. 2)

During his deposition, Prince testified that by creating *Portrait of Rastajay92* he intended to "transform something that had already been out there and make it unique. Make it different, make it a parody of [R]astayjay's portrait." (Boyajian Decl. Ex. 14 at 126:22–25.) When asked whether he had a "particular message [he was] trying to convey in the work," Prince stated that he wanted to "have fun," "make art," and to "make people feel good." (Fitzpatrick Decl. Ex. 38 at 143:11–20.)

In the fall of 2014, *Portrait of Rastajay92* was displayed, along with 36 other works from the *New Portraits* series, in the Gagosian Gallery in New York City. (*Graham* SOF ¶ 35.) Each portrait was priced at $40,000 and sold before the exhibit opened to the public.[1] (*Graham* SOF ¶ 39.) Laurence Gagosian, the controlling shareholder of Gagosian Gallery, purchased the *Portrait of Rastajay92* from Prince for $21,600, which included a 10% discount that all purchasers received. (*Graham* Am. Compl. ¶ 17, ECF No. 25; *Graham* SOF ¶ 40; Boyajian Decl. Exs. 53, 54.)[2] During the exhibition, Gagosian Gallery distributed pamphlets featuring images of each of the 37 portraits. (*Graham* SOF 41 ¶ 31.)

Graham learned about *Portrait of Rastajay92* in October 2014 when a friend recognized Graham's photograph *Rastafarian Smoking a Joint* while attending Prince's exhibition at the Gagosian Gallery. (CSOF ¶ 54.) Several months later, on February 12, 2015, Graham sent Prince a cease and desist letter, "demanding that Prince cease and desist from continuing to exhibit or distribute any work containing unauthorized reproductions of *Rastafarian Smoking a Joint*, remove all such reproductions of *Rastafarian Smoking a Joint* from any work attributable to Prince, remove all such productions from the Gagosian Gallery website, and deliver or destroy all copies of the Gagosian exhibition catalog that contained a reproduction of Graham's photograph." (CSOF ¶ 55.)

On June 12, 2015, eight months after the exhibition closed and all of the *New Portraits* had been sold, a billboard was erected on the West Side Highway in New York City depicting a photograph of an installation image of the Gagosian Exhibition. (*Graham* SOF ¶ 44; *see* Fig. 3.) The billboard included seven of the 37 portraits displayed

---

[1] Graham disputes the use of the term "sold." He argues that the specific date that each portrait was "sold" was not necessarily the day that it was paid for in full and the sales process is not complete until this happens. (*Graham* Plaintiff's Response to SOF ¶ 39.)

[2] Graham disputes these facts, asserting that Exhibits 53 and 54, which concern payment details, are "vague." (*Graham* Plaintiff's Response to SOF ¶ 40.) He argues Exhibit 53 shows the sale price as $36,000 and that the email in Exhibit 54 is redacted and does not specify which works were sold at a discount. (*Id.*)

in the Gagosian Exhibition, one of which was *Portrait of Rastajay92*. (*Graham* SOF ¶¶ 44, 45.)



The Billboard (Fig. 3)



The Twitter Compilation (Fig. 4)

On January 6, 2016, Prince tweeted a compilation of two blurry images accompanied by the caption "Booze Pot Sex. I guess I was wrong. (Memo to Turner: I DID NOT take make create this montage)." (*Graham* SOF ¶¶ 47, 49; *see* Fig. 4.) The image on the left was a portion of artist Jeff Koons' painting that was the subject of the lawsuit *Gray v. Koons*, No. 15 Cv 9727 (S.D.N.Y.); on the right was Graham's *Rastafarian Smoking a Joint*. (*Graham* SOF ¶ 48.) Prince states that the tweet was a comment on the instant lawsuit, a fact that Graham asserts is contradicted by Prince's deposition testimony. (*Graham* SOF ¶ 52; *Graham* Plaintiff's Response to SOF ¶ 52.) Prince also states that he did not create the picture compilation and does not recall where it came from. (*Graham* SOF ¶ 49.)

### D. Facts in *McNatt v. Prince, et al.*

#### 1. *McNatt's Creation of* Kim Gordon I

Plaintiff Eric McNatt is a commercial, editorial, and fine art photographer who specializes in portraiture. (CSOF ¶ 6.) Throughout his career, McNatt has been commissioned to take photographs for editorial and advertising purposes and has licensed his photographs to numerous publications. (*Id.* ¶ 7.) His work has appeared in many magazines including *Entertainment Weekly, Esquire, Glamour,* and *GQ.* (*Id.* ¶ 8.) McNatt's photographs have also been displayed by a gallery on at least two occasions. (*McNatt* SOF ¶ 48; CSOF ¶ 9.)

In July 2014, McNatt photographed musician Kim Gordon—a member of the alternative rock band Sonic Youth—in conjunction with an interview slated to appear in *Paper* magazine. (CSOF ¶ 17.) *Paper* provided McNatt with general creative guidelines as a "start off from [which] to create [his] own vision." (*Id.* ¶ 21; Def. Response to CSOF ¶ 21.) To "keep a consistent feel across the images," *Paper* magazine directed that "[s]mall variants in shades of medium gray are expected" and "[s]hadows and contrast should be soft and kept to a minimum." (*McNatt* SOF ¶ 53.) McNatt brought his own equipment and spent roughly three hours photographing Gordon. He spent an additional twelve hours in post-production editing. (CSOF ¶¶ 18–20.)

The image *Paper* ultimately chose, *Kim Gordon I*, was first published in print, online, and on the magazine's Instagram account. (COSF ¶ 22; *see* Fig. 5.) In each instance, *Paper* published *Kim Gordon I* under license from McNatt and with a credit acknowledging McNatt's authorship. (*Id.*) The magazine paid McNatt $100 for its use of the photograph. (*McNatt* SOF ¶ 51.) McNatt also licensed the image to Vogue.com in February 2015 for $100. (*McNatt* SOF ¶ 75; CSOF ¶ 23.) He has published digital copies to his website and social media accounts accompanied by a "© Eric McNatt" notice. (CSOF ¶ 24.)

### 2. *Prince's Creation of* **Portrait of Kim Gordon**

Prince has been friends with Kim Gordon for many years and wanted to include her in the *New Portrait* series. (*McNatt* SOF ¶ 24.) Prince searched Instagram for her image until he found one that he wanted to incorporate. (*Id.* ¶¶ 19, 21.) On September 10, 2014, Prince took a screenshot of the image of Gordon, posted a cropped version of the image to his own Instagram account (@richardprince4), and added three comments below the image: (1) "Portrait of Kim Gordon"; (2) "Kool Thang You Make My Heart Sang You Make Everythang Groovy"; and (3) music themed emojis. (*Id.* ¶ 21.) Prince described these comments as both an "inside joke" between Gordon and himself and as "goobledygook."[3] (*Id.* ¶ 25; Plaintiff's Response to *McNatt* SOF ¶ 25.)

---

[3] During his deposition, Prince testified that he refers to the comments such as the ones he left on the *Portrait of Kim Gordon* as "goobledygook," or "bird talk." (*McNatt* Def. Reply to SOF ¶ 25.) Prince states that his father, a ham radio operator, used the term "goobledygook" to describe his call letters (W1UOH Uncle Obe Hal). (*Id.*) Prince also explained that when he read Samuel Beckett growing up, Beckett referred to his translated Finnegan's Wake as "goobledygook." (*Id.*) The term, Prince has explained, has an "autobiographical, self-referential meaning." (*Id.*)

After adding his comments, Prince took another screenshot and had the resulting image inkjetted onto a canvas.  (*McNatt* SOF ¶ 14; *see* Fig. 6.)







McNatt's *Kim Gordon I* (Fig. 5)        Prince's *Portrait of Kim Gordon* (Fig. 6)

When asked whether Prince's portrait was commenting on or criticizing the composition of *Kim Gordon I*, Prince explained that "[i]n some ways I was commenting on the social media, the whole idea of putting up images on a new platform that was available to anyone, to an entire population."  (*McNatt* Boyajian Decl. 14 at 8–15.)

Between April 3, 2015 and May 30, 2015, defendant Blum & Poe exhibited the *Portrait of Kim Gordon*, along with 25 other portraits from the *New Portrait* series, in its Tokyo gallery.  (*McNatt* SOF ¶ 31.)  All 26 photos were "released for sale" for $90,000 each before the exhibit opened.  (*Id.* ¶ 34.)  The *Portrait of Kim Gordon* was purchased prior to the opening of the exhibition.[4]  (*Id.* ¶ 35.)  The buyers, Alexander DiPersia and his mother, purchased the piece for their joint art collection.  (*McNatt* Alexander DiPersia Decl. ¶ 8, ECF No. 122.)  DiPersia claims he would never have purchased McNatt's original photograph and he has no plans to sell Prince's *Portrait of Kim Gordon*. (*Id.* ¶¶ 7, 8)

In September 2016, Blum & Poe released a book commemorating the exhibition (the "Gallery Book").  (*Id.*¶ 37; *see* Figs. 7, 8.)  The gallery book featured all 26 works

---

[4]Although *Portrait of Kim Gordon* was purchased prior to the start of the Blum & Poe exhibition, title did not pass until payment was received in full on an unspecified later date.  (Def. Response to *McNatt* SOF ¶ 35.)

displayed at the exhibit, including the *Portrait of Kim Gordon*. (*Id.* ¶ 38.) The gallery book was sold at various book fairs, art bookstores, and on Blum & Poe's website. (*Id.* ¶ 40; *McNatt* Plaintiff's Response to SOF ¶ 40.) When the gallery book was published, all of the *New Portraits* featured in the Blum & Poe Exhibition had already been sold.[5] (*Id.* ¶ 41.)


