UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------

DONALD GRAHAM

                              Plaintiff,

        -against-                                        15-CV-10160 (SHS)

RICHARD PRINCE, GAGOSIAN
GALLERY, INC., and LAWRENCE                              OPINION & ORDER
GAGOSIAN

                              Defendants.

------------------------------------------------------

SIDNEY H. STEIN, U.S. District Judge.

Defendants Lawrence Gagosian ("Mr. Gagosian") and Gagosian Gallery (together, "Gagosian Defendants") have moved for partial summary judgment dismissing plaintiff Donald Graham's claims against them to indirect and unrealized profits attributable to the alleged infringement of Graham's photograph in artist Richard Prince's work, *Untitled* (*Portrait of Rastajay92*) ("*Rastajay92*"). The Gagosian Defendants contend that Graham has failed to demonstrate a causal connection between *Rastajay92* and any profits from the sales of the other works in Prince's *New Portraits* series. They further urge that any claim to Mr. Gagosian's "unrealized profits" from his ownership of *Rastajay92* is duplicative, not sufficiently related to the alleged infringement, and overly speculative.

Graham counters that a reasonable jury could find that he is entitled to Gagosian Gallery's revenues from sales of the other works in the *New Portraits* series because *Rastajay92* was used to promote sales of the other works in the series, and because, according to Graham, the Gagosian Defendants have not met their burden of apportioning any profits not resulting from the infringement. In addition, Graham urges that a reasonable jury could find he is entitled to unrealized profits from the hypothetical resale of *Rastajay92* because he alleges both 1) a causal connection between the infringement and unrealized profits, and 2) a method for determining the amount of unrealized profits.

The Gagosian Defendants' motion for partial summary judgment is granted. Upon review of the evidence marshaled by plaintiff to support his theories of indirect and unrealized profits recovery, the Court finds that no reasonable jury could find a

sufficient causal connection between the alleged infringement in *Rastajay92* and profits earned by the Gagosian Defendants from the sales of the other *New Portraits* to support an award of indirect profits. In addition, plaintiff cannot recover unrealized profits from a hypothetical resale of *Rastajay92* as a matter of law.

## I.   FACTUAL BACKGROUND

The following facts are undisputed except where otherwise noted. This action arises out of photographer Donald Graham's claim that well-known appropriation artist Richard Prince infringed on Graham's copyright in a photograph entitled *Rastafarian Smoking a Joint* when Prince created and sold a work featuring that photograph. Prince's work, called *Untitled (Portrait of Rastajay92)* ("*Rastajay92*"), was displayed along with a series of non-infringing works with a similar aesthetic titled *New Portraits*. Graham has also sued the Gagosian Gallery and its owner Larry Gagosian for infringement because the Gallery purchased and displayed *Rastajay92* in an exhibition of the *New Portraits*, sold *Rastajay92* to Mr. Gagosian, and allegedly promoted the exhibition and the sale of the other *New Portraits* using *Rastajay92*.

Specifically, for the five weeks from September 19, 2014 through October 24, 2014, Gagosian Gallery exhibited the *New Portraits* series at its gallery at 976 Madison Avenue ("the Exhibition"). (ECF No. 133, Defendants' Rule 56.1 Statement of Undisputed Facts ("Def. SUF") ¶¶ 8-9; 26.) The Exhibition featured 37 *New Portraits* ("Original Works"), including *Rastajay92*. (*Id.* ¶ 27.) All of the Original Works were purchased before the Exhibition opened. (Def. SUF ¶¶ 84-85; ECF No. 142 ("Appleton Decl.") Ex. 36.) Mr. Gagosian, the owner of Gagosian Gallery, purchased *Rastajay92* for himself on September 10, 2014, before the Exhibition opened. (*Id.* ¶ 50.) Prince produced and sold through the Gallery a set of 37 additional *New Portraits* ("Secondary Works") during the first week the Exhibition opened, (Def. SUF ¶¶ 84-85; Appleton Decl. Ex. 75 at 4-8), as well as three other custom *New Portraits* ("Specialty Works") upon request during the five weeks of the Exhibition. (Def. SUF ¶¶ 88-91.) Among other remedies, plaintiff seeks to recover the commissions earned by Gagosian Gallery from sales of the 36 Original Works excluding *Rastajay92*, the 37 Secondary Works, and the three Specialty Works (collectively, "Other Works") in the *New Portraits* series on the theory that the buyers of these Other Works were allegedly influenced in their decision to purchase the Other Works by having seen *Rastajay92* in promotions of the series, thereby generating indirect profits for Gagosian Gallery.