Cover of the Gallery Book (Fig. 7)


Single Page of the Gallery Book (Fig. 8)

## II. PROCEDURAL HISTORY

On December 30, 2015, Graham sued Prince, Gagosian, and Gagosian Gallery. (*Graham* ECF No. 1.) The operative complaint asserts three separate claims of willful copyright infringement against Prince for (1) the *Portrait of Rastajay92* work displayed in the *New Portraits* exhibition and its Catalog, (2) the Billboard, and (3) the Twitter Compilation.[6] (*Graham* Am. Compl. ¶¶ 61–73.) Graham asserts separate claims of willful copyright infringement against Gagosian Gallery and Laurence Gagosian for the *Portrait of Rastajay92* and the Catalog. (*Id.* ¶¶ 74–85.) Finally, Graham seeks the following relief: declaratory relief; injunctive relief, including orders of seizure, forfeiture, and destruction of the various works at issue; statutory or actual damages; and attorneys' fees and costs. (*Id.* at 32–33.)

---

[5] McNatt notes that many of the *New Portraits* were subsequently resold on the secondary market after their initial sale. (*Id.* ¶ 42.)

[6] Because Graham's photograph had not yet been registered with the Copyright Office at the time the New Portraits exhibition commenced, he only alleges infringement of a registered copyright with respect to the above second and third claims. (*See* Am. Compl. ¶¶ 66, 70.)

On November 16, 2016, roughly eleven months after Graham filed his action, McNatt filed copyright infringement claims against Prince and Blum & Poe. (*See McNatt* Compl., ECF No. 1.) McNatt brings claims against Prince for (1) the infringing Instagram post, (2) the *Portrait of Kim Gordon*, and (3) the Gallery Book. (*Id.* ¶¶ 63–66.) McNatt also asserts claims against Blum & Poe stemming from its exhibition of the *Portrait of Kim Gordon* and its production of the Gallery Book. (*Id.* ¶¶ 67–72.) McNatt seeks the same relief as Graham. (*Id.* 25–26.)

In both lawsuits, defendants filed motions to dismiss asserting the defense of fair use. (*See Graham* ECF No. 33; *McNatt* ECF No. 22.) On July 18, 2017, this Court denied defendants' motion to dismiss in *Graham*, finding that "this is not a case in which the open-ended and context-sensitive fair use inquiry can be properly applied at the motion to dismiss stage." *Graham v. Prince*, 265 F. Supp. 3d 366, 379 (S.D.N.Y. 2017). The Court concluded that not one of the four fair use factors favored defendants. *Id.* at 380. With an eye towards the inevitable summary judgment motions, the Court reviewed the case law and suggested that specific evidence, such as the opinions of art critics and collectors, could aid the Court's summary judgment analysis. *See id.* at 382, 385.

In the same vein, the Court declined defendants' invitation to convert the motion to dismiss into one for summary judgment pursuant to Federal Rule of Civil Procedure 12(d), explaining that "discovery will be necessary to uncover evidence about the purposes and circumstances under which each of the allegedly infringing works were created, to ascertain whether certain of the works were commercial in nature, and to identify the markets for Graham's and Prince's works." *Id.* at 386. The Court similarly opted to forgo limiting Graham's potential statutory or non-statutory damages award. *See id.* at 386–91. The Court did find, however, that Graham was barred from recovering punitive damages as a matter of law. *See id.* at 390 (citing *Obler v. Goldin*, 714 F.3d 211, 213 (2d Cir. 1983)).

Following the Court's ruling in *Graham*, defendants in *McNatt* withdrew their joint motion to dismiss. (*McNatt* ECF No. 50.) Soon after, defendants in each case filed their respective answers, asserting numerous affirmative defenses, including fair use. (*Graham* ECF Nos. 62, 63; *McNatt* ECF No. 56.) The Court then set an extensive discovery schedule. (*Graham* ECF No. 67; *McNatt* ECF No. 66.)

On October 5, 2018, Prince moved for summary judgment in *Graham*. (*Graham* Mot for Summary Judgment, ECF No. 123; *Graham* Mem. of Law in Support of Mot. for Summary Judgment, ECF No. 131 [hereinafter *Graham* Mem.].) Gagosian and Gagosian Gallery moved for partial summary judgment in their favor against Graham. (*Graham* Mot. for Partial Summary Judgment, ECF No. 140; *Graham* Def, ECF No. 141.) In *McNatt*, defendants Prince, Blum & Poe New York, LLC, and Blum & Poe, LLC

submitted a joint motion for summary judgment. (*McNatt* Mot. for Summary Judgment, ECF No. 116; *McNatt* Def. Mem., ECF No. 125.) Plaintiffs opposed all three motions. (*See Graham* Opp'n, ECF No. 154; *Graham* Pltf.'s Opp'n to Mot. for Partial Summary Judgment, ECF No. 160; *McNatt* Opp'n, ECF No. 143.) Both Graham and McNatt also request that the Court enter summary judgment in their favor against defendants on the issue of fair use pursuant to Federal Rule of Civil Procedure 56(f).[7] (*Graham* Opp'n at 4; *McNatt* Opp'n at 3.) The parties also filed motions to preclude experts; those motions were decided from the bench. (*Graham* ECF No. 196; *McNatt* ECF No. 178.)

## III. SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "When considering a motion for summary judgment, a court must construe the evidence in the light most favorable to the nonmoving party, drawing all inferences in that party's favor." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005).

"Although fair use is a mixed question of law and fact, [the Second Circuit] has on a number of occasions resolved fair use determinations at the summary judgment stage where . . . there are no genuine issues of material fact." *Cariou v. Prince*, 714 F.3d 694, 704 (2d Cir. 2013) (quoting *Blanch v. Koons*, 467 F.3d 244, 250 (2d Cir. 2006)); *see also Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 560 (1985); *Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 137 (2d Cir. 1998). "The mere fact that a determination of the fair use question requires an examination of the specific facts of each case does not necessarily mean that in each case involving fair use there are factual issues to be tried." *Wright v. Warner Books, Inc.*, 953 F.2d 731, 735 (2d Cir. 1991) (citations omitted). However, the Second Circuit has also urged that "the fact-driven nature of the fair use determination suggests that a district court should be cautious in granting Rule 56 motions in this area[.]" *Id.*

## IV. FAIR USE

### A. Legal Standard

As embodied in the United States Constitution, the purpose of copyright is "[t]o promote the Progress of Science and useful Arts." U.S. Const. art. I, § 8, cl. 8. To

---

[7] Rule 56(f) states, in relevant part: "After giving notice and a reasonable time to respond, the court may . . . grant summary judgment for a nonmovant." Fed. R. Civ. P. 56(f)(1).

effectuate this purpose, copyright law grants creators a limited monopoly over the dissemination of their original works. *See Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 95 (2d Cir. 2014). The doctrine of "fair use" is an important limitation on the original creator's monopoly rights. This doctrine, as codified in the Copyright Act of 1976, provides that "the fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching . . . , scholarship, or research, is not an infringement of copyright." 17 U.S.C. § 107. Thus, fair use is a complete bar to liability for copyright infringement.

"Fair use is a doctrine the application of which always depends on consideration of the precise facts at hand." *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 916 (2d Cir. 1994) (citing *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994)). The determination of fair use is a "mixed question of fact and law," which necessitates "an open-ended and context-sensitive inquiry." *Cariou*, 714 F.3d at 704–05 (citations omitted). Courts conduct this inquiry by considering four non-exclusive factors:

> (1) "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes";
>
> (2) "the nature of the copyrighted work";
>
> (3) "the amount and substantiality of the portion used in relation to the copyrighted work as a whole"; and
>
> (4) "the effect of the use upon the potential market for or value of the copyrighted work."

17 U.S.C. § 107.

These factors must be "weighed together, in light of the purposes of copyright." *Campbell*, 510 U.S. at 578. "Although defendants bear the burden of proving that their use was fair, they need not establish that each of the factors set forth in § 107 weighs in their favor." *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 476–77 (2d Cir. 2004) (citations omitted).

Nonetheless, the first factor, and in particular the "transformativeness" subfactor, is at "[t]he heart of the fair use inquiry." *Koons*, 467 F.3d at 251. If the allegedly offending use of the original work is "transformative" — that is, if it "alter[s] the first [work] with new expression, meaning, or message," *Campbell*, 510 U.S. at 579, — it is likely to be "the very type of activity that the fair use doctrine intends to protect for the enrichment of society." *Cariou*, 714 F.3d at 706 (quoting *Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 142 (2d Cir. 1998)); *but see TCA Television Corp. v. McCollum*, 839 F.3d 168, 183 n.13 (2d Cir. 2016).

## B.  Application of the Fair Use Factors

Although filed under separate captions, the parties' respective motions and responses parallel one another in their presentation of fact and argument.  For several factors, the briefing is identical with the exception of the names of the specific works at issue.  (*Compare Graham* Opp'n at 15 *with McNatt* Opp'n at 23–25.)  Thus, analysis of the fair use factors for the disputed works will be performed together, with distinctions noted as appropriate.

### 1.  *First Factor: Purpose and Character of the Use*

The first factor requires a court to examine the "purpose and character of the use." 17 U.S.C. § 107(1).  This factor, and in particular, whether or not a use is transformative, has a significant impact on the remainder of the fair use inquiry.  *See Campbell*, 510 U.S. at 579; *Davis v. Gap, Inc.*, 246 F.3d 152, 174 (2d Cir. 2001); *Blanch*, 467 F.3d at 251; *Cariou*, 714 F.3d at 705–06.