### A.   Original Works

The Original Works – including *Rastajay92* – arrived at Gagosian Gallery on September 3, 2014. (Def. SUF ¶ 30.) Gagosian Gallery began contacting clients to sell them works from the Exhibition around September 5, 2014 (*id.* ¶ 39), and at least one of those emails included an image of *Rastayjay92* (*see id.*; Appleton Decl. Ex. 28 at 5). All 37 of the Original Works were sold by September 12, 2014, a week before the Exhibition opened. (Def. SUF ¶ 51.)[1] For approximately one week at some point prior to the Exhibition, a handful of clients – "more than five" but less than ten – were brought to an annex which was closed off to the public to see the Original Works. (Def. SUF ¶ 54; Appleton Decl. Ex. 9 at 143.) There is no evidence in this record that the buyers of the Original Works viewed *Rastajay92* in the annex before buying the work they purchased.

Defendants[2] insist that there was no promotion of the Exhibition "via email, social media, or its website," nor through "standard electronic outlets," that included *Rastajay92* before the Original Works were sold. (Def. SUF ¶¶ 37, 58). Although plaintiff suggests that there was such promotion (ECF No. 159, Plaintiff's Response to Defendants' Statement of Undisputed Facts ("Pl. Reply to SUF") ¶ 33), there is no evidence to substantiate that assertion.

The revenue generated from the Original Works was approximately $1.32 million. (Def. SUF ¶ 124.)

---

[1] The parties dispute when a work can be considered "sold." Gagosian Gallery claims that all the Original Works had been "sold," in the sense that they were spoken for by buyers, a week before the Exhibition opened. (Def. SUF ¶¶ 38, 51; *see* Appleton Decl. Ex. 27). Graham, however, notes that only five of them had actually been paid for by the time of the Exhibition's opening, and the rest were paid for in the months following. (ECF No. 180, Defendants' Reply to Plaintiff's Counterstatement of Material Facts ("Def. Reply to CMF") ¶ 54; *see* Fitzpatrick Decl. Ex. 102.) For purposes of this motion, the Court accepts the definition proffered by defendants, for when considering whether *Rastajay92* had a causal connection to any buyers' decision to purchase a different work, the pertinent time frame is prior to when the buyer made the decision to purchase the work, not prior to when the buyer actually paid and completed the sale.

[2] When the Court refers to "defendants," it refers only to the movants Gagosian Defendants unless otherwise stated.

**B. Secondary Works**

The 37 Secondary Works were claimed[3] during the eight-day period after the Exhibition, which included *Rastajay92*, opened. (Def. SUF ¶ 87; Appleton Decl. Ex. 75 at 4-8.) These works were never exhibited by Gagosian Gallery. (Def. SUF ¶ 98.) Gallery salespeople sold the Secondary Works by sending images of the particular works they were offering for sale, as well as on at least one occasion installation images from the Exhibition, to potential buyers. (Def. SUF ¶¶ 100-03.) One of at least three of these installation images included *Rastajay92* alongside six other portraits.[4] (Appleton Decl. Ex. 79 at 6; Ex. 2 ¶ 22.) The buyers of the Secondary Works may also have seen *Rastajay92* displayed with the Original Works at the Gallery during that first week of the Exhibition before deciding to buy a Secondary Work, or in the catalog that was available at the Exhibition and that featured the Original Works including *Rastajay92*,[5] but according to defendants there were no purely "walk-in" purchases of the Secondary Works. (Def. SUF ¶ 108.) On or after September 20, 2014, the Gagosian Gallery website added a subpage for the Exhibition that linked to installation shots featuring over 20 of the works in the Exhibition (including one photograph that showed seven of the works on display at the Gallery, including *Rastajay92*). (Def. SUF ¶ 67.) Kenneth Maxwell, a Gagosian Gallery employee who at the time was a salesperson and Prince's primary liaison to the Gallery, sent an email three days after the Exhibition opened authorizing another employee of the Gagosian Gallery to "social network" a Gagosian Gallery announcement of the Exhibition. (Appleton Decl. Ex. 26 at 2.) On September 23, 2014, an art critic posted an article about the Exhibition to vulture.com that included three photographs of the installation, one of which was of *Rastajay92* in a row with five other