At the motion to dismiss stage, this Court explained that because Prince's *Portrait of Rastajay92* did not make any substantial aesthetic alterations to Graham's *Rastafarian Smoking a Joint*, a simple side-by-side comparison of the two works was insufficient to show that Prince made a transformative use of Graham's original as a matter of law. *See Graham*, 265 F. Supp. 3d at 382.  The Court's reasoning was equally applicable to *Portrait of Kim Gordon*.

But even after extensive discovery, defendants still cannot show that the first factor favors a finding of fair use.  Prince's use of plaintiffs' images is not transformative as a matter of law.  The fair use precedents of *Google* and *Warhol* support and reinforce this conclusion.  Furthermore, although less consequential to the overall analysis, the use is undisputedly commercial.

#### a.  *Transformative Use*

##### i.  Aesthetic and Character

Prince argues that his portraits are transformative and urges the Court to "focus not solely on the photographic element of the works, but rather, the entirety of the works." (*McNatt* Def. Mem. at 19.)  Prince highlights what he believes to be key aesthetic differences, including (1) the novel canvas; (2) the three-dimensional look and feel; (3) the colored inks resulting in different coloration; (4) the "absurdly proportioned scale and *Alice in Wonderland*-dreamlike quality"; (5) the "intentional cropping of images in an homage to Andy Warhol"; and (6) his comments below the images.  (*Id.* at 20.)  The comments in particular, he argues, provide a "vastly different context to the images . . . resulting in dramatically different conclusions drawn by the viewer."  (*Id.*)  Finally,

Prince contends that the transformative purpose and character is readily perceived by a reasonable observer in a side-by-side comparison. (*Id.* at 21.) He submits that "in the art context, the transformativeness of a work should be assessed through the lens[] of a person who has a general interest in and appreciation of, but not specialized knowledge of, the arts." (*Id.*) Viewed through this lens, he urges, such an observer "would have no difficulty" discerning Prince's transformative message and meaning. (*Id.*)

Plaintiffs, on the other hand, contend that despite Prince's attempt to recontextualize their photographs, they nonetheless remain the dominant element. (*McNatt* Opp'n at 14.) They point out that the Second Circuit has discounted far more pronounced distinctions in rejecting fair use arguments. (*See id.* at 16 (citing *Rogers v. Koons*, 960 F.2d 301, 304, 309-10 (2d Cir. 1992) (sculpture copying postcard); *Castle Rock Entm't*, 150 F.3d at 143 (trivia book copying television series)).) Finally, plaintiffs take issue with defendants' interpretation of the reasonable observer test by arguing that defendants improperly imbue the "reasonable observer" with an interest in and appreciation of art. (*McNatt* Opp'n at 12–13.)

The U.S. Supreme Court has instructed that in determining "whether and to what extent the new work is 'transformative,'" a court must consider "whether the new work merely supersedes the objects of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning or message." *Campbell*, 510 U.S. at 579. "If 'looking at the [works] side-by-side,' the secondary work 'ha[s] a different character, . . . a new expression, and employ[s] new aesthetics with creative and communicative results distinct' from the original, the secondary work is transformative as a matter of law." *Cariou*, 714 F.3d at 707–08. A court must "examine how the [infringing works] may 'reasonably be perceived' in order to assess their transformative nature." *Id.* at 707 (quoting *Campbell*, 510 U.S. at 582); *see also North Jersey Media Grp. Inc. v. Pirro*, 74 F. Supp. 3d 605, 615 (S.D.N.Y. 2015) (analyzing whether the work is transformative from the standpoint of a "casual observer").

Defendants' attempt to define the "reasonable observer" as an individual who has a "general interest in and appreciation of, but not specialized knowledge of, the arts," is misguided. Defendants' addition to who constitutes a reasonable observer is drawn from whole cloth. Defendants provide no legal authority for their derivation of this standard and the Court has found none. The standard, as set forth above, is whether from the standpoint of a "reasonable observer," "looking at the artworks and the photographs side-by-side," the secondary images "have a different character, . . . a new expression, and employ new aesthetics with creative and communicative results distinct" from the original. *Cariou*, 714 F.3d at 707–08.

Here, the additional discovery does not change this Court's previous conclusion that "[v]iewing Graham's *Rastafarian Smoking a Joint* and Prince's [*Portrait of Rastajay92*] side-by-side, it is evident that Prince's work does *not* belong to a class of secondary works that are so aesthetically different from the originals that they can pass the Second Circuit's 'reasonable viewer' test as a matter of law." *Graham*, 265 F. Supp. 3d at 380. The same analysis is equally applicable to McNatt's *Kim Gordon I* and Prince's *Portrait of Kim Gordon*.

To defendants' credit, McNatt's and Graham's original photographs were not copied in their entirety. Prince indeed altered the content and message of plaintiffs' photographs, but only minimally. A close comparison reveals that Prince enlarged the images when he printed them onto the canvases, cropped portions of the photographs, added the Instagram frame, and included his own comments. But these alterations do not begin to approach those found to be transformative as a matter of law by the Second Circuit.

In *Blanch v. Koons*, for example, the Second Circuit affirmed Judge Louis Stanton's decision granting summary judgment to appropriation artist Jeff Koons, finding that he made transformative use of a fashion magazine photograph taken by Andrea Blanch, which depicted a woman's legs resting on a man's lap in an airplane cabin. *See Blanch*, 467 F.3d at 243. Koons incorporated the legs from Blanch's photograph into a massive collage painting featuring three *other* pairs of women's legs, "dangling prominently over images of confections," including trays of pastries and ice-cream, "with a grassy field and Niagara Falls in the background." *Id.* at 247. The court emphasized how Koons "change[d] . . . [the image's] colors, the background against which it is portrayed, the medium, the size of the objects pictured, [and] the objects' details." *Id.* These aesthetic changes contributed to Koons's stated transformative purpose and ensured that the new work did not merely "exploit the creative virtues of the original work." *Id.* at 252.

Similarly, in *Cariou v. Prince*, the Second Circuit concluded that "all but five" of Prince's 30-piece *Canal Zone* series were transformative as a matter of law. *See Cariou*, 714 F.3d at 706. The majority conducted a "side-by-side" comparison of Cariou's "serene and deliberately composed" photographs and Prince's "crude and jarring" artworks, *id.* at 706–07, and concluded that a reasonable observer would find that 25 of Prince's works "employ[ed] new aesthetics" and created "a new expression," *id.* at 707–08. The majority stressed the substantial aesthetic differences between the works, pointing out that Prince "fundamentally" altered the original photographs' "composition, presentation, scale, color palette, and media." *Id.* at 706. These changes

were sufficient to render 25 of the 30 *Canal Zone* works at issue transformative as a matter of law. *See id.* at 707.

With respect to the five works that were remanded to the district court, the Second Circuit majority found that there were "closer questions" as to whether they were sufficiently transformative to be fair use as a matter of law, which precluded the panel from making a fair use determination. *Id.* at 710. The majority explained that, by painting color guitars, "cartoonish appendages," and lozenges over the eyes and mouths of the subjects in Cariou's paintings, Prince made them appear "anonymous" and "not quite human," as opposed to "strong individual[s]" in their natural habitat[s]." *Id.* at 711. The majority also identified a difference in mood between Prince's works on one hand, which combined "divergent elements to create a sense of discomfort," and Cariou's photographs on the other, which presented human subjects "comfortably at home in nature." *Id.* Nevertheless, the majority considered these changes to be relatively "minimal alterations" because the two works were "still similar in key aesthetic ways." *Id.* The majority determined that it was unable to conclude "with certainty" whether the pieces were transformative as a matter of law. *Id.*

As this Court previously recognized, the alterations Prince made in *Portrait of Rastajay92* and *Portrait of Kim Gordon* are "materially less significant than those that were found to be insufficiently transformative to clearly warrant a finding of fair use in *Cariou*." *Graham*, 265 F. Supp. 3d at 381. Although Prince moved the disputed works "in a different direction" from plaintiffs' photographs, it cannot be said that *Portrait of Rastajay92* and *Portrait of Kim Gordon* are transformative as a matter of law. *See Cariou*, 714 F.3d at 711. Plaintiffs' images remain unobstructed, unaltered but for being cropped, and unquestionably dominant. *Cf. Blanch*, 467 F.3d at 253 (concluding that defendant's work was transformative where he "change[d] . . . [the image's] colors, the background against which it is portrayed, the medium, the size of the objects pictured, [and] the objects' details).

Ultimately, this Court concludes that Prince's alterations have merely "modif[ied] the original[s] without being transformative." *Cariou*, 714 F.3d at 708. *Portrait of Rastajay92* and *Portrait of Kim Gordon* do not significantly alter plaintiffs' presentation, color palette or mood. Prince did not use plaintiffs' photographs as raw material to create a collage nor did he attempt to obscure the images. A reasonable observer would likely identify Prince's alterations as (1) adding the Instagram frame and (2) showcasing his own comments. These modifications certainly do not begin to approach the alterations found to be transformative as a matter of law in *Cariou* and *Blanch*. Accordingly, it cannot be said that the *New Portraits* presented an "entirely different aesthetic" from plaintiffs' original photographs. *See Cariou*, 714 F.3d at 706.

## ii. Artist's Purpose

The defendants' contention that Prince's works have a transformative purpose is similarly unavailing. The Second Circuit has instructed that an artist's explanations of how he intended for his secondary work to be transformative can "len[d] strong support to his defense," though failing to provide such testimony is "not dispositive." *See Cariou*, 714 F.3d at 707. The Supreme Court has explained that the transformative inquiry asks whether the infringing work "adds something new, with a further purpose *or* different character." *Campbell*, 510 U.S. at 579 (emphasis added). Prince urges that "the use of the disjunctive—'or'—indicates that the transformative nature of a work can arise from myriad techniques, aesthetics, and intent." (*McNatt* Def. Mem. at 16.) Furthermore, defendants contend that the Supreme Court's decision in *Google* indicates that even a "precise" copying of copyrighted material, as with Prince's use of the plaintiffs' portraits, can constitute transformative use when given a different purpose. *See Google LLC v. Oracle America, Inc.*, 141 S. Ct. 1183, 1203–04 (2021) (citing 4 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 13.05[A][1][b]).