---

[3] Two of the 37 Secondary Works were not yet sold but were placed on hold for buyers within the week after the Exhibition's opening; one of the two was sold to that buyer while the other was not ultimately sold by Gagosian Gallery. (Def. SUF ¶ 87.)

[4] The email in evidence containing this installation image was sent to a couple who did not ultimately purchase the Secondary Work offered. (Def. SUF ¶ 104.)

[5] The Court previously noted in its denial of defendants' motion to dismiss that the "selection of [*Rastajay92*] to appear in a catalog for the *New Portraits* exhibition" was an alleged fact from which it could be reasonably inferred that the infringed photograph generated profits beyond those earned from the direct sale of *Rastajay92*. (ECF No. 54 at 29.) Significantly, it is now undisputed that the catalog was in fact simply a "Zine" available for free at the Exhibition, and that rather than *Rastajay92* being "selected" for the Zine, the Zine contained images of all 37 of the Original Works. (Def. SUF ¶¶ 70-72; ECF No. 159, Plaintiff's Counterstatement of Material Facts ("Pl. CMF") ¶¶ 32-34.)

works. (Def. Reply to CMF ¶ 42; Fitzpatrick Decl. Ex. 91.)

During this period, the Gagosian Gallery also promoted the Exhibition using a variety of media that did not include *Rastajay92*. (Def. SUF ¶¶ 62-65.) On or after September 20, a subpage promoting the Exhibition was created on the Gagosian Gallery's website. The cover photo for the subpage was not *Rastajay92*, but one of the other works in the Exhibition. (Def. SUF ¶ 62; Appleton Decl. Ex. 45.) And on September 23, a press release was added to the website and an email sent out to the Gagosian Gallery mailing list that prominently featured that same work, and neither of which featured *Rastajay92*. (Def. SUF ¶¶ 63-65; Appleton Decl. Exs. 16, 44.) In addition, at least 13 articles written about the *New Portraits* works dated on or before September 26, 2014 used installation photographs and other images not containing *Rastajay92*. (Def. SUF ¶ 81.)

### C.  Specialty Works

The three custom Specialty Works were made available to specific buyers after September 26, 2014. (Def. SUF ¶ 88.) The first Specialty Work was sold to the buyer on or before October 2, the second on or before October 22, and the third was sold to Maxwell by November 4, 2014. (Def. SUF ¶¶ 88-91; Appleton Decl. Ex. 76 at 9.) These works never appeared in a Gagosian Gallery exhibition nor were they displayed with or near *Rastajay92*. (*Id.* ¶ 92.) It is possible that their buyers were exposed to *Rastajay92* through the aforementioned channels, as well as an October 6, 2014 art blog post on Widewalls[6] that included an image of *Rastajay92* (Def. Reply to CMF ¶ 43), but there is no proof in this record to that effect.[7] In addition, at least nine articles were written about the *New Portraits* works after September 30, 2014 that used photographs of the installation and other images not containing *Rastajay92*. (Def. SUF ¶ 82; Appleton Decl.

---

[6] Plaintiff's expert Holzen proffered that "a number of different art blogs and bloggers generally [] discuss and reference the exhibition and [*Rastajay92*]" but was unable to identify any particular post, so this Court gives this conjectural testimony no weight. (Def. CMF Reply ¶ 43.)