To begin, it is unclear whether Prince articulated a consistent purpose in creating the series. Prince contends that "[h]is purpose was not to merely reproduce the image present in each of the *New Portraits*; rather, it was to satirize and provide commentary on the manner in which people today communicate, present themselves, and relate to one another through social media." (*McNatt* Def. Mem. at 16–17.) Plaintiffs, however, argue that Prince's deposition testimony "stand[s] in stark contrast to the declaration Prince submitted in support of his summary judgment motion." (*McNatt* Opp'n at 17.) For example, Prince testified that he wanted to "comment on [] social media, the whole idea of putting up images on a new platform that was available to anyone, to an entire population," (*Graham* SOF ¶ 17; *McNatt* SOF ¶ 18), and he wanted "to have fun, . . . to make people feel good," (CSOF ¶ 94.) Later, in his sworn declaration filed in conjunction with the motions for summary judgment, Prince stated that the series was intended "as both a serious and an amusing commentary on social media and art" and "to satirize and provide commentary on the manner in which people today—all people—communicate, present themselves, and relate to one another through the new technology of social media." (*McNatt* Prince Decl. ¶¶ 10, 31.)

Prince urges that his satirical intent "is a world away" from McNatt and Graham's respective purposes in creating the original photographs. (*McNatt* Def. Mem. at 17.) McNatt was commissioned to take Kim Gordon's photograph in conjunction with an interview she gave to *Paper* magazine, and the magazine provided McNatt with specific creative directives as a "starting off point." (*McNatt* McNatt Decl. ¶ 1, ECF No. 144.) At

Graham's deposition, he testified that he was seeking to capture the "authenticity" and "the spirit and gravitas of the Rastafarian people." (*Graham* SOF ¶ 57.)

Taken at face value, the artists indeed had different objectives in creating their works, which does lend support to Prince's assertion that this use is transformative. *See Blanch*, 467 F.3d at 252 ("But Koons asserts—and Blanch does not deny—that his purposes in using Blanch's image are sharply different from Blanch's goals in creating it. The sharply different objectives that Koons had in using, and Blanch had in creating 'Silk Sandals' confirms the transformative nature of the use." (citations omitted)). However, because Prince asserts that he intended that his work serve a parodical or satirical purpose, it is necessary to scrutinize his statements in this light.

"The issue of whether a work is a parody is a question of law, not a matter of public majority opinion." *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 801 (9th Cir. 2003) (citing *Campbell*, 510 U.S. 582-83). The Copyright Act expressly provides that comment or criticism of a copyrighted work may be a valid use under the fair use doctrine. *See* 17 U.S.C. § 107. Prince explains that "[t]hough [he] does not always make direct parody of just the image, he does make a parody of the entire *post*, which consists of both the images *and* the added user commentary." (*McNatt* Def. Mem. at 6.)

The Second Circuit's reasoning in *Rogers v. Koons* is instructive here. In *Rogers*, the plaintiff photographer sued Koons for copyright infringement arising from Koons's sculpture that reproduced plaintiff's photograph of a husband and wife holding a litter of puppies. *Rogers*, 960 F.2d at 304–05. Koons asserted that his sculpture was a "satire or parody of society at large" which showed "the mass production of commodities and media images ha[d] caused a deterioration in the quality of society." *Id.* at 309. The panel declined to take Koons's proffered purpose at face value; instead, it insisted that "[w]e must analyze . . . whether 'String of Puppies' is properly considered a comment on or criticism of the photograph 'Puppies.'" *Id.*

The panel began by defining "parody or satire" as "when one artist, for comedic effect or social commentary, closely imitates the style of another artist and in so doing creates a new art work that makes ridiculous the style and expression of the original." *Rogers*, 960 F.2d at 309–10. Relying on this definition, the court held that Koons's sculpture was not a parody of Rogers's photograph under the fair use doctrine. *Id.* at 310. "It is the rule in this Circuit that though the satire need not be only of the copied work and may, as appellants urge of 'String of Puppies,' also be a parody of modern society, the copied work must be, at least in part, an object of the parody, otherwise there would be no need to conjure up the original work." *Id.* (citing *MCA, Inc. v. Wilson*, 677 F.2d 180, 185 (2d Cir. 1981); 3 *Nimmer on Copyright*, § 13.05[C] n.60.9); *see also Campbell*, 510 U.S. at 580–85. The panel explained that such a rule is necessary because

"otherwise there would be no real limitation on the copier's use of another's copyrighted work to make a statement on some aspect of society at large." *Rogers*, 960 F.3d at 310. Therefore, despite Koons's contention that his sculpture was a "satirical critique of our materialistic society," the panel found that the first fair use factor cut against him because "it is difficult to discern any parody of the photograph 'Puppies.'" *Id.*

Roughly a decade later, the Second Circuit came to the opposite conclusion in *Blanch v. Koons*. As detailed above, *supra* Section IV.B.1.a.i, Koons again found his art at the center of a lawsuit regarding his unauthorized use of a fashion magazine photograph, which depicted a woman's legs resting on a man's lap in an airplane cabin. *Id.* at 248. The panel quoted Supreme Court precedent that elaborated on the parody/satire distinction: "Parody needs to mimic an original to make its point, and so has some claim to use the creation of its victim's (or collective victims') imagination, whereas satire can stand on its own two feet and so requires justification for the very act of borrowing." *Id.* at 255 (citing *Campbell*, 510 U.S. at 580–81).

The court explained that Koons's work was appropriately characterized as satire because "its message appears to target the genre of which 'Silk Sandals' is typical, rather than the individual photograph itself." *Id.* at 254. "The question is whether Koons had a genuine creative rationale for borrowing Blanch's image, rather than using it merely to get attention or avoid the drudgery in working up something fresh." *Id.* at 255 (citations omitted). The court held that Koons indeed established a "justification for the very act of his borrowing" relying on Koons's uncontradicted statement that "[t]he photograph is typical of a certain style of mass communication. . . . By using an existing image, I also ensure a certain authenticity or veracity that enhances my commentary—it is the difference between quoting and paraphrasing—and ensure that the viewer will understand what I am referring to." *Id.* at 255 (citations omitted).

Here, it is clear that "the parodic character" of *Portrait of Rastajay92* and *Portrait of Kim Gordon* cannot be "reasonably perceived." *Campbell*, 510 U.S. at 582. Prince's portraits suffer from the same infirmities as Koons's "String of Puppies." Although Prince asserts that the images are intended to be satirical, it cannot be said that Graham's *Rastafarian Smoking a Joint* is the target of Prince's satire. This is supported by Prince's own observation that he "could have used many other images of Rastafarians . . . and it would have had the same visual impact or value as the Rastafarian in the *Portrait of Rastajay92*." (McNatt Prince Decl. ¶ 28.) If Prince could have used any number of other photographs to feature in his series, it suggests that his "commentary has no critical bearing on the substance or style of the original composition." *Campbell*, 510 U.S. at 580; *see also Authors Guild v. Google Inc.*, 804 F.3d 202, 215 (2d Cir. 2015) ("A

secondary author is not necessarily at liberty to make wholesale takings of the original author's expression merely because of how well the original author's expression would convey the secondary author's different message."). Therefore, although Prince's portraits may be commenting or satirizing the social media culture that surrounds Instagram, his assertion that he is providing commentary on McNatt's and Graham's photographs falls flat.

This conclusion is further supported by the fact that the court's analysis in *Blanch* was made easier by "Koons's clear conception of his reasons for using 'Silk Sandals,' and his ability to articulate those reasons." *Blanch*, 467 F.3d at 255 n.5. Here, Prince's varied reasons can hardly be characterized as "clear." As discussed above, at one point Prince testified his purpose was simply to "make art" and "have fun"; while at other times, he articulates a rather grandiose intention to "provide commentary on the manner in which people today—all people—communicate, present themselves, and relate to one another through the new technology of social media." While defense counsel correctly observes these are not necessarily inconsistent, it does suggest that Prince did not have a "clear conception" or reason for using *Rastafarian Smoking a Joint* or *Kim Gordon I*. *Cf. Mattel*, 353 F.3d at 802 ("It is not difficult to see the commentary that [defendant] intended or the harm that he perceived in Barbie's influence on gender roles and the position of women in society.").

Finally, neither the Supreme Court's decision in *Google* nor the Second Circuit's decision in *Warhol* alters the analysis here. First, *Google* must be interpreted in its particular context, wherein the facts differed greatly from those the Court considers here. As the Second Circuit reflected in considering *Warhol*, a case with more similar facts to those of *McNatt* and *Graham*, "the Supreme Court in *Google* took pains to emphasize the unusual context of that case, which involved copyrights in computer code," and that context "may well make its conclusions less applicable to contexts such as ours." *Andy Warhol Foundation for Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26, 51 (2d Cir. 2021), *cert. granted*, 142 S. Ct. 1412 (2022).

> While Google did indeed find that the precise copying and incorporation of copyrighted code into a new program could (and did, on the particular facts of the case) constitute fair use, the opinion expressly noted that "copyright's protection may be stronger where the copyrighted material . . . serves an artistic rather than a utilitarian function."

*Id.* at 51–52 (quoting *Google*, 141 S. Ct. at 1197). "The fact that computer programs are primarily functional makes it difficult to apply traditional copyright concepts in that technological world." *Id.* at 1208.