[7] Although plaintiff's expert Stephen Holzen identified a television segment on MSNBC that allegedly included images of *Rastajay92* without identifying a date but which defendants have conceded may have aired in 2015 (Def. Reply to CMF ¶ 43), and though seven of the *New Portraits*, including *Rastajay92*, were displayed on a June 2015 billboard that Prince posted on the West Side Highway in New York City for one month (*Id.* ¶¶ 37-38), purchasers of the Other Works were not exposed to these forms of promotion before they made their purchases.

Exs. 63-69.)

## II.  SUMMARY JUDGMENT STANDARD

Pursuant to Federal Rule of Civil Procedure 56(a), "[s]ummary judgment may not be granted unless there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Island Software & Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 260 (2d Cir. 2005); *see also Edwards by Edwards v. City of New York*, No. 15-cv-3637 (SHS), 2019 WL 3456840, at *5 (S.D.N.Y. July 31, 2019) (citing Fed. R. Civ. P. 56(a)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "When considering a motion for summary judgment, a court must construe the evidence in the light most favorable to the nonmoving party, drawing all inferences in that party's favor." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005). However, "[t]o defeat summary judgment . . . nonmoving parties 'must do more than simply show that there is some metaphysical doubt as to the material facts,' and they 'may not rely on conclusory allegations or unsubstantiated speculation.'" *Id.* at 554 (citations omitted).

## III. DISCUSSION

### A.  Plaintiff Is Not Entitled to Indirect Profits from the Gagosian Defendants' Sales of the Other Works

Pursuant to 17 U.S.C. § 504(a), "an infringer of copyright is liable for either 1) the copyright owner's actual damages and any additional profits of the infringer, as provided by subsection (b); or 2) statutory damages, as provided by subsection (c)." Subsection (b) of section 504 states:

> The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages. In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to

> prove his or her deductible expenses and the elements of
> profit attributable to factors other than the copyrighted work.

Graham seeks the Gagosian Defendants' profits as alleged infringers under section 504(a)(1), as defined by subsection (b). It is therefore incumbent on Graham as the copyright owner to submit evidence of the infringer's gross revenue properly limited to that which is "reasonably related to the infringement." *On Davis v. The Gap, Inc.*, 246 F.3d 152, 160 (2d Cir. 2001), *as amended* (May 15, 2001). For example, in *On Davis*, The Gap used a photograph of an individual wearing Davis's copyrighted eyewear in a widely circulated Gap ad. *Id.* at 157. To support his claim to infringer's profits, Davis presented evidence of the annual "realized net sales of the corporate parent of the Gap stores" over the years including and after the ad was published. *Id.* at 159. The district court granted summary judgment dismissing Davis's claims for infringer's profits because Davis had "failed to show any causal connection between the infringement and the defendant's profits." *Id.* The Second Circuit affirmed, determining that "the statutory term 'infringer's gross revenue' should not be construed so broadly as to include revenue from lines of business that were unrelated to the act of infringement." *Id.* at 160.

Even "constru[ing] the evidence in the light most favorable to the nonmoving party, drawing all inferences in that party's favor," *Edwards*, 2019 WL 3456840, at *5, no reasonable jury could find that the Gagosian Defendants use of *Rastajay92* had a causal connection to profits earned from the sale of the Other Works.[8]

### 1. **Rastajay92** *is not contained within the Other Works*

First, the Court rejects Graham's contention that his claim to the Gagosian Defendants' profits earned from the sales of the Other Works is similar to a claim to profits from sales of an anthology of poems *containing* an infringing work. *See On Davis*,

---

[8] The other form of indirect profits alleged by plaintiff is financial benefits "from the publicity and notoriety [defendants] received as a result of the Exhibition" (ECF No. 30, Plaintiff's Corrected Amended Complaint ¶¶ 78, 84), which defendants seek to dismiss on this motion because plaintiff has shown no causal connection between the infringement and any such financial benefits. (ECF No. 141, Defendants' Memorandum of Law in Support of Motion for Partial Summary Judgment ("Def. Mem.") at 19.) In light of plaintiff's lack of response to this contention in its brief or in its response to defendants' statement of undisputed facts (Pl. Reply to SUF ¶¶ 148-151), and the complete lack of evidence in this record to support such an award, the Court also dismisses plaintiff's claim to financial benefits from the publicity and notoriety the Gagosian Defendants received as a result of the Exhibition.