Next, even if the context in *Google* were more similar to that of this case, the conclusion that Prince's use was not transformative does not conflict with *Google's* holding in any way. There, Google's use of Oracle's copyrighted Java application programming interface ("API") "to create new products" and "expand the use and usefulness of Android-based smartphones" was a use "consistent with that creative 'progress' that is the basic constitutional objective of copyright itself." *Id.* at 1203. That record was replete with references to "the numerous ways in which reimplementing an interface can further development of computer programs." *Id.* These factors helped convince the Court that "the amount of copying was tethered to a valid, and transformative purpose." *Id.* at 1205. While the entirely different context renders the comparison an imperfect one, the murkiness of Prince's purpose stands in stark contrast to Google's clearly discernible, well-recorded purpose. *See id.* The Court's conclusions here do not conflict with the Supreme Court's in *Google*; indeed, fair use "is flexible, . . . and . . . its application may well vary depending upon context." *Id.* at 1197.

The Second Circuit's decision in *Warhol*, currently under review by the Supreme Court, 142 S. Ct. 1412 (2022), provides further confirmation of the Court's analysis here. There, the panel rejected the defendant's fair use defense, finding that Andy Warhol's painting of the musician Prince violated plaintiff Goldsmith's copyright in the photograph upon which the painting was based. *Warhol*, 11 F.4th at 53. In describing prior decisions rejecting fair use defenses, the Second Circuit clarified that in *Cariou*,

> The works that were found potentially infringing . . . were ones in which the original was altered in ways that did not incorporate other images and that superimposed other elements that did not obscure the original image and in which the original image remained . . . a major if not dominant component of the impression created by the allegedly infringing work.

*Id.* at 41. It explained that "where a secondary work does not obviously comment on or relate back to the original or use the original for a purpose other than that for which it was created, the bare assertion of a 'higher or different artistic use' . . . is insufficient to render a work transformative." *Id.* (quoting *Rogers*, 960 F.2d at 310). Indeed, "[i]f an infringement of copyrightable expression could be justified as fair use solely on the basis of the infringer's claim to a higher or different artistic use—without insuring public awareness of the original work—there would be no practicable boundary to the fair use defense." *Rogers*, 960 F.2d at 310. Rather, *Warhol* insists that "the secondary work itself must reasonably *be perceived* as embodying a distinct artistic purpose, one that conveys a new meaning or message separate from its source material." 11 F.4th at 42 (emphasis added). As set forth in Section B(1)(a)(i), *supra*, *Portrait of Rastajay92* and *Portrait of Kim Gordon* cannot be reasonably perceived as such.

In sum, the transformative subfactor cuts against a finding of fair use here. *Portrait of Rastajay92* and *Portrait of Kim Gordon* make several modifications which are in the Court's view, both minimal and insufficient to warrant the conclusion that they result in an aesthetic and character different from plaintiffs' original photographs. Defendants' attempt to cast the images as satire or parody fails, and Prince's stated purpose in creating these portraits has been both inconsistent and has only limited relevance in light of the similarities between the original and secondary works. *Google* and *Warhol* only serve to affirm this conclusion. The Court concludes that the disputed images do not present a "new expression, meaning, or message" and are therefore not transformative. *Campbell*, 510 U.S. at 579.

    *b.   Commercial Use*

The first factor also requires the Court to consider whether the allegedly infringing work was made for a commercial purpose or, on the other hand, served a nonprofit aim. *See* 17 U.S.C. § 107(1). The core concern addressed by this sub-factor is "the unfairness that arises when a secondary user makes unauthorized use of copyrighted material to capture significant revenues as a direct consequence of copying the original work." *Blanch*, 467 F.3d at 253 (quoting *Am. Geophysical Union*, 60 F.3d at 922). The "greater the private economic rewards reaped by the secondary user (to the exclusion of broader public benefits), the more likely the first [statutory] factor will favor the copyright holder." *Id.* Nevertheless, because "nearly all" fair uses of copyrighted works are conducted for profit, the Second Circuit has cautioned that "[t]he more transformative the new work, the less will be the significance" of the commercial sub-factor. *Cariou*, 714 F.3d at 708 (citation omitted).

It is undisputed that both *Portrait of Kim Gordon* and *Portrait of Rastajay92* are commercial works—defendants made substantial profits from the sales of these images. Defendants nonetheless rely on Second Circuit precedent which recognizes that "[n]otwithstanding the fact that artists are sometimes paid and museums sometimes earn money, the public exhibition of art is widely and we think properly considered to 'have value that benefits the broader public interest.'" *Blanch*, 467 F.3d at 254 (citing *Am. Geophysical Union*, 60 F.3d at 921-22). However, because this Court has concluded that the works are not transformative as a matter of law, the primarily commercial nature of the works cannot be discounted here. *Cf. Blanch*, 467 F.3d at 257 ("[T]he second fair-use factor has limited weight in our analysis because Koons used Blanch's work in a transformative manner to comment on her image's social and aesthetic meaning rather than to exploit its creative virtues."). Accordingly, this subfactor militates against a finding of fair use.

### 2. *Second Factor: Nature of the Copyrighted Work*

The second fair use factor, the nature of the copyrighted work, "calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Campbell*, 510 U.S. at 586. In evaluating this factor, the focus is not on the allegedly infringing use, but rather on the original work. The Court must consider

> (1) whether the work is expressive or creative, such as a work of fiction, or more factual, with a greater leeway being allowed to a claim of fair use where the work is factual or informational, and (2) whether the work is published or unpublished, with the scope for fair use involving unpublished works being considerably narrower.

*Blanch*, 467 F.3d at 256 (quoting 2 Howard B. Abrams, *The Law of Copyright*, § 15:52 (2006)).

*Rastafarian Smoking a Joint* and *Kim Gordon I* are undeniably creative works. Both Graham and McNatt describe the artistic decisions they made with respect to composition, coloration, and editing. Nonetheless, defendants attempt to characterize the nature of McNatt and Graham's photographs as factual, rather than creative. *Kim Gordon I*, Prince submits, is a "commissioned, commercial photograph, taken in line with specific creative directives." (*McNatt* Def. Mem. at 26.) Similarly, in *Rastafarian Smoking a Joint*, Prince describes how Graham set out to capture the existence of the Rastafarian people in their surrounding environment. (*See Graham* Def. Mem. at 14.) Notably, defendants do not cite any controlling precedent to support this argument, and the district court case that they do cite has been overruled. *See Brammer v. Violent Hues Prods., LLC*, No. 1-17-CV-01009, 2018 WL 2921089, at *2–3 (E.D. Va. June 11, 2018), *rev'd and remanded*, 922 F.3d 255 (4th Cir. 2019). When faced with a similar argument, the U.S. Court of Appeals for the Ninth Circuit noted that "[s]imply because a photo documents an event does not turn a pictorial representation into a factual recitation." *Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1177 (9th Cir. 2012). Thus, defendants' attempt to cast plaintiffs' photographs in a factual or informational light fails.

Furthermore, the parties do not dispute that plaintiffs' images are published works. Accordingly, both considerations yield the conclusion that the second factor weighs against a finding of fair use.

### 3. *Third Factor: Amount and Substantiality of Work Used*

The third factor bearing on the fair use inquiry is "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3).

This inquiry must "take into account that 'the extent of permissible copying varies with the purpose and character of the use.'" *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 613 (2d Cir. 2006) (quoting *Campbell*, 510 U.S. at 586–87); *see also Cariou*, 714 F.3d at 711 ("We ask 'whether the quantity and value of the materials used[] are reasonable in relation to the purpose of the copying.'") (quoting *Blanch*, 467 F.3d at 257)). In other words, analysis of the third factor is interlaced with the first.

"In general, 'the more of a copyrighted work that is taken, the less likely the use is to be fair.'" *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 89–90 (2d Cir. 2014) (quoting *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 109 (2d Cir. 1998)). But as the Second Circuit has noted, copying an image in its entirety "does not necessarily weigh against fair use because [it] is sometimes necessary to make a fair use of the image." *Bill Graham*, 448 F.3d at 613; *see also Authors Guild, Inc.*, 755 F.3d at 98. "As applied to photographs," copyright protection "encompasses the photographer's 'posing the subjects, lighting, angle, selection of film and camera, evoking the desired expression, and almost any other variant involved." *Warhol*, 11 F.4th at 46 (quoting *Rogers*, 960 F.2d at 307). "The cumulative manifestation of these artistic choices – and what the law ultimately protects – is the image produced in the interval between the shutter opening and closing, *i.e.*, the photograph itself." *Id.*

At the motion to dismiss stage of this litigation, the Court observed that Prince reproduced Graham's image "in its entirety, in a size that enables the original to retain its full aesthetic appeal." *Graham*, 265 F. Supp. 3d at 383. Although defendants argued that Prince "needed to use the entirety of *Rastafarian Smoking a Joint* because he was commenting on an Instagram post which itself already contained Graham's complete photograph," the Court concluded that this argument was contingent upon a finding that Prince's use was transformative, which it did not find. *Id.* at 383–84.

Now, after full discovery proceedings, defendants' central argument remains unchanged. For both of Prince's portraits, defendants point to the fact that plaintiffs' images are "cropped" and that "negative space" has been removed. (*McNatt* Def. Mem. at 27; *Graham* Def. Mem. at 15.) What remains, defendants contend, is "necessary to accomplish Prince's transformative purpose—to capture and comment on the nature of social media posts as a communication tool, which type of creative expression serves the purpose of copyright." (*McNatt* Def. Mem. at 27; *Graham* Def. Mem. at 16.)