246 F.3d at 160.

"Depending on how attenuated profits are from the infringing act, an infringer's profits may be direct or indirect. Direct profits arise from the sale of the infringing good. Indirect profits are 'derived from the use of the copyrighted work to promote sales of other products.'" *Structured Asset Sales, LLC v. Sheeran*, 632 F. Supp. 3d 192, 200 (S.D.N.Y. 2022) (citations omitted), *reversed on reconsideration on other grounds*, No. 18-cv-5839, 2023 WL 3475524 (S.D.N.Y. May 16, 2023); *see also Mackie v. Rieser*, 296 F.3d 909, 914 (9th Cir. 2002) (defining "'direct profits'—those that are generated by selling an infringing product—and 'indirect profits'—revenue that has a more attenuated nexus to the infringement" but recognizing section 504(b) does not differentiate between them on its face); *Semerdijan v. McDougal Littell*, 641 F. Supp. 2d 233, 248 (S.D.N.Y. 2009) (distinguishing between claims for indirect profits that involve a "more attenuated causal link between infringement and a defendant's revenues where the copyrighted work is not part of the product sold" and direct profits claims in which the "infringing use of a copyrighted work in a product for sale can cause revenues by increasing the value of the product for sale."); *Bergt v. McDougal Littell*, 661 F. Supp. 2d 916, 927 (N.D. Ill. 2009) (defining profits from sales of textbook, the "product containing the copyrighted work," as direct because infringing painting "forms an integrated component of the textbook.").

The Other Works are not a "product containing" *Rastajay92*. Plaintiff's contentions to the contrary ignore the reality that each of the *New Portraits* was sold as a discrete and separate item, totally independently of each of the others and of the sale of *Rastajay92*. Unlike the court's anthology analogy in *On Davis* or the infringement in *Bergt* in which the infringing work "forms an integrated component of" the product for sale, *Rastajay92* was priced separately and yielded easily discernible profits standing alone.

2. *Plaintiff fails to show that the Gagosian Defendants' revenues from the Other Works are attributable to the infringement*

Summary judgment in favor of a defendant on an indirect profits claim is properly granted when the plaintiff "fail[s] to show any causal connection between the infringement and the defendant's profits." *On Davis*, 246 F.3d at 159; *see also Mackie*, 296 F.3d at 915–16 ("[T]o survive summary judgment on a demand for indirect profits

pursuant to § 504(b), a copyright holder must proffer sufficient non-speculative evidence to support a causal relationship between the infringement and the profits generated indirectly from such an infringement."). "A copyright owner bears the initial burden of demonstrating a causal nexus between the infringement and the appropriate gross revenues." *Complex Sys., Inc. v. ABN Ambro Bank N.V.*, No. 08-cv-7497, 2013 WL 5970065, at *3 (S.D.N.Y. Nov. 8, 2013). "The requirement of a 'causal' nexus" between the profits of the infringer and the infringement "—versus some non-causal 'connection'—is rooted in the text of the statute itself[.]" *Id.* "'Such an approach dovetails with common sense—there must first be a demonstration that the infringing act had an effect on profits before the parties can wrangle about apportionment.'" *Id.* (citing *Mackie*, 296 F.3d at 915).