The Court remains unpersuaded. As discussed at length above, *supra* Section IV.B.1.a, Prince's portraits do not make transformative use of plaintiffs' photographs. Thus, defendants' argument is grounded in a premise that this Court rejects. Because Prince's use is not transformative, his use of nearly the entirety of plaintiffs' photographs cannot be deemed "reasonable." *See Cariou*, 714 F.3d at 711.

Defendants contend that Second Circuit precedent supports using the entirety of the original image, but the cases upon which they rely are easily distinguishable. In *Cariou*, for example, this factor weighed in Prince's favor precisely because in those instances where Prince copied photographs in their entirety, his aesthetic alterations were so thorough that they rendered the original images "barely recognizable." *Cariou*, 714 F.3d at 710. In any event, "there is no bright line separating a permissible amount of borrowing from an impermissible one." *Warhol*, 11 F.4th at 46. *See also Rogers*, 960 F.2d at 310–11 ("Sometimes wholesale copying may be permitted, while in other cases taking even a small percentage of the original work has been held unfair use.").

Defendants' reliance on *Bill Graham* is similarly misplaced. In *Bill Graham*, the defendant publishing company used the plaintiff's copyrighted concert posters in a coffee table book that detailed the history of the Grateful Dead. *Bill Graham*, 448 F.3d at 607. Although the defendant used the plaintiff's "images in their entirety" the Second Circuit concluded that the third factor "d[id] not weigh against fair use." *Id.* at 613. To accomplish plaintiff's transformative use, the defendant "displayed reduced versions of the original images and intermingled these visuals with text and original graphic art." *Id.* As a result, "[e]ven though the copyrighted images [were] reproduced in their entirety, the visual impact of their artistic expression [was] significantly limited because of their reduced size." *Id.* Here, by contrast, Prince's use is not transformative and his portraits reproduce plaintiffs' images even *larger*. The third factor does not weigh in defendants' favor.

### 4. Fourth Factor: Effect of the Use on the Market Value for the Original

The fourth and final fair use factor the Court must analyze is the "effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). Although "the rightsholder bears some initial burden of identifying relevant markets . . . the ultimate burden of proving that the secondary use does not compete in the relevant market is appropriately borne by the party asserting the defense: the secondary user." *Warhol*, 11 F.4th at 49. This factor "requires courts to consider not only the extent of market harm caused by the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market for the original." *Campbell*, 510 U.S. at 590 (citation omitted). The Second Circuit has instructed that an alleged infringer has usurped the market for copyrighted works, including the derivative market, where the infringer's target audience and the nature of the infringing content is the same as the original. *Cariou*, 714 F.3d at 709. In conducting this analysis, courts must remain "mindful that '[t]he more transformative the secondary use, the less likelihood that the secondary use substitutes for the original,' even though 'the fair use,

being transformative, might well harm, or even destroy, the market for the original.'" *Cariou*, 714 F.3d at 709 (quoting *Castle Rock*, 150 F.3d at 145).

Here, analysis of this factor does not lend itself to an easy conclusion. As set forth above, *Portrait of Rastajay92* and *Portrait of Kim Gordon* are not substantially transformative – they do not present "an entirely different aesthetic" from plaintiffs' original photographs, and Prince's stated transformative purpose is unavailing. This suggests that Prince's portraits may constitute substitutes for plaintiffs' original photographs. Indeed, at the motion to dismiss stage, the Court determined that Graham adequately pled facts that showed Prince's work could serve as a substitute because *Portrait of Rastajay92* "present[s] the entirety of Graham's photograph in the same size in which the photograph is sold by Graham, without obstructing or distorting it in any physical sense." *See Graham*, 265 F. Supp. 3d at 385.

However, at this stage of the litigation, Prince has demonstrated that his "work appeals to an entirely different sort of collector," *see Cariou*, 714 F.3d at 709, which lends support to the conclusion that Prince has *not* usurped the primary market for the original photographs. In *Cariou*, the Second Circuit observed that "[a]lthough certain of Prince's artworks contain significant portions of certain of Cariou's photographs, neither Prince nor the *Canal Zone* show usurped the market for those photographs." *Cariou*, 714 F.3d at 709. In finding that this factor favored Prince, the majority noted that "Prince's audience is very different from Cariou's," and "there is nothing in the record to suggest that Cariou would ever develop or license secondary uses in the vein of Prince's artworks." *Id.*

Prince has also shown here that *Portrait of Rastajay92* and *Portrait of Kim Gordon* "appeal to an entirely different sort of collector" than Graham and McNatt's original photographs. Allan Schwartzman, one of defendants' experts and former Chairman of the Fine Art Division at Sotheby's, explains that the original photographs "do not share a market" with Prince's portraits. (*McNatt* Boyajian Decl. Ex. 58 ¶ 4.) In comparing the photographs with Prince's portraits, Schwartzman concludes that the photographs are "visually distinguishable," "judged by different standards, critics, and professionals," and "are displayed in substantively different kinds of venues and contexts."[8] (*Id.*) As further evidence of this conclusion, the individuals who purchased *Portrait of Kim Gordon* and *Portrait of Rastajay92* explain that they would have never purchased the original photographs without Prince's alterations. (*See McNatt* Boyajian Decl. Ex. 19 ¶ 7 ("We would never have purchased a reproduction of Mr. McNatt's photograph of Kim

---

[8] It is undisputed that while Prince has had several solo exhibitions at the Guggenheim and Whitney (SOF ¶ 2), Graham has never had a show at any major museum featuring only his work, (SOF ¶ 54).

Gordon—particularly one that is as large as Richard Prince's Portrait of Kim Gordon—to display. That would be a very strange thing to do . . . . A serious portrait of Kim Gordon taken to accompany a magazine article would seem odd to me and out of place if displayed in our home . . . ."); *Graham* Gagosian Decl. ¶ 8 ("The Graham Photo is not the kind of work Gagosian Gallery would exhibit, nor would I personally choose to purchase or display a work like it. I am not passing judgment on the Graham Photo's artistic merit or on those individuals who choose to purchase the Graham Photo. But the style and appearance of the Graham Photo is different from the kind of work one would normally see in a Gagosian Gallery or on my wall at home.").) Neither McNatt nor Graham provide evidence to the contrary.[9]

Although it remains the defendants' burden to prove fair use, "nothing in the record suggests that anyone will not now purchase [plaintiffs'] work[s] . . . as a result of the market space that Prince's work has taken up." *Cariou*, 714 F.3d at 709. For example, it is undisputed that since 1997, Graham has sold nine copies of *Rastafarian Smoking a Joint*, with sales prices ranging from $500 to $8,000. (SOF ¶ 81.) Four of the nine sales occurred *after* Prince's 2014 exhibition of *Portrait of Rastajay92*. (SOF ¶ 82.) Thus, the record does not support a finding that Prince's single edition *Portrait of Rastajay92* usurped the market for Graham's prints of *Rastafarian Smoking a Joint*. Similarly, no evidence demonstrates that *Portrait of Kim Gordon* usurped the market for *Kim Gordon I*. McNatt does not allege that he has ever offered a physical print of the photograph for sale, but he continued to receive multiple licensing inquiries even after the Blume & Poe exhibition featuring *Portrait of Kim Gordon*. (*See McNatt* SOF ¶¶ 75–76; Pltf's Resp. to SOF ¶ 75.)

In fact, there is evidence in the record that Prince, like Warhol, has reached a category of artistic prominence such that collectors purchase his work at least in part for the name recognition, suggesting that those collectors would not find the same value in even an identical work by the original artist. *See, e.g., Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*, 382 F. Supp. 3d 312, 331 (S.D.N.Y. 2019) ("Put simply, the licensing market for Warhol prints is for 'Warhols.'"); *but see Warhol*, 11 F.4th at 43 (2d Cir. 2021) (finding "it is entirely irrelevant to this analysis that 'each Prince Series work is immediately recognizable as a 'Warhol'" because "[e]ntertaining that logic would inevitably create a celebrity-plagiarist privilege.").

---

[9] Graham states that "[b]oth Mr. Prince and I exhibit our fine artwork in art galleries and museums, and both sell our artwork to fine art collectors." (*Graham* Graham Decl. ¶ 10.) Such a broad statement is not useful in determining whether the two artists share the same target audience. Regarding *Kim Gordon I*, the evidence shows that the photograph appeals to, and is available for license by, commercial and editorial magazines such as *Paper* and *Vogue*, rather than art galleries. (*See McNatt* Def. Mem. at 31.)

When plaintiffs' expert, Michelle Bogre, was asked to explain why Prince's portraits sold for significantly more than plaintiffs' original photographs, she stated:

> [it's] the fact that [it is] Mr. Prince—so it's a brand issue. Just like . . . a Hermes bag or a Birkin bag sells for $20,000. It's not much different from a bag by anyone else. You buy it for the Birkin name. You buy it for the Prince name.

*McNatt* Boyajian Decl. Ex. 14 (Bogre Depo) at 235.

Plaintiffs nonetheless assert that Prince's portraits usurp their potential licensing markets. (*Graham* Opp'n at 18.) "It is indisputable that, as a general matter, a copyright holder is entitled to demand a royalty for licensing others to use its copyrighted work, and that the impact on potential licensing revenues is a proper subject for consideration in assessing the fourth factor." *Am. Geophysical Union*, 60 F.3d at 929 (internal citations omitted). Of course, "were a court automatically to conclude in every case that potential licensing revenues were impermissibly impaired simply because the secondary user did not pay a fee for the right to engage in the use, the fourth fair use factor would *always* favor the copyright holder." *Id.* at 930 n.17; *see also Bill Graham*, 448 F.3d at 614. Therefore, this consideration is only relevant "where the secondary use occurs within a traditional or reasonable market for the primary work." *Warhol*, 11 F.4th at 50.