It is true that "[o]nce a copyright owner has demonstrated a sufficient causal nexus between the infringement and the appropriate gross revenues, the burden shifts to the infringer 'to prove its deductible expenses and elements of profits from those revenues attributable to factors other than the copyrighted work.'" *Complex Sys., Inc.*, No. 08-cv-7497, 2013 WL 5970065, at *3. But "'the statute does not exempt the copyright plaintiff from the requirement of Rule 56 that he respond to a properly supported motion for summary judgment by setting forth specific facts showing that there is a genuine issue for trial.'" *Semerdijan v. McDougal Littell*, 641 F. Supp. 2d 233, 246 (S.D.N.Y. 2009) (quoting *Bouchat v. Balt. Ravens Football Club*, 346 F.3d 514, 522 (4th Cir. 2003)). "If the plaintiff fails to respond with such evidence—'whether that failure is due to the absence of any conceivable connection between the infringement and the claimed revenues, or instead simply due to the plaintiff's inability to muster nonspeculative evidence in support of the alleged causal link—then summary judgment may properly be awarded to the infringer with respect to part or all of the contested revenues.'" *Id.* "'Because of the at-best highly speculative nature of all indirect profits claims' . . . the decision to 'send[] such claims to a jury should be extremely rare.'" *Int'l Bus. Machs. Corp.*, No. 10-cv-128, 2013 WL 1775437, at *3 (S.D.N.Y. Apr. 25, 2013) (citing 6 William F. Patry, *Patry on Copyright* § 22:131 (2010)).

"[M]odern cases 'more frequently deny profits' earned from advertising that incorporates infringing copyrighted material." *Bayoh v. Afropunk LLC*, No. 18-cv-5820, 2020 WL 6269300, at *7 (S.D.N.Y. Oct. 26, 2020) (citing 4 Nimmer on Copyright § 14.03 (2019)). In cases in which the evidence was sufficient for a reasonable jury to conclude

that profits from non-infringing products were causally connected to allegedly infringing works, evidence was presented showing that the infringing work contributed to an increase in value of, or increase in decisions to buy, the non-infringing products. *See Semerdijan*, 641 F. Supp. 2d at 248 (noting that "[c]ourts' use of the decision to buy inquiry reflects the more attenuated causal link between infringement and a defendant's revenues where the copyrighted work is not part of the product sold.") For example, in *Laspata DeCaro Studio Corporation v. Rimowa GMBH*, No. 16-cv-934, 2018 WL 3059650 (S.D.N.Y. June 20, 2018), the luggage brand Rimowa featured allegedly infringing photos prominently in its advertising and on the cover of its "lookbook" (a collection of photographs assembled for marketing purposes) used for marketing its luggage, *id.* at *1-2, and the plaintiff introduced evidence of Rimowa's increased luggage sales revenues during the year the infringing images were published and circulated. *Id.* at *7. That court found these revenues were sufficiently related to the infringement based on evidence presented by the plaintiff that Rimowa issued a press release that year crediting the lookbook in part for the company's substantial increase in sales. *Id.* The court also highlighted the prominence of the infringing image in Rimowa's advertising that year: "[t]he images appeared internationally in stores, billboards, advertisements in print and online publications and Rimowa's website," and "[t]hat year, images . . . including at least two of the allegedly infringing photographs, were the only promotional images Rimowa used in all advertising worldwide." *Id.*; *see also Andreas v. Volkswagen of Am., Inc.*, 336 F.3d 789, 796-97 (8th Cir. 2003) (reinstating jury award of Audi's profits on sales of the TT coupe model because the "infringement was the centerpiece of a commercial that essentially showed nothing but the TT coupe.").

Graham has presented nothing comparable here. Defendants have never credited *Rastajay92* for the success of their sales of the Other Works, nor did *Rastajay92* figure prominently in defendants' promotion of the Other Works. Indeed, *Rastajay92* was only one work of the 77 works that comprise the Original Works, the Secondary Works, and the Specialty Works. As set forth above, relative to the total amount of promotion for the 77 works, there was precious little that included *Rastajay92*, and none that did so prominently. (Def. SUF ¶¶ 61-65; 81-82.) Moreover, the profits gleaned from the sales of the Other Works largely pre-dated the limited *New Portraits* Exhibition publicity that contained images of *Rastajay92*. *See supra* Section I.