Defendants have also introduced some evidence that the potential licensing of the original works by publications is unlikely to be affected by Prince's secondary works. McNatt argues that "individuals or entities who may have licensed the photograph from [him] could instead license the Prince version." (*See McNatt* Opp'n at 29.) But McNatt continued to receive multiple licensing inquiries from magazines even after the Blume & Poe exhibition featuring *Portrait of Kim Gordon*. (*See McNatt* SOF ¶¶ 75–76; Pltf's Resp. to SOF ¶ 75.) And unlike in *Warhol*, there has been no showing here that Prince can now obtain licensing revenues for his works which Graham and McNatt might otherwise receive for theirs. *Cf. Warhol*, 11 F.4th at 48-49 (noting that although "the primary market[s] for [Goldsmith's and AWF's works] do not meaningfully overlap," "both Goldsmith and AWF have sought to license (and indeed have successfully licensed) their respective depictions of Prince to popular print magazines to accompany articles about him," and therefore the secondary work competed with the original work in the derivative licensing market.).

Nonetheless, the Court of Appeals recognizes that there also "exists a market to license photographs of musicians, such as the Goldsmith [photograph of Prince], to serve as the basis of a stylized derivative image; permitting [Warhol's secondary use] would effectively destroy that broader market, as, if artists 'could use such images for

free, there would be little or no reason to pay for [them].'" *Id.* at 50 (quoting *Barcroft Media, Ltd. V. Coed Media Grp., LLC.*, 297 F. Supp. 339, 355 (S.D.N.Y. 2017)). "This, in turn, risks disincentivizing artists from producing new work by decreasing its value – the precise evil against which copyright law is designed to guard." *Id.* Permitting Prince's secondary use of McNatt's and Graham's images without sufficiently transforming them or paying for them would allow other artists like Prince to do the same, which could disincentivize artists like McNatt and Graham from producing new work. Indeed, Graham and McNatt both contend that if Prince had asked to license their photographs, they would have been receptive to negotiations. (*See Graham* Opp'n at 18 (quoting Graham Decl. ¶ 14); *McNatt* Opp'n at 28 (quoting McNatt Decl. ¶ 9).) Prince has not borne his burden of showing this danger does not exist.

Finally, "the public benefits the copying will likely produce" are also relevant to the Court's analysis of the fourth factor. *Google*, 141 S. Ct. at 1206. In *Google*, the Supreme Court found that "enforcement of Oracle's copyright . . . would risk harm to the public." *Id.* at 1208. Similarly, defendants argue that enforcing plaintiffs' copyrights would also risk harm to the public by depriving it of the *New Portraits* and potentially other appropriation art, erupting into a parade of horribles for the entire appropriation art industry. (Def. Suppl. Mem. at 14, ECF No. 223.) However, as in *Warhol*, "[n]othing in this opinion stifles the creation of art that may reasonably be perceived as conveying a new meaning or message, and embodying a new purpose, separate from its source material." *See* 11 F.4th at 51. The Court has no doubt that, following this decision and the Supreme Court's anticipated decision in *Warhol*, 142 S. Ct. 1412 (2022), Prince and other appropriation artists will continue to make art, as they should.

Thus, because the Court finds the primary markets for the original and secondary works do not overlap, nor do the derivative markets to some degree, this fourth factor weighs slightly in favor of defendants.

### 5. *Balance of Factors*

On balance, the four factors weigh significantly against a finding of fair use. For the first factor, which sits at the heart of the fair use inquiry, it is clear that from the standpoint of a reasonable observer conducting a side-by-side comparison that plaintiffs' photographs remain the dominant, unobscured focal point of Prince's portraits. Prince's minimal modifications and proffered transformative intent do not alter this conclusion. Thus, *Portrait of Rastajay92* and *Portrait of Kim Gordon* are not transformative as a matter of law. Furthermore, Prince's portraits are commercial— defendants earned substantial profits from the sales of these images. Thus, the first factor militates against a finding of fair use.

The second factor, the nature of the copyrighted work, also weighs against fair use because Graham's and McNatt's portraits are creative and published.

The third factor, the amount and substantiality of the work used, also weighs against fair use; it falls in plaintiffs' favor because Prince made only minimal modification and used essentially the entirety of plaintiffs' photographs. Although this is occasionally permissible under Second Circuit case law, because Prince's use is not transformative, his use of nearly the entirety of plaintiffs' photographs cannot be deemed "reasonable" under the third factor.

Finally, the fourth factor partially supports defendants, who have presented evidence that Prince's work appeals to an entirely different type of collector than plaintiffs' photographs, and that plaintiffs do not stand to lose licensure revenues from certain outlets as a consequence of Prince's works. However, Prince has failed to show that other artists would not be emboldened by his success in declining to compensate plaintiffs for his non-transformative use, which negatively affects the value of original works.

The fair use inquiry "presents a holistic, context-sensitive inquiry 'not to be simplified with bright-line rules[.] . . . All [four statutory factors] are to be explored, and the results weighed together, in light of the purposes of copyright.'" *Warhol*, 11 F.4th at 37 (quoting *Campbell*, 510 U.S. at 578); *see also Am. Geophysical Union*, 60 F.3d at 926 (characterizing *Campbell* as "apparently abandoning the idea that any factor enjoys primacy"). Here, three factors weigh firmly against a finding of fair use, and only one factor weighs slightly in favor of fair use. Accordingly, defendants have not established that *Portrait of Rastajay92* and *Portrait of Kim Gordon* make fair use of plaintiffs' original photographs.

### 6. *Application of the Fair Use Factors to the Other Allegedly Infringing Works*

Plaintiffs bring additional copyright infringement claims with respect to the Gagosian Gallery Pamphlet, the Billboard, the Twitter Compilation, the Blum & Poe Gallery Book, and the Instagram Post. (*See Graham* Am. Compl. ¶¶ 61–73; *McNatt* Compl. ¶¶ 63–66.)

#### a. *The Blum & Poe Gallery Book, the Gagosian Gallery Pamphlet, and the Billboard*

Defendants argue that the Gallery Book, the Pamphlet, and the Billboard make fair use of plaintiffs' photographs. Separately, Prince argues that Billboard should not be subject to copyright infringement because it falls under the *de minimis* doctrine.

"[W]here the unauthorized use of a copyrighted work is *de minimis,* no cause of action will lie for copyright infringement, and determination of a fair use claim is unnecessary." *Sandoval v. New Line Cinema Corp.,* 147 F.3d 215, 217 (2d Cir. 1998) (citing *Ringgold v. Black Entm't Television, Inc.,* 126 F.3d 70, 76 (2d Cir. 1997)). Accordingly, the Court must address defendants' *de minimis* claims first.

> i.   De Minimis Claims

Defendants argue that Graham's copyright infringement claims against the Billboard fail under the *de minimis* doctrine. "The *de minimis* doctrine essentially provides that where unauthorized copying is sufficiently trivial, 'the law will not impose legal consequences.'" *Davis,* 246 F.3d at 172 (quoting *Ringgold,* 126 F.3d at 74). As Judge Pierre Leval sees it:

> Trivial copying is a significant part of modern life. Most honest citizens in the modern world frequently engage, without hesitation, in trivial copying that, but for the *de minimis* doctrine, would technically constitute a violation of law. We do not hesitate to make a photocopy of a letter from a friend to show to another friend, or of a favorite cartoon to post on the refrigerator. Parents in Central Park photograph their children perched on José de Creeft's Alice in Wonderland sculpture. We record television programs aired while we are out, so as to watch them at a more convenient hour. Waiters at a restaurant sing "Happy Birthday" at a patron's table. When we do such things, it is not that we are breaking the law but unlikely to be sued given the high cost of litigation. Because of the *de minimis* doctrine, in trivial instances of copying, we are in fact not breaking the law. If a copyright owner were to sue the makers of trivial copies, judgment would be for the defendants. The case would be dismissed because trivial copying is not an infringement.

*Id.* at 173.

Here, the Billboard was constructed over New York City's bustling West Side Highway and depicts an installation image of the Gagosian Gallery exhibition, which includes the *Portrait of Rastajay92* along with six of the other portraits. Defendants contend that the Billboard constitutes a trivial, *de minimis* use because it was "on top of a building" and Graham's photograph "comprises approximately less than 10% of the billboard." (*Graham* Def. Mem. at 23.)

The *de minimis* doctrine is inapplicable to the Billboard. Defendants displayed a significant portion of Graham's photograph on a very large, very public billboard for all of Manhattan to see. The display stands in stark contrast to the clearly trivial examples

Judge Leval describes. Accordingly, the Billboard "cannot be considered a *de minimis* act of copying to which the law attaches no consequence." *Davis*, 245 F.3d at 173.

### ii.   Fair Use Claims

Defendants rely heavily on *Bill Graham* to support their position that the Gallery Book, the Pamphlet, and the Billboard are sufficiently transformative to compel a fair use finding. In *Bill Graham*, the Second Circuit noted that fair use protection is "frequently afforded . . . to the use of copyrighted materials in biographies, recognizing such works as forms of historical scholarship, criticism, and comment that require incorporation for original source material for optimum treatments of their subjects." 448 F.3d at 609. In that case, significantly reduced versions of Grateful Dead concert posters were included as a collage as part of a biographical tome on the music group. The court held that the biographical work was transformative and significantly different from the posters' original purpose of promoting concerts, as they were "displayed to commemorate historical events, arranged in a creative fashion, and displayed in a significantly reduced form." *Id.* at 608–09.