While it is nonetheless possible that some buyers may, as plaintiff alleges, have seen

*Rastajay92* before purchasing Other Works, plaintiff has not shown a causal connection between patrons seeing *Rastajay92* and deciding to purchase a different *New Portrait*. Far from crediting *Rastajay92* for the success of its sales of Other Works, defendants have presented convincing evidence that buyers who purchased the Other Works were likely interested in those works for reasons unrelated to their minimal association with *Rastajay92*, such as the buyers' interest in owning a work by a well-known and controversial artist such as Richard Prince. (Def. SUF ¶¶ 1-6, 17, 145); *see Rogers*, 960 F.2d at 313 ("These 'elements [of profit attributable to factors other than the copyrighted work]' may include Koons' own notoriety and his related ability to command high prices for his work" and collecting cases). Yet another factor is the buyers' previous connection with the Gagosian Gallery, Prince, or the particular work offered. (Def. SUF ¶ 109.)

Still other factors that might have compelled these buyers include, importantly, the image featured in the work (Appleton Decl. Ex. 83 (Holzen Reply Report) ¶ 95; Def. SUF ¶¶ 89-90), the work's inclusion of a popular social media application interface, or what the buyer perceived to be a unique artistic message contained in the work; there are innumerable other factors to account for these buyers' decisions to buy one of the *New Portraits* that are totally unrelated to having possibly seen *Rastajay92* at some point before deciding to purchase a different work. *See, e.g., Mackie*, 296 F.3d at 916 (affirming summary judgment dismissing indirect profits in part because "[i]ntuitively, we can surmise virtually endless permutations to account for an individual's decision to [purchase the product advertised by the infringing artwork], reasons that have nothing to do with the artwork in question."). Indeed, Mr. Gagosian himself, who purchased two of the Other Works, states that viewing *Rastajay92* had no effect on his decision to purchase them (Def. SUF ¶ 106), and Maxwell, the Gagosian Gallery employee who also purchased two of the Other Works, made a similar statement (Def. SUF ¶¶ 93, 107.)

The evidence presented here is more comparable to that which was presented at trial in *Mannion v. Coors Brewing Company*, 530 F. Supp. 2d 543 (S.D.N.Y. 2008). There, defendant advertising agency CHWA was paid $1.25 million by co-defendant Coors to deploy a multi-pronged ad campaign which included the infringing image on a single billboard, and the plaintiff presented evidence of Coors's gross revenues during the years before, after and including the year the billboard was published, as well as a proposed formula for discerning what portion of those revenues was attributable to the

infringement. *Id.* at 546-47. The jury declined to award any profits reaped by Coors from its use of the billboard in light of its assessment of the "significance of the infringing image to the one billboard design in which it was used, the scant evidence of actual display of the billboard containing the infringing image, the relatively small part that outdoor advertising played in the African-American marketing plan for 2002, and the relatively small part that the African-American marketing plan played in the overall marketing of Coors Light[.]" *Id.* at 551. *Rastajay92*'s similarly limited presence in Gagosian Gallery's overall advertising and promotions of the Other Works prohibits an award to Graham of profits earned by the Gagosian Defendants from the sale of those works. To the extent that Gagosian Gallery *did* "receive gross revenues from the sale of a product containing or using the infringing image," *id.*, that revenue is properly limited to what it received from the sale of *Rastajay92* itself.[9]

Given the absence of any proof that any exposure to *Rastayjay92* affected the sales of the Other Works, plaintiff has failed to show a causal connection between the Gagosian Defendants' profits from the sales of Other Works and the alleged infringement of *Rastafarian Smoking a Joint*. As a result, defendants' motion for partial summary judgment in their favor is granted with respect to Graham's claim for the Gagosian Defendants' profits from the sale of *New Portraits* works other than *Rastajay92.*

### B.  Plaintiff Is Not Entitled to Recover "Unrealized Profits" from Mr. Gagosian's Ownership of *Rastajay92*

The record on this matter reflects that Mr. Gagosian has not sold *Rastajay92* since his purchase of it, nor has he offered it for sale. (Def. SUF ¶¶ 117-18.) Graham argues that he can recover profits attributable to the infringement that Mr. Gagosian has "earned" but not yet realized through his purchase and ownership of *Rastajay92* due to Graham's copyright of the image contained in the work.