Defendants contend that the Gallery Book, the Pamphlet, and the Billboard are transformative because each serve as a "historical representation of a significant art show in which [the disputed portraits were] merely one small part," (*Graham* Def. Mem. at 23; *see also McNatt* Def. Mem. at 35), just as the images of the Grateful Dead posters "serve[d] as historical artifacts graphically representing the fact of significant Grateful Dead concert events selected . . . for inclusion in the book's timeline." *Bill Graham*, 448 F.3d at 610. However, defendants fail to recognize a key distinguishing fact. In *Bill Graham*, the plaintiff was challenging the defendant's inclusion of its copyrighted posters in the book. The dispute was not centered on the posters themselves, but rather the defendant's use of the posters in the commemorative book.

Here, by contrast, *Portrait of Rastajay92* and *Portrait of Kim Gordon* are the subject of the copyright infringement claim and do not constitute fair use as a matter of law. Thus, the ancillary works that include Prince's portraits in their entirety cannot pass as fair use, regardless of the transformative, historical purpose that defendants urge.

Furthermore, it remains disputed as to how the Pamphlet, Billboard, and Gallery Book affect the market for plaintiffs' original photographs. For example, defendants argue that "conveying a historical event did not result in any profit to Prince" because all of the *New Portraits* had been sold prior to the opening of the exhibitions. (*See Graham* SOF ¶ 45.) But plaintiffs aptly observe that many of the *New Portraits* were resold on the secondary market after their initial sale (Pltf's Response to SOF ¶ 45), thus

these ancillary works, which include plaintiffs' photographs, could have promoted the re-sale of other portraits from the series. Accordingly, this factual dispute precludes a finding of fair use in these secondary materials on summary judgment.

### b. The Twitter Compilation

Prince contends that the Twitter Compilation, which includes a blurry, cropped portion of Graham's photograph, is not copyright infringement because it is protected under the doctrines of de minimis and fair use.

### i. De Minimis Claim

The Court agrees with Prince that the Twitter compilation is a trivial violation that is not actionable under the de minimis doctrine. The Twitter Compilation indisputably displays a blurry, cropped portion of Graham's photograph, juxtaposed with another out of focus image, and a convoluted caption which reads: "Booze Pot Sex. I guess I was wrong. (Memo to Turner: I DID NOT take make create this montage)." (*Graham* SOF ¶ 50.) It falls within the examples of trivial violations described in *Ringgold*.

### ii. Fair Use Claim

Prince urges that the Twitter Compilation qualifies as a fair use for the previously argued reasons but adds that it was even more transformative because it was "making a comment on the instant lawsuit." (*Graham* Def. Mem. at 22; *see Graham* Prince Decl. at ¶ 35.) However, his declaration conflicts with his sworn deposition testimony in which he first stated that he was not aware of tweeting about the lawsuit (Fitzpatrick Decl. Ex. 38 (Prince Tr.) at 13:21-23), then later that he "was making a comment on the fact that [he] did not make the montage." (*Id.* at 179–80). Thus, Prince's testimony creates a genuine issue of a material fact (Prince's transformative purpose), which precludes summary judgment on the issue.

### c. Instagram Post

In order to create *Portrait of Kim Gordon*, Prince took a screenshot of the image of *Kim Gordon I*, which he found on another user's Instagram account. He then posted a cropped version of the image from his own account—@richardprince4—with the addition of the three comments: (1) "Portrait of Kim Gordon," (2) "Kool Thang You Make My Heart Sang You Make Everythang Groovy," and (3) several music-themed emojis.

Defendants contend that the post is a protected fair use for the previously set forth reasons.[10]  However, McNatt is correct that most of these arguments (e.g., the change in scale and medium on a large inkjet canvas, the soft focus) do not apply to the Instagram Post.  The record is also devoid of facts on how the Instagram Post could affect the market for the original photograph.  Accordingly, defendants have not met their burden of proving that the use of McNatt's photograph in Prince's Instagram Post was fair.

## V.  Express or Implied License

As with fair use, a nonexclusive license is a defense to a claim of copyright infringement.  *See Graham v. James*, 144 F.3d 229, 236 (2d Cir. 1998) ("A copyright owner who grants a nonexclusive license to use his copyrighted material waives his right to sue the licensee for copyright infringement."); *Psihoyos v. Pearson Educ., Inc.*, 855 F. Supp. 2d 103, 119 (S.D.N.Y. 2012).  "A nonexclusive license may be granted orally, or may even be implied from conduct."  3 *Nimmer on Copyright* § 10.03[7] (2019); *see also Psihoyos*, 855 F. Supp. 2d at 119; *Keane Dealer Servs., Inc. v. Harts*, 968 F. Supp. 944, 947 (S.D.N.Y. 1997).  In cases where the existence of a license is in dispute, defendants bear the burden of showing a license was granted.  *See Bourne v. Walt Disney Co.*, 68 F.3d 621, 631 (2d Cir. 1995).

Prince contends that Instagram and Facebook's terms of use granted him a non-exclusive implied license to use Graham's *Rastafarian Smoking a Joint*.  At the time Prince found and downloaded the photograph from Facebook, Facebook's Terms of Service provided in relevant part:

> 2(1) For content that is covered by intellectual property rights, like photos and videos ("IP content"), you specifically give us the following permission, subject  to your privacy and application settings:  you  grant  us  a  non-exclusive, transferable, sub-licensable, royalty-free, worldwide license to use any IP content that you post on or in connection with Facebook ("IP License"). . . .
>
> 2(4) When you publish content or information using the "everyone" setting, it means that you are allowing everyone, including people off of Facebook, to access and use that

---

[10] Prince also makes a confusing argument characterizing the harm alleged by McNatt as being with respect to his attribution rights, which is not cognizable under copyright law. (*See McNatt* Def. Mem. at 34.)  However, McNatt's complaint is clear that he is alleging copyright infringement. (*See* McNatt Compl. at ¶¶ 86-87.)

> information, and to associate it with you (i.e., your name and
> profile picture).

(*Graham* Boyajian Decl. Ex. 32 (Facebook Terms of Service) § 2.)  Prince urges that because Graham previously posted the photograph on Facebook publicly and without a copyright notice or watermark, he provided a "license to others, without his approval or even knowledge." (Def. Mem. at 24-25.)

In support of this position, Prince relies on *Field v. Google*, 412 F. Supp. 2d 1106 (D. Nev. 2006).  In *Field*, a Nevada district court held that Google, an internet search engine, had an implied license to include works authored by the plaintiff in its database of "cached" webpages. *Id.* at 1116.  The court relied on the fact that the plaintiff was aware that a website author can prevent a search engine from sorting "cached" versions of a webpage by including particular instructions in the coding of its website (referred to in the decision as a "no archive meta-tag"). *Id.*  Because plaintiff "had knowledge of how Google would use the copyrighted works he placed on those pages, and [had] knowledge that he could prevent such use, [and] instead made a conscious decision to permit it," the district court held that plaintiff's "conduct [was] reasonably interpreted as the grant of a license to Google for that use." *Id.*

*Field* is neither analogous nor controlling.  In *Field*, the court held that the plaintiff's conduct granted an implied license to Google, the defendant in the action.  The court did not consider whether a third party could also claim an implied license.  Here, Graham does not dispute that a license was granted to Facebook via the terms of service; rather, Graham contests that the terms of service extend the license to "everyone else," including Prince. (*Graham* Opp'n at 25.)  In essence, Prince's argument is a request to find that any copyright holder who posts his copyrighted material onto a social media platform has waived his copyright to the material.  *Field* does not support finding in favor of such a sweeping rule.

Although the Second Circuit has "not yet ruled on the precise circumstances under which an implied non-exclusive license will be found," at minimum there must be a "meeting of the minds between the parties to permit the particular usage at issue[.]" *ABKCO Music, Inc. v. Sagan*, 50 F.4th 309, 320 (2d Cir. 2022) (citation omitted); *see also Psihoyos*, 855 F. Supp. 2d at 124 (collecting cases).  Under this rubric, it is clear that no "meeting of the minds" took place between Graham and Prince regarding Prince's unauthorized use of *Rastafarian Smoking a Joint*.  No evidence in the record supports the

conclusion that Graham intended for Prince to use his work.  Thus, this defense also fails.[11]

## VI. CONCLUSION

As former Chief Judge Robert Katzmann observed, the work of appropriation artists "inherently raises difficult questions about the proper scope of copyright protection and fair use doctrine." *Blanch*, 467 F.3d at 263 (Katzmann, J. concurring).  As boundaries between technology and art blend, these questions become increasingly difficult.

Prince indeed tested the boundary between appropriation art and copyright infringement when he created *Portrait of Rastajay92* and *Portrait of Kim Gordon*.  This opinion is this Court's attempt to elucidate that boundary.  For the reasons set forth above, both of defendants' summary judgment motions are denied.


Dated:  New York, New York
       May 11, 2023

SO ORDERED:

Sidney H. Stein, U.S.D.J.

---

[11] In his reply brief, Prince posits that the Terms of Use grant him a sublicense.  Cases in this district suggest otherwise.  *See McGucken v. Newsweek LLC*, No. 19 CIV. 9617 (KPF), 2020 WL 2836427, at *4 (S.D.N.Y. June 1, 2020) ("Although Instagram's various terms and policies clearly foresee the possibility of entities such as Defendant using web embeds to share other users' content . . . none of them expressly grants a sublicense to those who embed publicly posted content."); *Sinclair v. Ziff Davis, LLC*, No. 18-CV-790 (KMW), 2020 WL 3450136, at *1 (S.D.N.Y. June 24, 2020) ("[T]he Court holds that the pleadings contain insufficient evidence to find that Instagram granted Mashable a sublicense to embed Plaintiff's Photograph on its website.").