The disgorgement of "unrealized profits" proposed by Graham is a remedy with scant precedent to support it. Graham's theory is that an infringer is required to disgorge profits that have not yet been realized because if the infringer were to sell the infringing work, he might earn a profit upon the sale. Plaintiff cites three out-of-circuit

---

[9] Here, there is no evidence that Gagosian Gallery sold advertising containing an infringing work, as CHWA did; its "gross revenue from the sale of a service containing or using the infringing image" is clearly defined and limited to the revenue earned from its sale of *Rastajay92*.

district court cases from almost 20 years ago in support of this remedy that have not been followed by any other court since, and each of the three specifically concern the infringement of architectural plans by infringers who constructed property built in accordance with those plans, and the availability of would-be profits on the sale of that property to the plaintiff prior to the actual sale of the property. *See Associated Residential Design v. Molotky*, 226 F. Supp. 2d 1251, 1256 (D. Nev. 2002); *Van Brouck & Assocs., Inc. v. Darmik, Inc.*, 329 F. Supp. 2d 924, 937 (E.D. Mich. 2004); *William Hablinski Architecture v. Amir Constr. Inc.*, No. 03-cv-6365, 2004 WL 4909902, at *2 (C.D. Cal. Dec. 27, 2004).

Here, the allegedly infringing item – *Rastajay92* – *has* been sold, and defendants do not appear to contest that Graham would be entitled to the $21,600 in realized profits that Gagosian paid to Prince to purchase *Rastajay92*, should that work ultimately be found to be infringing. (Def. Mem. at 3; Def. SUF ¶ 50.) But Graham claims that *Rastajay92* has appreciated in value, such that if Mr. Gagosian were to sell *Rastajay92* now, Graham would be entitled to at least a portion of that increase in value.

The Court finds that as a matter of law, Graham is not entitled to recover unrealized profit that Mr. Gagosian could theoretically earn on the resale of *Rastajay92*.[10] To recover infringer's profits, plaintiff must produce evidence of gross revenue reasonably related to the infringement, and Graham has not proffered evidence that Mr. Gagosian has earned revenue from his ownership of *Rastajay92*. Graham has pointed to no cases that have awarded profits on works not yet sold outside of the specific context of infringing architectural plans, and even in that context, some courts have declined to take this approach. *See, e.g., Ocean Atl. Woodland Corp. v. DRH Cambridge Homes, Inc.*, 262 F. Supp. 2d 923, 928 (N.D. Ill. 2003); 6 *Patry on Copyright* § 22:123 (noting of *Van Brouck* that "of course, absent sale of the house, there was no benefit and therefore no award should have been made").

The Court declines to extend the unique line of cases cited by plaintiff beyond its cabined context to award unrealized profits to Graham here.

---

[10] Defendants' argument that Graham cannot claim both unrealized profits from the work as well as disgorgement of the work itself does not speak to whether, as a matter of law, Graham can recover unrealized profits, because Graham is permitted to present alternative remedies. *See Colon v. City of New York*, No. 11-cv-0173, 2014 WL 1338730, at *11 (E.D.N.Y. Apr. 2, 2014) ("As the Second Circuit has long held, a plaintiff can proceed to trial on all viable theories of recovery and submit alternative claims to the jury.")

13

## IV. CONCLUSION

For the reasons set forth above, the Gagosian Defendants' motion for partial summary judgment is granted. Plaintiff Donald Graham may recover neither the Gagosian Defendants' profits from the sales of the Other Works in Prince's *New Portraits* series nor any unrealized profits on a hypothetical resale arising out of Lawrence Gagosian's ownership of *Rastajay92*.

Dated:  New York, New York
        September 11, 2023

                        SO ORDERED:

                        Sidney H. Stein, U.S.D.J.